GERMAN N. JORDAN v. BENJAMIN ROACH et al.

1. DEFINITE FAILURE OF ISSUE.—The Statute of this State, of the 18th of June, 1822, (Hutch. Code, 610, § 26,) on the subject of contingent limitations in deeds and wills, depending on the dying of any person without heirs or issue, &c., has the effect to make such limitations depend on a definite failure of issue, unless a contrary intention is expressly and plainly declared on the face of the will or deed.

2. ESTATE TAIL: DETERMINABLE FEE: REMAINDER, AND EXECUTORY DEVISE.—There is a well settled distinction between the case of a devise to one *and the heirs of his body*, with a limitation over, on the death of the first taker without issue living at his death, and that of a devise to one and *his heirs generally*, with a limitation over, depending on the death of the first taker without issue living at his death. In the former case, the estate of the first taker is an estate tail, with a *remainder* depending on an event, which is the natural termination of the first estate. In the latter case, by force of the general term *heirs*, the estate of the first taker is a fee, determinable by an event which defeats it, with an *executory devise* depending on that event.

R., by his will, devised and bequeathed to his daughter M., real and personal estate, (land and slaves,) in the following words: "To make my intention plain, the property in this, my last will and testament, devised and bequeathed to my daughter, is for her sole and separate use and behoof and her heirs forever; but should she die without issue, or if her child or children surviving her, should die before arriving at the age of twenty-one, then the estate herein devised shall revert to my other children and their heirs, share and share alike, according to the law of this State." *Held*, that M. took an estate in fee, determinable by the happening of a specified event, and that the limitation to the "other children" was an executory devise.

The two contingencies specified, to wit: the death of M. without issue, and VOL. III.—31

the death of her child or children before arriving at the age of twenty-one, are distinct and independent. The first, by force of the rule of construction, introduced by the 26th section of the Act referred to, points to a definite failure of issue, to wit: at the death of M.; but the second refers to an event which might not happen within the time allowed by the common law for executory devises.

The death of *issue* under twenty-one years, does not import a definite failure of issue, or a failure of issue within that period. It is otherwise when there is a limitation over, depending on the death of a *particular individual* under twenty-one years, without issue, because ·in the latter case the contingency must happen, if at all, within the compass of twenty-one years.

The words "child or children," as they stand in the clause of the will above quoted, are *synonymous* with the term issue in the same clause, and include lineal descendants in the remotest degree; and the words "surviving her," in the connection in which they are used, mean nothing more than what would have been implied from the limitation itself, "if she died leaving issue."

The paramount intention of the testator, according to a fair construction of the will, was, that the limitation over to his "other children," should not take effect short of an extinction of the issue of his daughter; and this intention might be defeated, by confining the word issue to the specific individuals who might be in existence at her death. It would exclude the issue of the issue, or the grand-children of M. born after her death. Such a contingency is within the ordinary range of human probabilities. M., herself, died under twenty-one, leaving issue.

It cannot be supposed that the testator intended to make a distinction between his daughter's lineal descendants, standing in the same relation to himself, and consequently the word "issue" must be understood to refer to a class or denomination of persons to take in succession, any one of whom arriving at the age of twenty-one years, would be entitled. Hence, if M. should die, leaving issue, and such issue should die under twenty-one years leaving issue, although they might die under that age, the contingency on which alone the limitation could take effect, to wit: the extinction of the issue of M., might not happen within twenty-one years after her death, and is therefore void on the principles of the common law, and must be so declared, unless a limitation upon such a contingency is authorized by the legislature of this State.

3. THE ACT OF THE 13TH JUNE, 1822, CONCERNING CONVEYANCES.—As early as 1807, all the statutes of England and Great Britain not re-enacted here, were, by express legislative enactment, excluded from operation within the territory of Mississippi. Hutch. Dig. 65. Consequently, when the Act of June 13th, 1822, concerning conveyances, was passed, neither the statute "*de donis conditionalibus*," nor the Statute of Wills of Henry VIII., was in force in this State, and the doctrines in regard to estates tail and executory devises, engrafted on these statutes by the courts, never had an existence here by any express or positive legislative enactment.

Nevertheless, it is apparent that the 27th section of the Act referred to, proceeded upon the supposition that it was competent for testators to limit estates, by way of executory devise. The intention of the legislature, however, was

not to relax the rule of the common law as to perpetuities, and the effect of the provision was simply to destroy one of the recognized distinctions between a remainder and an executory devise.

The 26th section of the Act was intended simply to fix the meaning of certain words in common use, and not to authorize new limitations upon contingencies not warranted by the common law.

Whether the 24th section of the Act is to be regarded as designed to abolish estates tail, and to impose a rule to cut off perpetuities of all kinds, or as merely intended to abolish conditional fees, as known at common law, or to enlarge them into absolute fees, the result is that, since its passage, no conditional fee can be created, and that neither before nor since, could estates tail be limited.

At common law, unless the donee, after issue born, exercised the power to alienate the estate, it would descend to his lineal heirs as a conditional fee, with a right of reverter in the donor, upon the failure of the issue of the donee at any time, if no alienation took place; and this right to the reversion continued in him and his heirs, whether it was expressly reserved or not. And if the 24th section was designed to affect conditional fees only, it converts them into absolute fees, thereby making the estate in the donee descendible to all his heirs, and destroying the donor's reversion.

The proviso to that section, if so construed as to allow a conditional fee to be limited to the "remainderman" and the heirs of his body, with a reservation of the reversion to the right heirs of the donor, would defeat the main object of the statute, which was to convert the estate of the donee into an absolute fee-simple, with unrestricted power of alienation. That section abolishing entails, and by its proviso authorizing a limitation to a succession of donees then living, and to the heir or heirs of the body of the remainderman, and in default thereof, to the right heirs of the donor, must be regarded as being designed to abolish *estates tail*, which the legislature supposed were sanctioned by law; and so regarding it, the object of the proviso was not to allow an estate tail to be limited by conveyance or devise, either directly to one, or after a particular estate to one in remainder; for this would result in one of two things; either the general provision of the statute would convert the estate so limited into an absolute fee, which would render the proviso nugatory, or an estate tail of indefinite duration would be created, which would defeat the manifest object of the general provision. Whatever estate the "remainderman" may take under this proviso, it cannot be an estate of inheritance, and the heirs of his body would take by purchase, and not by descent.

The object of the statute was, by converting estates tail into estates in fee-simple, to withdraw restraint on alienation, and to restrict the power which most persons are prone to exercise, to direct the descent, and provide for the enjoyment of their estates after they have ceased to exist.

Apart from the proviso, the power to control the disposition of his property, and to restrict the right of alienation, is bounded by the time when the owner shall cease to live, or at which he has parted with his estate; but the legislature wisely thought that the right of alienation might, consistently with sound policy, be suspended for a limited period of time, after a person has, either by deed or devise, divested himself of his estate, and has accordingly fixed that

limit *to life or lives in being;* giving to the donor or devisor the power to limit the ultimate fee to the heirs of the body of the remainderman, and in default thereof to his own right heirs.    Within this limit, the partial interests or particular estates given to the successive donees, may be, without doubt, created by deed, or limited by executory devise.

It may with certainty be affirmed, that there is nothing in the proviso, or upon the face of the statute, or within its equity, nor any consideration arising from the policy indicated by the law, from which the authority can be inferred to limit an estate upon a contingency, which is not to happen within the compass of the time prescribed by the proviso to the 24th section of the statute.

When we assert the want of power, we decide upon the invalidity of the grant or devise, and if we test the validity of the limitation in question by the provisions of the statute, it is seen clearly, that it is not only unwarranted by it, but repugnant to the obvious policy of the law.

This court has recognized the validity of executory devises, in respect to both personal and real estate, in *Carrol* v. *Renich*, 7 S. & M. 798; *Kirby* v. *Calhoun*, 8 Ib. 462; and in *Lambden* v. *Rucker*, 12 Ib. 230; but in neither of these cases was it held that broader limits were allowed for executory devises than the boundaries fixed by the proviso to the 24th section.

Appeal from the Superior Court of Chancery.    Hon. Charles Scott, chancellor.

The bill in this case was filed by the children of Benjamin Roach, Sr., deceased, (one of whom was also executor,) against German N. Jordan, the surviving husband of Mary Roach, to recover from him about thirty slaves, and a tract of land, containing about 1500 acres; and also to have the right of the complainants established to all the property remaining in the hands of the executor for distribution, and which, by the terms of the will, was to be distributed when the youngest of the complainants should become of age.

It appeared from the bill, that the said Benjamin Roach, Sr., died in the year 1847, having first made and published his last will and testament, which was, after his death, duly probated in the Court of Probates of Adams county, in this State.    The testator, after making several specific bequests, by the fourth clause of his will, devised and bequeathed to his five children, (the complainants and said Mary,) all the residue of his estate, consisting of a very large amount of real and personal property, bank stock, and choses in action, "to have and to hold, share and share alike, to them and their heirs forever, subject only to the conditions and limitations as to distribution, &c., as are hereinafter mentioned."

The 5th clause directed that his four plantations should be kept up and cultivated by his executors, and that the money arising from that source should be invested in slaves, until a final distribution of his estate should take place.  By the 8th, 9th, and 10th, he provided for an advancement to be made by his executors to his sons, as they should respectively arrive at the age of twenty-one years.    By the 11th clause he provided for a similar advancement to be made to his daughter Mary, when she should arrive at full age, or marry ; and he also directed as follows :—" Provided, that in case my daughter should marry, all the property she may then receive, and also on the final distribution, is limited to her sole and separate use, free from any control or liability for the debts of her husband.

" To make my intention plain, the property in this my last will and testament, devised and bequeathed to my daughter, is for her sole and separate use and behoof, and her heirs forever ; but if she should die without issue, or if her child or children, surviving her, should die, and before arriving at the age of twenty-one, then the estate herein devised shall revert to my other children, and their heirs, share and share alike, according to the law of distribution of this State."

By the 13th clause of his will, he provided that when his youngest child arrived at full age, a final distribution of his estate should be made " among all his (my) children, share and share alike, the division to be made in the manner prescribed by law."

His daughter Mary, in 1853, intermarried with the defendant, German N. Jordan.  Upon her marriage, the executors of said Benjamin Roach, Sr., in accordance with the provisions of his will, advanced to her thirty slaves, and a plantation containing about 1500 acres of land, and also all necessary farming utensils, stock, &c.

In the year 1855, and before she arrived at the age of twenty-one years, the said Mary died, leaving issue, two children, who survived her about thirty days.

The defendant, Jordan, filed a demurrer to the bill, which being overruled by the chancellor, he appealed.

*W. P. Harris,* for appellant.

Benjamin Roach, by his will, devised and bequeathed certain property, consisting of lands and slaves, and other personalty, to his daughter Mary, in these words :—" To make my intention plain, the property in this my last will and testament, devised and bequeathed to my daughter, is for her sole and separate use and behoof, and her heirs forever ; but if she should die without issue, or if her child or children, surviving her, should die, and before arriving at the age of twenty-one, then the estate herein devised shall revert to my other children and their heirs, share and share alike, according to the law of distributions of this State."

The testator had five children, to whom he gave the bulk of his property, and provided for the final distribution of it, when the youngest child should attain the age of majority, and directed that, in the mean while, as the male children respectively attained the age of twenty-one years, a certain portion of the property should be advanced to each, and that when his daughter Mary arrived at full age, or married, a certain portion of the property should be advanced to her ; the amount so advanced to be charged against them, &c.    The testator died in the year 1847 ; and after his death, his daughter Mary married the appellant, Jordan, and, according to the directions of the will, received a certain portion of the property, consisting of land and slaves, stock, &c., &c.    Mary died, after having given birth to two children, twins, who survived their mother but a few days.    The property advanced remains in the possession of her husband, the appellant, who claims the same, as the heir of his children.    The executors of Roach are seeking to recover the property, basing their claim upon the ground, that as the children of Mary did not attain the age of twenty-one years, the property reverted, in the language of the will, to the " other children" of the testator, and must await, in the hands of the executors, the event on which final distribution is directed to take place by the will, which event has not yet arrived.

The case thus stated, raises the question, whether or not the limitation to the " other children" of the testator took effect as a valid limitation ; and to determine this, we must first ascertain what estate Mary took under the will.    If she took an estate tail, whether it be an estate tail proper, or upon condition, or a qualified estate tail, or an estate tail determinable on a collateral event, our

statute enlarged it into a fee simple, pure and absolute, to the *destruction* of the subsequent limitation. But if Mary took a *fee simple,* determinable on a collateral event, then the question arises, whether the subsequent limitation was valid, and took effect as what is termed an executory devise; and this question involves the further question, whether executory devises exist here, and if so, to what extent, and under what restrictions. Do they exist here on the footing of executory devises, as known in the jurisprudence of England, or are they affected by the proviso to the 24th section of the Act of 1822, on the subject of estates, &c. ? Hutch. Code. 609, § 24.

It may be as well to observe, at the outset, that there may be estates tail upon condition subsequent, or estates tail determinable, and estates tail qualified. Fearne on Remainders, 428 ; 2 Preston on Estates, 295, 296 ; and that such estates were subject to be barred by the common recovery, which worked the destruction of all conditions and subsequent limitations; and further, that our statute, before cited, makes no distinction between the different kinds of estates tail, and is as comprehensive as the common recovery.

These remarks are made to qualify the assertion often repeated, that it is of the essence of an *estate tail,* that there should appear to be an intention to continue it to the lineal descendants *to the remotest generation*—an assertion which seems to imply, that when there is a provision for its possible termination short of a general failure of issue, it is not an estate tail.

In this connection, it may be as well also to state, that where an estate tail is created, with a limitation over, which is to take effect on the "failure of the issue" of the donee in tail, such limitation must of necessity be a *remainder* and not an *executory devise ;* and that the addition of the words "living at the death" of the donee in tail, has no other effect than that of making the *remainder contingent.* The introduction of such words does not affect the *first estate.* It is important that we should know the force and effect of the words "living at the death," before we undertake to deal with them; for it would seem, that they are thought to have the effect of *changing the character of the first estate.* Mr. Fearne, at pages 427-8, speaking of *limitations*

depending on the dying of the tenant in tail *without issue living at his death*, says:

"They seem in fact not to differ from remainders as they are taken up from an event, which is in itself a *regular determination of the estate tail*, to wit: the death of the tenant in tail without *leaving issue then living*, so that the express declaration, that the estate tail shall cease, determine, or become void *in such an event*, being no more than what is involved in the very nature of the estate itself, is in strictness a mere nullity, and the *ulterior limitation not operating in any degree to abridge or interfere with the estate tail, or accellerate its determination* may well be considered a *remainder*, not vested indeed because confined only to the event of the estate tail determining by the decease of the tenant in tail leaving no issue then living, but contingent on that event;" and he concludes by saying that such ulterior limitations are subject to be barred by common recovery.

Again at page 6, of the same author, Mr. Butler, the annotator, says: " an estate tail expires whenever there is no issue inheritable .to it; now that failure of issue may take place at one particular time or another; if, therefore, lands be limited to A. and the heirs of his body, and if A. die without leaving issue of his body *living at his death*, to C. in fee, the failure of issue of A. may take place on the death of A. or at a subsequent time.

" In the proposed case it is intended that if the estate tail expire in consequence of there being no issue inheritable to it at A.'s death, C. shall have the land; but that if it expire in consequence of such issue being alive at the death of A. and afterwards failing, C. shall not have the land; now during A.'s life it is uncertain in which of these modes the estate tail will expire, the *remainder*, therefore, evidently depends upon the contingent determination of the preceding estate."

The object of these quotations is to settle beyond dispute that, in determining whether an estate in a given case, is or is not an estate tail, the words "living at the death," &c., cannot be invoked as a test; nor can they be invoked, as indicative of *an intention* not to create an estate tail; because their effect is to change the character of the ulterior limitation only, and that change is not from a vested remainder to an executory devise, but to a contin-

gent remainder.  They do not interfere with, abridge, or accellerate the determination of the first estate.

Some have gone so far as to say, that the introduction of such words, prevents the creation of an estate tail; but it is settled beyond a doubt, if reason and authority can settle it, that these words do not convert an estate tail into an estate of a different kind, nor a remainder into an executory devise.  3 Lomax, Dig. 210; 2 Jarman on Wills, 329, 330, 358, 359; *Richard* v. *Bergaveney*, 2 Vernon, 324; *Clifton* v. *The University of Oxford*, 1 Eden, 473; 6 Cruise, Dig. title Devise, 258; 4 East, 313.

These authorities are decisive.  When we analyze the words in question, and remember Mr. Fearne's observation that the limitation over coupled with such words, does not alter, abridge, or interfere with the estate tail, it becomes obvious, that such limitation cannot be a springing or shifting use if created by deed, nor an executory devise if created by will—nor any thing but a remainder after an *estate tail*.

We are now enabled to assert, that in cases where an estate tail is created by the technical words known to the common law, or where other words are employed, but the *intention*, nevertheless, is manifest to create an estate tail, the introduction of the words "living at the death," &c., has no bearing upon the question as to the true character of the estate; and it matters not whether these words are introduced by the deed or will itself, or are supplied by a *statutory* rule of *construction*.  It may be asserted also, that adding the words " or if such issue shall die before they attain the age of twenty-one years," does not control the previous general expression " die without issue."  According to the authorities, the former words are a " *limited portion* of the contingency," expressed by the general words " die without issue."  The two expressions together, make one contingency, "compounded of two events, and one being included in the other, is therefore superfluous."  *Grimshaw* v. *Pickup*, 9 Simons, 595; 2 Jarman on Wills, 233; Ib. 429.

The principle established by these authorities results from the following considerations.  In all cases of limitations depending on the dying without issue, as in the case cited from 9 Simons, there is an obvious paramount, general intention, that so long as the

first donee has issue, the limitation over is not to take effect. *There must be an extinction of issue first.* This is the event on which the limitation over depends. If a failure of issue has taken place, then we inquire whether it took place at the time prescribed; and lastly, whether the time prescribed violates the rule as to perpetuities. We are not, therefore, to resort to any construction which would cause the limitation over to take effect while there is issue of the first donee in existence, unless the context indicates an unmistakable intention to the contrary.

In the case cited, this paramount general intention is indicated by the word " heirs," which imports an inheritance, and by the limitation over on the death of the donee without "issue," a word which includes lineal descendants in every degree; and the superadded words " or if such issue shall die under twenty-one years," are not necessarily and obviously in conflict with the general intention. That is, they do not necessarily import that the limitation over is to take effect short of a failure of issue, but may, and to effectuate the obvious general intention must, import a dying of the issue, without issue under twenty-one years. The contingency of A.'s death without issue, we know *includes* the death of the issue of A. without issue. They are parts of the same general contingency, to wit: the extinction of issue. Therefore, to add to this contingency the words, " or if such issue shall die without issue," neither restricts nor enlarges the general words "if A. shall die without issue." The result is not varied by inserting words to protect the minority of the issue. The object of such a provision is clearly to protect minority, and not to cut off heirs or issue.

Therefore to hold that the words " if such issue shall die under twenty-one years," express a separate, independent contingency, and indicate an intention to confine the word " issue" to issue who happen to be in existence at the death of the first donee, cuts off after-born issue.

. For if, in the case cited, A. had left surviving him a daughter, and such daughter had died under twenty-one, leaving issue, her issue would, by this construction, be cut off. This is a common probability, a common incident in human life. It is not to be supposed that the testator intended that grand-children of A. should not inherit. By the use of the word "heirs," and the word "issue,"

both of which comprehend grand-children, he indicates a different purpose. Such an interpretation, therefore, frustrates the general intent, to wit: that the limitation over is not to take effect so long as there is issue of A., and opposes any rational view of what the testator desired.

We are thus enabled to perceive the force of the language of the chancellor in the case of *Grimshaw* v. *Pickup*, to wit: that the dying of the issue of A. under twenty-one years, is but a part of the general contingency of A.'s dying without issue. The adding of such words is " superfluous," as they are included in the previous words. The introduction of such words in cases where an estate tail is created by the words "heirs of the body," have no effect according to the leading case of *Jesson* v. *Wright*, cited with such marked approbation by Mr. Jarman. 2 Jarman on Wills, 279, 280, 281, 290, 291, 292.

The word "issue" is equivalent, in legal extent, to "heirs of the body," though more susceptible of modification "by the context;" yet in the case cited from 9 Simons, the word "issue" is used as qualifying the word "heirs," and the chancellor, as we have seen, held that the added contingency of the death of the issue under twenty-one years, was but a part of the general contingency, having little or no meaning by itself.

We are compelled, therefore, to conclude that such words do not affect the character of the estate in the first donee, nor indicate an intention not to create an estate tail *in him*. They may affect the character of the ulterior limitation by making it a contingent, instead of a vested remainder, but do not alter the estate in the first donee. 2 Jarman on Wills, 292.

The devise in Roach's will differs from that in *Grimshaw* v. *Pickup*, in two respects. In the former the words are, "if her *child* or *children surviving her* shall die, and under twenty-one years;" in the latter the words are, " if such issue shall die under twenty-one."

The words " child or children," however, are synonymous with " issue" in Roach's will. They import the same thing imported by " issue" in the contingency first expressed in the will. We must refer them to the words " issue" and " heirs," previously employed, which words include lineal descendants in every degree.

1st. Because the testator meant, according to the paramount intention disclosed by the words "heirs" and the limitation over on the death of Mary "without issue," that the limitation over should only take effect on the extinction of her issue. 2d. Because, if we give to the words "child or children" their ordinary meaning, a sole surviving grand-child of Mary would be excluded; nay, if we give them such meaning, every purpose which we can rationally impute to the testator would be frustated. Suppose Mary had died leaving grand-children by a deceased child, and a child living at her death, which child died under twenty-one, leaving the grand-child surviving and of full age. ·If the word "children" is to be restricted to its ordinary meaning, the limitation over would take effect to the exclusion of the grand-child who was in being at the death of Mary, and also lived to attain majority. The limitees are already amply provided for, and we cannot suppose that the testator intended to increase their already ample fortune at the expense of his daughter's grand-children. The case of a sole surviving grand-child, dying without issue under twenty-one, illustrates the absurdity of such a construction. In such case the limitation over could not take effect, because it was not the death of a *child* under twenty-one years— and yet there would be an extinction of issue within the limit of twenty-one years. In the case of *Dalzell* v. *Welch*, 2 Simons, 319, a case essentially like this in principle, the vice-chancellor held the word "children" to mean "issue," because, said he, if A. left a grand-child and no child, the grand-child would be excluded. In order, therefore, to prevent the exclusion of objects plainly comprehended in the testator's bounty, to wit, surviving grand-children, we must construe the words "child" or "children" to mean "issue," a term which includes grand-children. 2 Jarman, 355, 356; see the elaborate opinion of Story, J., in 1 Sumner, 359. If we are to construe them to mean issue for one purpose, we must construe them to mean issue for every purpose.

The difference between the two cases then, is reduced to the words "surviving her." · This expression performs one of two offices; it either qualifies the word "issue" in the will, causing that word to mean issue living at the death of Mary, or it has an independent operation upon a substantive contingency, independent of the death of Mary without issue. The reasoning which

we have employed, has shown that the death of issue under twenty-one in such a connection, is not independent of the general contingency of death without issue, but forms part of it; and consequently, to render the words "surviving her" applicable to an independent separate contingency, we would be driven to hold that the words "child or children" do not mean issue, and do not include grand-children—a construction incompatible with the object the testator had in view. The consequence is, that this expression can be invoked only as a qualification of the word "issue" occurring in connection with the death of Mary, causing it to mean "issue" living at her death. The question then arises, of what value is it if it only qualifies the language of a contingency which never happened? Mary left issue living at her death. The qualification is answered, whether we get the qualification from these words or get it from the 26th section of our statute before cited. This minute and (it is feared) tedious examination of the import of the contingency of the death of issue under twenty-one, is intended to show that the introduction of it does not indicate a purpose not to create an estate tail, and that it may be engrafted on an estate tail without affecting such estate by accelerating its determination.

All argument as to the extent to which it qualifies the words "dying without issue," or as to the effect of the statute upon these words is rendered useless by the fact that Mary died leaving issue alive at her death. If we take such contingency as it is expressed in the will of Roach to be a separate contingency and to mean the death of issue who happen to be alive at her death, still it would admit of the exclusion of after-born grand-children of Mary, objects clearly of the bounty of the testator, and within the range of the ordinary probabilities of life. This case differs from that of *Pells* v. *Brown*, in one most important feature. In that case the first donee died without issue living at his death. Here there was issue living at the death of the first donee. The judges in the case of *Pells* v. *Brown*, declared that the effect of confining the "death without issue" to the lifetime of William, who was in being, was to qualify the word "issue," so as to make it import issue living at his, the donee's death, and held that the whole contingency meant the death of Thomas in the lifetime of William, without issue living at his death.

But suppose, as in this case, Thomas had died in the lifetime of William, leaving issue surviving him, but who died in the lifetime of William. The qualification would have been answered. Mr. Jarman, speaking of the case of *Pells* v. *Brown*, says, that the court did not decide what would have been the result in such an event, as the case did not raise the point. But he goes on to say, that the construction which is most consistent with established principles, is to hold that the contingency meant a "general failure of issue," that is, that it points to the death of the donee in the lifetime of William, and the failure of issue at any time either before or after the death of William ; and he, therefore, concludes, that the first donee took an estate tail, and William a *contingent remainder*. 2 Jarman on Wills, 429, 430. · In the same connection he makes the general remark, that "words referring to a failure of issue, are not restricted by the insertion of the contingency of the death of the issue under twenty-one."

We are now enabled to consider the character of the estate which Mary took under the will, with the assurance that there is no peculiar magic in the words "living at the death," &c., or in the contingency of the dying of her child or children under twenty-one, and *that such words may* be engrafted on an estate tail without altering its character, or exempting it from the operations of our statute—the case of *Kirby* v. *Calhoun*, to the contrary notwithstanding.

We must look at what the testator intended. Mary took an estate of inheritance beyond all doubt, it being limited to her and her heirs forever. Her estate, therefore, can in no possible view of it, be regarded as a *life estate*.

Was the estate an inheritance in fee simple, or in fee tail? If it was an inheritance in fee simple, then all her heirs, lineal and collateral, were inheritable to it ; for an estate of inheritance in fee simple, is defined to be an estate descendible to all the heirs of a person, whether lineal or collateral, and the annexing a condition collateral to it, by which it is rendered determinable, does not alter it in that essential feature, to wit : its capacity to descend to all the heirs, both lineal and collateral ; but until the event or condition happens, it will continue to descend to all the heirs. This proposition will not be disputed. 1 Preston on Estates, 445.

It will be found to be impossible to bring the estate *created by the will* within this definition. The rule is well established in regard to wills, that the true test shall be, whether from the whole will the testator intended to restrict the descent of the estate or not. Although the word "heirs," a word which ordinarily and unexplained carries the fee, may be used, yet the inquiry must be, is the descent of the estate restricted or unrestricted, taking the whole will together? If there be a limitation over, engrafted on the first estate, and the language in which such limitation is engrafted be such as to indicate *clearly* a purpose to restrict the descent to the *lineal,* to the *exclusion* of the collateral heirs of the donee or devisee, the first estate is not a *fee simple* of any sort, because the estate has not the capacity to descend to *all the heirs.*

According to the language and provisions of Roach's will, no one can in any possible event succeed to the estate given to Mary, who is not the heir of her body. This is absolutely certain. She took an estate of inheritance and not a life estate; because, it is most obvious, that the estate was intended to be continued beyond her life, and it cannot be a fee simple, because the succession is not general, but limited. 2 Preston on Estates, 395, 396.

It is an inheritance restricted to lineal heirs, and is, therefore, an estate tail. The testator, in conferring this inheritance, did not mean to say, and has not said, that upon her death, any one coming under the general denomination of heir, might take the estate by descent, but only such as were of the issue of her body. This makes an estate tail of necessity.

The words "dying without issue," coupled with a limitation over on that event, have always been held to create an estate tail in the first donee. 1 Cruise, 81; 6 Ib. 250, chap. 12, tit. devise.

And when the limitation over, is to persons who would take as collateral heirs, in the event the donee died without lineal heirs, as in this case, to brothers and sisters, the intention is regarded as so manifest as to exclude all doubt. 2 Preston on Estates, 504, 505, 506, 507; 6 Cruise, 256, 257, tit. devise; *Nottingham* v. *Jennings,* 1 Ld. Ray. 568; *Lee* v. *Brace,* 1 Ib. 101; Fearne on Rem. 466; Jarman on Wills, 237, 238.

It is on the plain principle, that although the word "heirs" generally is used in the first instance, the subsequent language and

provisions show, that by that term, "heirs of the body" only were intended. It is not material what precise words are employed in the creation of an estate tail. If the descent is restricted, it is an estate tail, of necessity. And it may be affirmed positively, that the will restricts the descent, when it confines the descent of the estate from Mary to her issue.

We have seen that the addition of the words, "living at the death," &c., do not abridge, interfere with, or accellerate the determination of an estate tail; hence, the use of these words furnish no evidence of an intention not to create an estate tail, with capacity to continue to the remotest lineal descendants; for a very plain reason. It is involved in the very nature of every estate tail, that if the first donee shall leave no issue surviving him, the estate shall cease; and we have also seen, that a provision that the estate may cease on an event short of its natural expiration, such as the failure to pay money on a particular day, &c., or that it shall cease on the death of the issue under twenty-one years, is not incompatible with an estate tail, because the *capacity* to descend indefinitely to the lineal heirs, remains.

The succession being limited, it cannot be a fee simple : neither can it be a life estate, because, in the language of Mr. Preston, "it is expressly declared that the estate shall have continuance beyond the life of the donee. The issue of Mary could only take by descent, and in the *character* of heirs of her body, which is conclusive as to the character of the estate. They could not take as purchasers, because they were not *in esse* at the date of the will, or at the death of the testator; and they could not take as remaindermen, because it would cut the estate of the mother down to a life estate, against the express declaration of the testator. They could take as heirs only. The words by which an estate tail is created are wholly immaterial, provided the intention is manifest; 'for any words that indicate the testator's intention to restrain the descent of the estate to the lineal descendants of the donee or devisee, will only create an estate tail.' Although a devise to a person and his heirs gives him a fee simple, yet, if the word 'heirs' be qualified by any subsequent words, which show the intention of the testator to restrain it to the heirs of the body of the devisee, they will, in that case, only create an estate tail." 1 Cruise, 81,

title Estate Tail; 6 Ib. 249, 250, title Devise, chap. 12, §§ 1, 7;
*Lyons* v. *Mitchel*, 1 Maddox, 469; 2 Jarman on Wills, 287; 25
Ala. Rep. 285.

It will be perceived, that in considering the character of the
estate given to Mary Roach, the argument has, in the main, been
based upon the nature of the estates in fee simple and in fee tail.
The standard elementary definition of an estate tail, is, that it is
an estate which, by the terms of the deed, or will creating it, de-
scends to the lineal heirs only, of the donee or devisee, and is in-
alienable by him.    I find the estate given to Mary Roach to be an
estate descendible to her lineal heirs only, and inalienable by her;
and I call it an estate tail.    It possesses the essential features of
an entailment of property, call it what you will.    It is the thing
our statute aimed at.    That statute, if it means anything, means
to destroy estates descendible to the lineal heirs only of the donee,
and inalienable by him.

This being the nature of the limitation in Roach's will, embody-
ing as it does the very evil which the legislature sought to correct,
and opposed as it is to the well known policy which dictated the
statute, the court, it is believed, will not be over " astute" in find-
ing a pretext for exempting it from the operation of the statute.
We may call the estate by another name—we may call it a fee
simple determinable, but the thing itself will remain unchanged.
It will still be an estate descendible to the lineal heirs only of
Mary Roach, and inalienable by ordinary means.

Should the court, however, be induced to regard the estate in
Mary as a fee simple determinable, there still remains to be con-
sidered the further questions, to wit: whether executory devises
exist here, and if so, are they modified by our statute, and to what
extent, and in what way ?

In this branch of the investigation, it may be conceded, for the
sake of argument, (and for that purpose only is the concession
made,) that in all cases where the term "heirs" generally is used
in the first instance, and the words "dying without issue" are em-
ployed to cut down the fee simple to a fee tail, the 26th section of
our statute, before cited, supplies the words "living at the death,
or born within ten months thereafter," &c.

For the same purpose it may be conceded, that the case under

VOL. III.—32

consideration is one in which the restricted construction of the words "dying without issue" must be adopted either from the language of the will or from the language of the statute, and that the fee simple implied by the word "heirs," is not cut down, but remains a fee simple, determinable on a definite failure of issue, and that, according to the principles recognized in the jurisprudence of England, the limitation to the "other children" is a good executory devise.

To all this we answer, that the only contingency on which the limitation ever could take effect, was the contingency of the death of Mary Roach, without leaving issue surviving her—a contingency which never happened—and that the other contingency, if viewed as a separate and distinct contingency, to wit: the dying of the issue under twenty-one years of age, is too remote, according to the proviso to the 24th section of the statute before cited. It is the case of a limitation to take effect upon the happening of either of two contingencies, one of which is good, and the other bad for remoteness—and that which is good never happened. See example cited by Keyes. Keyes on Chattels, 150.

The question now raised is of the first impression in this State, to wit: the effect of the proviso of the 24th section of our statute before cited upon the question of *remoteness*, as applicable to executory limitations. The leading decision relied on to support executory devises, and as giving a construction to our statute, is that of *Kirby* v. *Calhoun*, 8 S. & M. 470. The authority of that case, however, (and of course of the cases which were predicated on it,) has been destroyed by the more recent cases of *Powel* v. *Brandon*, and *Hampton* v. *Rather*. In the case of *Kirby* v. *Calhoun*, there was a bequest of *slaves* to the "testator's daughter, and the heirs of her body," and if she died without heirs of her body, then to the testator's grand-children. An estate tail, in express words, is given with a *quasi* remainder, either vested or contingent. For if the 26th section supplied the words "living at her death," we have seen that the result would be to render the *remainder contingent*. The proviso of the 24th section did not save it, the property being slaves. On what principle this contingent remainder could be upheld as an *executory devise*, it is impossible to perceive. The case therefore is wrong in the principle it de-

cides, and wrong in the result; the party who lost should have prevailed in the suit. But withal, the court did not undertake to say what change the proviso to the 24th section introduced, that having reference to lands only. In the case of *Hampton* v. *Rather*, the court say, that the two sections of the statute have each an office to perform, and must not be construed so as to neutralize or counteract each other, and that the proviso to the 24th section was intended to fix a *limit*. The question now presented, is, what is the operation of this proviso upon executory devises, and all contrivances to suspend the power of alienation?

Our statute has no where expressly sanctioned executory devises. In one section it explodes the idea that a freehold cannot be created to commence in future without a previous estate of freehold to support it, and declares that a freehold may be limited to commence in future by *deed as well as by will*, and this is the nearest approach to it. But be this as it may, the position now assumed, is, that if executory devises exist here *at all*, they are controlled by the proviso to the 24th section, especially where they take the place of a *regular entailment*.

It is therefore proposed to examine our statute as independent legislation, and by the light which it affords.

The 24th section is in these words: "Every estate in lands or slaves which now is, or shall hereafter be created an estate in fee tail, shall be an estate in fee simple; *and the same shall be discharged of the* conditions annexed thereto by the common law *restraining alienations* before the donee shall have issue; *so that* the donee, or person in whom the conditional fee is vested, or shall vest, *shall have the same power over said estate as if they were pure and absolute fees :* Provided, that any person may make a conveyance of *lands* to a succession of donees then living, and the heir or heirs of the body of the remainderman, and in default thereof, to the right heirs of the donor in fee simple."

It is apparent that the object of this section was to unfetter estates tail—to enlarge them into *pure and absolute fees*, with full power of alienation. Estates tail were condemned, not because of the preference given to *lineal descendants*—that preference is secured by the Statute of Descents—but because of that feature of the entail which *restrained alienation by the donee*. We may

assert, then, that the principle and policy of this legislation was opposition to restraint on alienation, as such, and to 'abolish this restraint, the object of the section quoted.

The proviso was intended to prescribe a boundary, a limit to the power of suspending the right of alienation, or in other words, the vesting of the *fee simple*, which carries the right.   This must have been the object, and the only object.   It was clearly not intended to *except from the operation of the section a particular class of estates tail ;* because, if we should conclude that the statute meant that estates tail might be created in the form indicated, to wit: by a gift to A. for life, remainder to B., and the heir or heirs of his body, and in default thereof, to the right heirs of the donor; then the proviso sets up the type of a pure entail of indefinite duration, with every feature which rendered entails obnoxious to the policy of the statute.   We cannot suppose anything so absurd as this, and must therefore conclude, that " the heir or heirs of the body of the remainderman" would take the fee simple; and if the remainderman had no heir or heirs of his body, at his death, then the fee simple, vested in the right heirs of the donor, so that the vesting of the fee simple, with power of alienation, can be suspended, according to the proviso, during the existence of a life or lives in being, and the usual period of gestation, and no longer. The heirs, in such case, cannot be tenants in tail, for it is obvious that this would render the section abortive.   They must take the fee simple, with the power of alienation.

From this view it results, that the proviso was not designed to *break* the force of the first part of the section, or even to qualify it so far as to admit of the creation of estates tail *in a particular way*.   Indeed it is quite apparent that it regarded the suspension of the power of alienation, *as entailment*.   We must, therefore, regard the proviso as introducing a principle, or standard, by which to measure the period within which the power of alienation, or the vesting of the fee simple, may be suspended by any of those contrivances by which the donor was enabled to keep property in his family ; in other words, a limit to the power of restraining alienation, *that being the evil,* and without regard to the particular form in which the restraint might be imposed, or the particular name that form bore in the jurisprudence of other countries.   It

seems that the legislature forebore, *purposely,* to enumerate the various modes in which restraints might be imposed by the multiplied forms of conveyance known to the jurisprudence of England. The *object was to introduce a principle repugnant to perpetuities in every form, and to restraint on alienation however imposed.* The language of the proviso seems to indicate more than a mere purpose to qualify the first part of the section; for what has a *succession of donees then living* to do with estates tail? This points to *life estates and remainders.* The whole force of the section, then, may be thus expressed. Entailments of property are abolished; nevertheless, the power of alienation may be suspended during a life or lives in being, but no longer. With this construction of the 24th section, the statute is harmonious, simple, and comprehensive.

It may be therefore affirmed, that the proviso was designed to limit, and does limit, the power of suspending alienation, by means of *entailment* regular, or irregular, and consequently limits executory devises. The executory devise is but one of the modes of creating entails, irregular in form, but substantially a most efficient mode. A gift to A. and his heirs, and if he dies without issue living at his death, then to B. in fee, has always been regarded by the most learned of the English lawyers and judges, as one mode of entailing an estate. This, according to the position of the counsel for the appellee, is an executory devise, and we will find that such an executory devise is regarded as an entail.

Mr. Hargrave, speaking of the executory devise, says: When executory devises were first permitted, it was foreseen that *entails made in that form* could not be barred by fines and recoveries. *Entails by executory devise* being thus exempt from any legal mode of barring them, it became necessary to prescribe bounds and limits to this *new species of settlement,* lest otherwise *entails* should obtain a longer duration through the *irregular* and barely permitted *executory devise than the law endures* where the *entail* commences in the regular way—and by *analogy* to the case of *strict entails* which cannot be protected from fines and recoveries longer than the life of the tenant for life in possession, and the attainment of twenty-one years by the first issue in tail, it was settled that the period within which executory devises must vest, should be a life or lives

in being and twenty-one years.   See note to Fearne on Remainders, page 444.   It may here be asked, is the *irregular entail* created through the *executory devise,* to be introduced and obtain a longer duration than the *law* (24th section and proviso,) endures where the *entail* commences in the regular way ?

Butler gives an instance of the strict technical entail, by which the executory devise was measured.   He cites it as the instance of a pure entailment, admitting of the longest possible suspension of the power of alienation.   An estate to the father for life with remainder to his sons successively in tail.   The father dies leaving his wife *enceinte* of a son.   "The land," he says, "would be inalienable during the life of the father, and would remain inalienable during the minority of the son."   This gives a life in being and twenty-one years and nine months, the boundary of executory limitation in England.   The case given is an extreme case, a bare possibility, to wit : the death of the father leaving his wife *enceinte of a son ;* not an ordinary case, certainly.   It is commonly the case, that the tenant in tail is in a condition, being of full age, to suffer a common recovery, (an inseparable incident to an estate tail proper,) the moment the gift takes effect.   The restraint on alienation, therefore, which is ordinarily imposed by a regular technical entail is partial only, while that imposed by the *irregular entail by executory devise* is total; or to express the idea more clearly, strict entails operate in restraint of alienation, entails by executory devise destroy the power of alienation, and the restraint is absolute and total—a perpetuity, in other words, as far as it goes.

The question then arises, what was the scope of the 24th section with its proviso, taken in connection with the 26th section, with its rule of construction ?   If the purpose of the legislature was to take off fetters from the power of alienation, and that clearly was the object, can it be supposed that they would stop at one of the forms by which these fetters were imposed, and the most *inoffensive* form at that, and leave untouched, other modes and forms, which imposed restraints more rigorous, and therefore more odious ?   Can it be fairly argued, that there was a policy which reached partial restraint and stopped short of total restraint ? or that, in abolishing "regular" entails, because of restraint on the power of alienation, we intended to omit a species of entails more

obnoxious to this objection than regular entails, and which had been sanctioned only in analogy to regular entails? If we ascribe to the 26th section the office and effect claimed for it, these questions must all be answered in the affirmative. The effect claimed for it is, that it establishes limitations, as good executory devises, which at common law were held to be void. The whole of that numerous class of cases in which a fee-simple is cut down to a fee tail by the limitation over being coupled with the failure of the issue of the first donee, and the whole of that class of cases, where life estates are enlarged by implication, or the rule in *Shelly's case* into estates tail, I mean the class represented by the case of *Carrol* v. *Renich,* where a life estate is given to one with remainder to the heirs of his body, and in default thereof, to another, all clear cases of limitations, too remote as executory devises in England, are by the effect of the construction put on the 26th section, erected into good executory devises, and this species of entailment fastened upon us, nay—occupying a broader basis, than was given to them in the jurisprudence of England, the evils of which we were attempting to correct. It is clear that, before the statute, all cases in which a fee was given in the first instance, and a limitation over, on the death of the first taker without issue, or heirs of the body, and all cases in which a life estate was given to one and a remainder to the heirs of his body, and in default thereof to another, were regular entails, and would naturally fall under the 24th section of our statute; and can we conceive of an absurdity so great, or of folly so extreme, as a statute by one section coming in to destroy these entails, because they restrained alienation, and by another section to set them up as entails under the name of executory devises, in which the restraint is more rigorous. The two sections were not designed to thwart each other. Such folly cannot be imputed to the legislature. They may be reconciled so as to operate harmoniously, and effect the real object of the statute. To do this, we must discard the idea that executory devises exist here unaffected by the proviso of the 24th section, we must strip them of the twenty-one years, or in other words, we must make them conform to the proviso. Indeed, it would seem that there could be no other interpretation given to the statute. Take the case of a devise to A. and his heirs, and in case A. should die

without issue, then to B. in fee-simple ; this, at common law, was an estate tail.    If so, then the legislature had such a case in contemplation in enacting the 24th section and the proviso.    If we had not touched the subject at all by the hand of the legislature, A. would have had the power at any moment, to enlarge the entail into a fee-simple by the common recovery.    The power to do so is an inseparable incident to the estate he took, and if estates tail ever existed here they existed with this common law incident.

The legislature, however, determined to enlarge it into a fee-simple by operation of law, and declared by one section, that A. shall take the estate, discharged of all conditions in restraint of alienation, and shall have full power over the estate, as *if it were a pure and absolute* fee, (*not a determinable fee,*) and the reason for this was to enable A. to alienate the estate if he thinks proper.

The legislature, however, dealing, it would seem, with a subject they did not understand, undertook to rid the courts of a knotty question of construction, and by an after section, the 26th section, established the rule, that the words " dying without issue" should be taken to mean issue living at the death of A., or born within ten months thereafter ; and it is contended that this estate tail, by this rule of construction, is converted into a *fee-simple determinable*, and is snatched, like a brand from the flames, and under the name of fee-simple determinable, is enabled to pass muster and escape the 24th section.    The limitation to B. ceases to be a remainder and becomes an executory devise, and A. is absolutely deprived of all power to alienate the estate.    The legislature is thus made to promote, rather than to discourage, restraints on alienation, and in abolishing entails on account of this restraint, have, by a most suicidal stroke, set up in their stead a species of entails and restraints much more rigorous.    This consummation seems to be ludicrously absurd.    It is well known that the controversy respecting the question, whether a limitation depended upon a definite or indefinite failure of issue was directly connected with the subject of entails, and it may be fairly assumed that the 24th and 26th sections of the statute relate to the same subject-matter. It is sufficiently obvious that the legislature, in following the general policy of the country, designed to unfetter estates, not to rivet their fetters.    This policy is important and fundamental, and what

is more, it is manifest. The 26th section establishes a rule of construction simply. It is going far, perhaps, to say, that the object of it was to preserve the ulterior limitation to B. in the example given ; but be this as it may, it preserves it, *if at all, consistently with the spirit of the 24th section and its proviso.* We can then consistently say, that by the rule of construction the estate of A. is a determinable fee, and the limitation over to B. an executory devise ; and as the fee-simple must, of necessity, vest either in the issue of A. at his death, or in B., the limitation is protected by the proviso. But had the limitation over depended upon the dying of the issue of A. under a certain age, then the vesting of the fee being postponed beyond a life in being and ten months, the limitation would be inconsistent with the proviso, and therefore void. This view of the subject seems to reconcile the sections. If the 26th section was designed to protect the ulterior limitation to B. as an executory devise, it must nevertheless *conform to the limit fixed by* the proviso to the 24th section ; otherwise the former counteracts the latter. And we may safely apply this rule to all cases which would fall under the first part of the 24th section, but for the construction which has been erroneously put on the 26th section ; and taking the example given, and inserting the contingency of the issue dying under twenty-one years, we have the case in *Roach's Will*—a case which postpones the vesting of the fee-simple and suspends the power of alienation beyond the limit fixed by the proviso—a case of entails by means of an executory devise, and consequently void.

I would say, therefore, in conclusion, that in respect to all cases, in which, as the law stood before the statute, the estate of the donee was an estate tail, the two sections of the statute must both operate together and in harmony.

The 26th section must not come in to convert the estate tail into a determinable fee, with an executory devise, having, as we have seen, a more stringent operation than a pure entail ; but if it comes in at all, to uphold a limitation which would be rendered void by the 24th section, that limitation must conform to the proviso of the 24th section. And I would go further and say, that the power of alienation cannot, by any form of entailment, regular or irregular, be suspended beyond the limit fixed by the proviso—that

if executory devises have survived our legislation, they have sur-
vived with such modifications as render them conformable to the
spirit and policy of that legislation, and that spirit and policy for-
bid the suspension of the power of alienation beyond a life or lives
in being and the period of gestation.

I have not adverted to the distinction between the cases in which
personalty is the subject of the gift, and those in which realty is
the subject of the gift. Of course, if Mrs. Jordan took an estate
tail in the land, she took an absolute interest in the personalty,
because both are given in the same words, in the same will, and
the rule is, that when personal property is conveyed by language
which, if employed as to realty, would create an estate tail,
the donee takes the absolute interest. 8 Simons, 22. In respect
to the validity of limitations depending on the failure of the issue
of the first taker, a distinction seems to have prevailed in England,
between personalty and realty, founded on the following considera-
tions : In cases of realty, the courts were inclined to *favor the heir*,
and therefore leaned to such a construction as would preserve the
estate to him. As personalty did not descend to the heir, but
passed under the statute of distribution, the interest of the heir in
the personalty was not considered as sufficient to influence the con-
struction, and the courts leaned to what is known as the restricted
construction of the words dying without issue. Fearne, 475; 1
P. W. 663; but see 8 Simons, 22. Further, in most cases of limi-
tations of real estate, depending on the failure of issue, the limita-
tion over did not necessarily fail, because it depended upon a
general failure of issue, but might be upheld as a remainder ; but
as entails and remainders are not incident to personalty, the limi-
tation over, unless upheld as an executory devise, failed altogether;
hence the courts were inclined, lest the intention of the testator
should be completely frustrated, to lean to the restricted construc-
tion in cases of personalty. Here, however, the same persons who
take the land by descent, take the personalty by descent. Hutch.
Code. 624. It is true the personalty stands chargeable with the
debts of the deceased, but the same may be said of the realty.
The difference in effect is, that the personalty is first chargeable.
The title of the administrator is that of a trustee for the heirs.

There is, therefore, no foundation here for the distinction at all, and it would be inconsistent, in principle, to uphold it.

If, however, the restricted construction is applied to the will, in this case, and so applied as to admit of a limitation over as an *executory devise*, it is insisted, that in adopting a rule as to perpetuities in cases of bequests of personalty, the court would not be warranted in adopting any other limit than that which the statute has prescribed in cases of real estate. It is obvious that every consideration, suggested by the wants of commerce, and by the policy which discountenances restraint on alienation, applies with greater force to personal property, than to real property.

The 24th section of the statute speaks of estates tail in lands and slaves. So far as slaves are concerned, it is clear that the statute is but declaratory of the old law, in effect, but in the proviso of that section, lands only are mentioned. It would seem, from this, that gifts in the nature of entails of personal property, were not to be protected by the proviso, and the 26th section must be invoked to uphold the limitation over as an executory devise. It will be at once perceived, however, that to give to the 26th section such an operation, is to make it conflict with the 24th section, which obviously intended to give more latitude to conveyances of real estate than to conveyances of personalty.

The courts of this State, in adopting a rule as to perpetuities, are bound by no statute except our own; and it will be conceded that the common law is no authority for the rule in England. It would seem to follow, therefore, that they would be governed by what appears to be the policy of our legislation, and if they sanction executory devises, sanction them with a limit, which will be the same both as to real and personal estate. If, therefore, the court should regard the will as creating a quasi determinable fee in the personalty, and the contingency of the death of the children of Mary Roach as too remote, then the limitation over on that contingency is void, and operates to enlarge or make absolute the estate of Mary, because the intention of the testator was to part with "his whole interest." Fearne, 488. It would be otherwise, perhaps, if a life estate only had been given to her; but it is clear she took an inheritance under the will.

What has been said respecting the effect of introducing the

words "living at the death," &c., in connection with contingent limitations, is based upon the authorities cited. Should the court be inclined to give a different effect to these words, to wit: the effect of preventing the creation of an estate tail, then we must regard the rule of construction, introduced by the 26th section,* *as intended to occasion the vesting of the fee simple absolute in the issue, living at the death of the donee, or born within ten months thereafter.* On this idea the estate which is authorized to be created by the proviso to the 24th section, though in form a pure entail, is converted into a fee simple in the "heirs of the body of the remainderman," by adding the words, "living at the death of the remainderman," &c., to the words "in default thereof."

This view, it is admitted, seems to harmonize the two sections of the statute. We may, then, regard the 26th section as coming in to support the principle declared in the proviso to the 24th section, and not to establish executory devises on the footing they had in England; and as the 26th section embraces "personal as well as real estate," (8 S. & M. 462,) the effect of the two sections is to require the vesting of the fee or the absolute interest at the death of the donee in being, or in ten months thereafter. This leads to the result attempted to be attained from a consideration of the 24th section, and the proviso alone, and that is placing personalty upon the same footing as to the limit of the power of suspending alienation, and the vesting of the fee simple on which the statute places real estate.

The combined operation of the two sections, on this hypothesis, is to make every disposition of property void which suspends the vesting of the fee simple or absolute interest, or the power of alienation beyond a life or lives in being, and ten months. This

---

* The 26th section of the Act of 1822, for convenience, is added. It is as follows: "Every contingent limitation, in any deed or will, made to depend on the dying of any person without heirs, or heirs of the body, or without issue, or issue of the body, or without children, or offspring or descendant, or other relative, shall be held and interpreted a limitation to take effect when such person shall die, not having such heirs or issue, or child, or offspring, or descendant, or other relative, (as the case my be,) living at the time of his death or born to him within ten months thereafter, unless the intention of such limitation be otherwise expressly and as plainly declared on the face of the deed or will creating it."

view of the statute is equally conclusive against the limitation in Roach's will.

The foregoing brief was intended to be accompanied by an oral argument, without which, or some explanatory observations, the bearing of some of the suggestions made, may not be readily perceived, especially in the first branch of the argument. I have taken it for granted, that the estate of Mary Roach was an estate of inheritance, a fee simple determinable, or a fee tail. I have not thought it probable that there would be any effort to construe the will, as giving her a life estate, and her issue the remainder, as purchasers, or as giving her and her children, or issue, the inheritance jointly. It is, however, of little importance, as respects one leading position, which we take in the case, whether the issue were intended to take as purchasers or not, as the event on which the limitation over was to take effect is postponed beyond a life in being, and ten months. The stress of the question lies in the construction which shall be given to our statute; and all argument on this head resolves itself into the answer which ought to be given to the question, whether the proviso to the 24th section in the Act of 1822, was designed to limit the power of suspending alienation, or in other words, as a rule respecting perpetuities. If this question is answered in the affirmative by the court, it will be decisive of the fate of the limitations in Roach's will. For it matters not by what form of conveyance a perpetuity is created, if it violates the rule established by the proviso, and must therefore be condemned. We think the proviso was aimed at perpetuities, and that it has always been so regarded by the profession.

It is hardly to be supposed that the legislature, adapting the common law of real property, to our condition and policy, would have left untouched the subject of perpetuities.

*W. T. Withers*, on same side.

The complainants in the court below found their claim to the property in controversy, on the 11th clause of the will of Benjamin Roach, deceased, by which a large amount of property, both real and personal, was devised to his daughter Mary, with the following proviso, viz: " Provided, that in case my daughter should marry, all the property she may thus receive, and that on the final

distribution, is limited to her sole and separate use, free from any control, or liability for the debts of her husband. To make my intention plain, the property in this my last will and testament, devised and bequeathed to my daughter, is for her sole and separate use and behoof, and her heirs forever; but if she should die without issue, or if her child or children, surviving her, should die before arriving at the age of twenty-one, then the estate herein devised shall revert to my other children and their heirs, share and share alike, according to the law of distribution of this State." Mary Roach intermarried with the appellant, Jordan, and died, leaving twin children surviving her. Both of the children died shortly after their mother's decease, when only a few weeks old.

The appellees filed their bill in the Superior Court of Chancery, seeking to recover from Jordan the plantation, slaves, and other property that his wife had received under their father's will; and also asking the advice of the court in relation to the final distribution of the property yet in the hands of the executor, awaiting the majority of the youngest child. To this bill there was a demurrer, which the chancellor overruled; and Jordan, who claims the whole property, as heir-at-law of his children, has brought the case to this court by appeal.

The question presented for decision is:—was the limitation over to the "other children," valid ?

In order to determine this question, it becomes necessary to ascertain what was the nature of the estate which Mary Roach took under the will ? To this inquiry our attention will be directed.

1. We contend that the language used by the testator, would, at the common law, have created an estate tail, which, by virtue of the 24th section of the Statute of 1822, (Hutch. Code, 609,) was at once converted into a fee simple, and vested the whole property, absolutely, in Mary Roach. The words, "her heirs forever," in the connection in which they are used, cannot possibly be construed in any other manner than "the heirs of her body forever." The authorities on this point are numerous and uniform. The general rule on this subject, (and there is no exception to it,) is as follows :—

"Where lands are devised to a person and his heirs, and if he

Jordan *v.* Roach et al.

die without heirs, remainder to a *stranger*, the remainder·is void, because it is limited after an estate in fee simple. But if the remainder was over to a *collateral relation*, the first devisee will take only an *estate tail*." 3 Lomax, Digest, 200, § 5; *Lillebridge* v. *Adie*, 1 Mason, C. C. R. 224. The rule is thus stated by Jarman; 2 Jarman on Wills, 236, 237.

"And here it should be observed, that where real estate is devised over in default of heirs of the first devisee, and the *ulterior devisee* stands related to the prior devisee, so as to be in the course of descent from him, whether in the lineal or collateral line, and however remote, as the prior devisee, in that case, could not die without heirs, while the devisee over exists, the word, "heirs," is construed to mean *heirs of the body*, and accordingly the estate of the first devisee, by effect of the devise over, is restricted to an *estate tail*, and the estate of the devisee over becomes a remainder expectant on that estate." "This construction is induced," says Jarman, "by the evident absurdity of supposing the testator to mean that his devise over should depend on an event which cannot happen without involving the extinction of its immediate object." See also, on same point, *Nottingham* v. *Jennings*, Salk. 233; *Ives* v. *Legges*, cited in note to 3 Durn. & East, R. 277; and numerous cases cited in note to 3 Jarman on Wills, 238; *Porter* v. *Bradley*, 3 Term R. 589. This rule has been repeatedly recognized by our courts in the United States. *Bell* v. *Gillespie*, 5 Rand. (Va.) R. 276; 3 Kelly, (Ga.) R. 551.

The word "heirs," in this connection, meaning heirs of the body, the clause of the will referred to, in legal effect, would read—"to my daughter Mary, and the heirs of her body forever." This is the precise technical language necessary to create an estate tail. Unless, then, the superadded limitations are inconsistent with the course of devolution and enjoyment under an estate tail, we may safely conclude that Mary Roach took an estate tail, which our statute converts into a fee simple absolute. The words which follow are:—

"But if she should die without issue, or if her child or children surviving her, should die before arriving at the age of twenty-one, then," &c.

The superadded limitation, "but if she should die without issue,"

is certainly not inconsistent with the creation and existence of an estate tail. On the contrary, it is the identical language, that, in more than one hundred cases, has been adjudged to create such an estate. In fact, it was held by Lord Thurlow, in *Hockly* v. *Mowbray*, 1 Vesey, Jr. 149, that a devise "to A. and his issue, was the aptest way of describing an estate tail under the statute *de donis.*" The books are so full of authorities on this point, that we deem it unnecessary to refer to them in detail.

We now come to the additional limitation. "Or if her child or children surviving her, should die before arriving at the age of twenty-one." We may remark, that no case can be found, or at least, that we have been unable to find any case, in which such a limitation, superadded to a devise *to one and the heirs of his body*, has been held to be inconsistent with the creation of an estate tail. The case of *Doe* v. *Goff*, 11 East, 668, is the only case that has a tendency that way; but the decision there seemed to be predicated chiefly on "the heirs of the body being restricted to take *as tenants in common, and not as joint tenants.*" Speaking of this case, Mr. Jarman says: "It is enough to say that it has been distinctly overruled by the highest authority." 2 Jarman on Wills, 291; Powell on Devises, 479; Lord Redesdale, in *Jesson* v. *Wright*, 2 Bligh, 58, says:

"In *Doe* v. *Goff*, there were no subsequent words, except the provision, in case such issue should die under twenty-one, introducing the gift over. This seems to be so far from amounting to a declaration that he did *not* mean heirs of the body, in the technical sense of the words, that I think they peculiarly show that *he did so mean.* They would otherwise be wholly insensible. If they did not take an estate tail, it is perfectly immaterial whether they died before or after twenty-one. They seem to indicate the testator's conception, that at twenty-one, the children should have the 'power of alienation.'" Lord Eldon agreed in opinion with Lord Redesdale, and the effect of the decision is, that a devise to A. and the heirs of his body, with limitation over in case the issue dies under twenty-one, gives A. an estate tail. See, also, *Grimshaw* v. *Pickup*, 9 Simons, 595. There are a few cases which, at first sight, might seem to clash with *Jesson* v. *Wright* on this point, such as *Lees* v. *Mosely*, 3 Bro. C. C. 82; *Ryan* v. *Cowley*,

Lloyd & Gould, 10; but it will be found that they are decided on other grounds, and that the devise was to the first taker *for life only*.

We would call the attention of your Honors particularly to the following extract from 2 Jarman on Wills, 430:—

"But it seems that the words referring to a failure of issue, are not restricted to such failure at the death, by the mere insertion of the contingency of the issue dying under age. Thus, if real estate be devised to A. and his heirs, with a devise over in case A. should die without issue, or such issue should die under the age of twenty-one years, A. would be tenant in tail; for it is said, that does not necessarily show that the testator is speaking of a failure of issue at the death of A. He is speaking of a general failure of issue, and then he alludes to the case of there being issue, and their dying under the age of twenty-one, which is a limited portion of the contingency, which is expressed by the preceding words. It is a contingency compounded of two events, one of such events being comprised in the other, and therefore superfluous."

We feel we may safely conclude that there is nothing in the superadded limitations in the devise in this case to take it out of the operation of the general rule, and that, according to the common law, it vested an estate tail in Mary Roach. The devise is equivalent in law to a naked devise to Mary, and the heirs of her body forever.

It will doubtless be contended, that since the adoption of the 26th section of our statute of 1822, a devise to one and the heirs of his body forever, does not create an estate tail. If any language could create an estate tail, this would; and we are bound to infer that the legislature contemplated the creation of such estates, or the 24th section would never have been adopted.

This section speaks of estates tail being "*hereafter created,*" and converts them at once into estates in fee simple. If the 26th section rendered it impossible for them to be created, wherefore the necessity of the 24th section of the same statute abolishing them? The body of the 24th evidently means that, when a grantor or testator attempts to create an estate tail, by using words that would, at common law, have created such an estate,

the estate tail shall immediately be converted into a fee simple absolute, relieved of all conditions and limitations that operate as a restraint on alienation.

We are free to confess that the High Court of this State, in *Kirby* v. *Calhoun*, 8 S. & M. 462, and *Rucker* v. *Lambden*, 12 Ib. 256, held that a conveyance or devise to one and the heirs of his body, does not create an estate tail; but they seem to have evidently misconstrued the 26th section, the only object of which was to establish *a rule of construction* in relation to contingent limitations, and give it an operation and effect entirely inconsistent with the 24th section of the same statute. The High Court, however, have lately shown a disposition not to be bound by the construction given to the 26th section in those cases. The views expressed in *Powell* v. *Brandon*, 24 Miss. R. 345, strongly tend to subvert the construction contended for by Judge Clayton. In fact, Smith, C. J., in a recent case, remarks: "That although there is no necessary conflict between the judgments in these cases," yet it would be impossible to reconcile the views expressed in the two opinions.

In the case last referred to, (*Hampton* v. *Rather*, MSS. opinion,) the High Court reviewed all the cases in which the 26th section has been construed, and distinctly overrule the construction Judge Clayton has insisted on in *Kirby* v. *Calhoun*, and cite with approbation, the construction given in *Powell* v. *Brandon*.

In this case (*Hampton* v. *Rather*,) a female slave and her increase were conveyed by deed of gift "to A. and the heirs of her body forever, to have and to hold, &c., to A. during her natural life, and at her death to the heirs of her body." The question presented for decision was, whether A. took a life estate, or an estate tail, which our statute converted into a fee simple. It was insisted by counsel that she only took a life estate, and that the case was without the operation of the rule in *Shelly's case*, as modified by the 26th section. The court held that, "in our opinion, the terms of the instrument in question are precisely such as, if employed under the rule in reference to real property, would carry an *estate tail*, and consequently the whole interest in personal property. Indeed, the 24th section of the statute concerning conveyances, *determines this controversy*, unless the 26th section of

the same Act has not only rendered the rule in *Shelly's case* inapplicable to the instrument under consideration, *but has also rendered nugatory the provisions of the statute above quoted.*" After a thorough discussion of the reasons which induced the enactment of the 26th section, and the object and scope of that section, the court concluded that it must be construed "*in reference to the 24th section;*" and held that Mrs. Irby took the entire interest in the slave and her issue.

The effect of this decision seems to be that, notwithstanding the 26th section, a devise to one and the heirs of her body forever, creates an estate tail; for the same limitation which, annexed to a life estate, brings it within the operation of the rule in *Shelly's case* would, if annexed to a devise, in fee, create an estate tail with remainder over. The construction adopted by the High Court in this case, renders both the 24th and 26th sections operative, whereas, Judge Clayton's construction, in the language of Judge Smith, "rendered nugatory the provisions of the 24th section."

The manifest object of the 24th section is to free land and slaves from the fetters of entailment, and it declares that "every estate in lands or slaves which now is, or shall hereafter be created an estate in fee tail, shall be an estate in fee simple." "Estate in fee tail," is a technical term, and when the statute speaks of their being "*created,*" it means, as a matter of course, created by the appropriate terms that at common law would have done so. It can mean nothing else. It asserts the plain rule, that when an estate is created that would, *at common law*, have been an estate tail, it shall be an estate in fee simple.

We think, then, we are authorized to conclude that there is nothing in the statute law of this State which would prevent language that, at common law, created an estate tail, from creating one here. The 24th section, however, immediately converts the estate into a fee simple absolute. If this be so, then there can be no doubt that the devise under consideration, vested an estate tail in Mary Roach, which the statute immediately transformed into a fee simple. This descended to her children, on her death, and to the appellant, Jordan, their father and heir-at-law, on the death of the children.

2. We insist that even though we may be mistaken in supposing the words "her and her heirs forever," &c., as used in the will, should be construed to be the same, in legal effect, as her and the heirs of her body forever, yet there is sufficient in the limitations that follow, to create an estate tail at common law. It is settled beyond dispute that a devise to one and his heirs, but if he should die without issue, or without leaving issue, then to another, creates an estate tail in the first devisee, with remainder over. *Hawley* v. *Northampton*, 8 Mass. R. 41, and authorities there cited; 1 P. Williams, 57; 2 Lomax, Dig. 221-223; Ib. 197. This rule will be found inflexible in all those cases in which there is a devise to *one and his heirs* forever, or to one and the heirs of his body, or to one and his issue in *one unbroken limitation*. The only cases that we have been able to find, that have even a semblance of conflicting with this rule, are *Doe* v. *Burnsall*, 6 Durn. & E. 30, and *Doe* v. *Elvey*, 4 East, 313. " Of these two cases, it may be observed," says Jarman, vol. 2, page 333; "that they decided nothing more than that A.'s estate was either a contingent remainder, after an estate for life, or a vested remainder after an estate tail, either of which was defeated by the recovery. The opinion of the court upon the alternative of these propositions can hardly be considered an *adjudication* on the point here discussed."

The confusion has arisen only in cases where there is a devise to *A. for life, and after his death to his issue*, &c.; and had its origin in the efforts of the courts to lay hold of the slightest circumstance to relieve cases from the operation of the rule in *Shelly's case*. But it has been uniformly held that where the devise to the issue was concurrent with that to the ancestor, and not by way of remainder, the devisee took an estate tail, although words of limitation in fee were superadded.

Chancellor Kent, after a review of the principal cases bearing on this point, (see 4 Com. 276,) arrives at this conclusion : " The series of cases, in the English law, have been uniform from the time of the Year Books down to the present day, in the recognition of the rule of law, that *a devise in fee*, with remainder over if the devisee dies without issue or heirs of the body, is a fee cut down to an estate tail, and the limitation over is void by way of

executory devise, as being too remote, and founded on an indefinate failure of issue."

In the case at bar, the devise is to "M. and her heirs forever; but if she should die without issue," &c., and clearly falls within the operation of the rule.

In *Anderson* v. *Jackson*, 16 Johns. 382, the testator devised land to I. in fee, and other lands to M. in fee, and in a subsequent part of the will directed that "if either of his said sons should depart this life without lawful issue, his share or part shall go to the survivor, and in case of both of their deaths, then he gave all the property over to his brother and sister and their heirs."

Chancellor Kent, in his very able opinion, (to which we particularly invite the attention of the court,) after reviewing all the leading English cases bearing on the subject, makes this remark : "We ought constantly to bear in mind, as we go along, that all these cases are perfectly in point; for, in the present case, an estate in fee was first given to Joseph Eden, and then came the words, *if he depart this life without lawful issue.* What *English* court, for the last three hundred years, would have hesitated for one moment in saying, *This then, must be an estate tail.*"

The words "child or children," subsequently used in the devise, cannot be held to abridge the operation of the term issue, for it appears from the bill that the " child or children" were *not in esse* at the date of the will, or even at the death of the testator. It has been the settled rule of construction ever since Wild's case, (6 Coke, R. 17,) that a devise to one and her child, *the child not being in esse at the date of the devise*, vests an estate tail in the parent. This distinction has been strictly adhered to ever since, and has been fully recognized in America. *Nightingale* v. *Bursell,* 15 Pick. 114; 1 Sumner, 359.

In a late case decided in Georgia, (3 Kelly, 551,) it was held, after full and able discussion, that when a testator devises property (real and personal,) to his sons, W. and B., and their heirs, with a devise over to other heirs named in the will, upon W. and B. *dying without child or children*, the word "heir," in the antecedent limitation, was synonymous with issue, or heirs of the body ; and that W. and B. took an estate tail, which their statute converted into a fee simple.

We will, in concluding this branch of our argument, briefly notice a class of cases that seem to establish the doctrine, that a devise to A. and *his issue living at his death*, or to A. and *the heirs of his body living at his death*, creates an estate tail in A. They seem to be founded on the fact, that under such a devise, the issue cannot take as joint tenants with A., since the objects are not ascertained until his death. It is only through the parent that they become entitled; and under the principle established in *Wild's case*, the parent must take an estate tail, in order to let in the children. In the case of *The University of Oxford* v. *Clifton*, 1 Eden, 473, certain premises were devised to Clifton and the issue of his body, lawfully begotten, *living at his death;* and for want of such issue, to the University of Oxford. The Lord Chancellor said: " This is the plainest case I ever saw in my life. The issue cannot take by present devise, as joint tenants with defendant. They are not to take by remainder, but by descent. All the posterity are intended to take. It cannot, therefore, be a contingent remainder, but is clearly an estate tail." Mr. Jarman, in noticing this case, seems to approve it in the text, but remarks: " Had the devise been to A. *for life*, with remainder to the issue living at his death, the case would have been different." In a note, he seems to think the doctrine would not hold when applied to personal property. But in *Richards* v. *Bergavenny*, 2 Vern. 324, where an estate (including personal property,) was limited to Lady Bergavenny, and such heirs of her body as should be living at her death, with remainder over for want of such heir, it was held that she took an estate tail.

In Kentucky, it was held, only a few years since, that a devise to A. and the heirs of his body, *if he had any at the time of his death*, and if none, to his brothers and sisters, created an estate tail. *Deboe* v. *Lowen*, 8 B. Monroe, 616.

It may be remarked, in relation to this class of cases, that although the reasoning seems to be technical, yet it is undoubtedly correct, and has stood the test of two centuries.

It follows, as a necessary consequence, that the devise to " Mary and her heirs forever; but if she should die without issue," &c., created an estate tail under the inflexible rule referred to in 8 Mass. R. 41, and in 4 Kent, Comm. 276.

Jordan *v.* Roach et al.

But even if this should not be so, yet the class of cases last cited, settle beyond doubt, that the devise created an estate tail, and would have done so, if its language had been to "her and her heirs forever; but if she should die without issue *living at her death*," &c.

If we are correct in the conclusion to which we have arrived, then the limitation over to the "other children" is invalid; for the statute converts the fee tail into a fee simple absolute, with full power of disposition in Mary Roach, the first taker. All the property devised to her descended to her children on her death, and to their father, on the death of the children.

3. Let it be admitted that we are entirely mistaken in the effect of the devise under consideration—that it did not create an estate in fee tail, according to the law of England, but that it created a qualified, base, or determinable fee; and the limitation over was good as an executory devise.

This brings us directly to the question—Do executory devises exist in this State? and if they do, to what extent are they modified by our statute?

We would remark, at the outset, that our courts are under no obligation whatever to recognize the doctrines of the English courts on this subject. Executory devises were unknown to the common law, and have arisen since the enactment of the English Statute of Wills; 4 Kent, Com. 264, 265, et seq.; 2 Wendell's Blackstone, and note. Not being part of the common law, our courts are at liberty to entirely disregard the arbitrary rules adopted (not without great opposition,) by the English courts, respecting them; and we feel assured these arbitrary rules will not be adopted by our courts, if found to be in conflict with the settled policy of our laws.

We will briefly notice the rise and progress of executory devises in England. After it was decided in *Taltarum's case*, (in the time of Edward the 4th,) that estates tail might be barred by a common recovery, the feudal aristocracy, in order to re-establish perpetuities, resorted to provisos and conditions not to alien, with a cesser of the estate, if the tenant attempted to alienate; but the courts held these restraints to be invalid. Resort was then had to executory devises to accomplish the same object, but the courts were

very cautious in sustaining them.   In *Pells* v. *Brown*, it was first established that a fee might be limited on a fee by way of executory devise, upon a contingency not exceeding *one life in being*, and that *it could not be barred by a common recovery.*   The doctrine, after a most violent opposition, was gradually extended so as to include several lives in being.

But it was not until the case of *Stephens* v. *Stephens*, 2 Barnard, 375, decided in 1736, that the doctrine was extended so as to include the unborn son of a married woman, who should first attain the age of twenty-one.   Then came the great case of *Thellusson*, 4 Vesey, 227, decided in the reign of George the 3d, which gave rise to the enactment of the statute of 39 & 40 George 3d, against accumulations.   Subsequently there is the case of *Beard* v. *Wescott*, in which an executory devise was held good, that was not to take effect until the end of an *absolute term of twenty-one years* after a life in being, *without reference to the infancy of the person intended to take.*   And in *Bengough* v. *Eldridge*, 1 Simons, 173-267, a limitation was made to depend on an absolute term of twenty-one years, after twenty-eight lives in being at the testator's death.

This brief notice of the history of executory devises shows that they have, since the adoption of the English Statute of Wills, gradually been fostered by the English courts, until they have become *the most rigorous perpetuities known to the law.*   Executory devises have, in fact, established perpetuities in England to the same extent that they existed under the statute *de donis*, before *Taltarum's case,* for they render " the estate inalienable," says Justice Powell in *Scatterwood* v. *Edge,* 1 Salk. 229, " during the period allowed for the contingency to happen, *though all mankind should join in the conveyance.*"   Estates tail could be rendered inalienable only during the life of the tenant for life, and the infancy of the remainderman in tail.   But since *Taltarum's case,* the tenant in tail can at any time defeat the entail by suffering a common recovery.

But property can be tied up by an executory devise for an unlimited number of lives in being, and an absolute term of twenty-one years afterwards.   We see, then, that executory devises go much further towards creating perpetuities, and imposing restraints

on alienation of property, than did estates tail at the time our statute of 1822 was adopted. It is undeniable that the object of the 24th section was to remove all restraints upon alienation, except those indicated in the proviso. It settled the fixed public policy of the country. It declared that policy to be hostile to perpetuities. It did not strike at technical estates tail only, but at every thing that savored of entailment. "Every estate in lands or slaves which now is, or shall hereafter be created an estate in fee-tail, shall," &c., is the language of the statute. Personal property never was the subject of a strict technical entail. It is manifest that it was the object of the framers of the statute to overthrow every species of entailment.

But if the rule of the English courts in relation to executory devises, is adopted by the courts of this State, then indeed is the statute a dead letter. The lesser evil only has been stricken down, the greater still remains. Property then could be rendered inalienable for as great a period of time in Mississippi as in England. We feel assured that this court will do all they properly can to prevent such a result.

It will, doubtless, be urged that executory devises are not, in terms, abolished by the statute. We answer, that there was no necessity for abolishing the arbitrary rule of the English courts on the subject of executory devises, *for it was not a part of the common law,* and never was in force in this State. This being so, legislation on the subject was unnecessary. Besides, it may be said that executory devises were originally adopted by the courts in analogy to limitations by way of remainder in tail. Estates tail were a part of the settled policy of the law of England at that time. But our policy is exactly the reverse; and as estates tail are expressly abolished in this State, it would seem reasonable that a system of perpetuities, that had grown up in England in analogy to estates tail, should not survive their parent.

It was remarked by Chancellor Kent, 16 Johns. R. 418, "that sound policy, (and the very policy that dictated the act abolishing entails,) would lead us not to give any great encouragement to the doctrine of executory devises."

We cannot believe that the courts of this State will give effect to the rule of the English courts on this subject, when they are

under no obligation to do so, (as it is no part of the common law ;) and thus introduce into our midst a system of perpetuities, *the most rigorous known to the laws of England.* The legislature has distinctly taken ground against perpetuities, and it would be strange indeed, if, after the Act of 1822, the courts should give effect to a species of entailment directly at war with the settled policy of the country. *If the English courts did right in adopting the rule, in order to carry out the policy of their country, which favored entails, our courts would do right to reject it, in order to give effect to the fixed policy of our laws, which have abolished them.*

In conclusion, we insist that the boundaries of every contingent limitation, of whatever nature it may be, are distinctly defined by the proviso to the 24th section. The proviso is as follows :—

"Provided, that any person may make a conveyance or devise of land to a succession of donees then living, and the heir or heirs of the body of the remainderman, and in default thereof, to the right heirs of the donor, in fee simple."

This proviso, in the language of the court, in *Hampton* v. *Rather,* indicates "with unmistakable certainty, the boundaries of the limitations therein sanctioned." And whenever, in any deed or will, a limitation is attempted, that does not fall within these "boundaries," it is clearly invalid. These "boundaries" are, a life or lives in being, and ten months thereafter, to meet the case of a posthumous child. This is the *"ultima thule,"* beyond which no restraint upon alienation will be permitted. The English rule in relation to executory devises, exceeds this period twenty-one years. If executory devises are adopted here, they must be so modified as to fall within the limit prescribed by the proviso. When so modified they are harmless, and not opposed to the fixed public policy of the country.

In the devise now under consideration, there is a manifest attempt to exceed the limit fixed by the proviso. An effort is made to tie up property, both real and personal, for a life in being, and twenty-one years afterwards, and the question is, whether the intention of the testator or the law of the land, is to prevail.

*Wm. L. Sharkey,* on same side.

This case comes to this court by appeal from a decree of the

chancellor, overruling the demurrer of the appellant to the bill of the appellees.

The question raised by the demurrer to the bill involves the construction of the will of Benjamin Roach, Sr., or rather the legal effect of the provisions of that will, under the laws of this State.

The 4th clause of the will is in these words: "I give, devise, and bequeath unto my five children, Benjamin, David, Mary, James Wilkins, and Eugene, all the rest of, and all kinds of my property," and after enumerating a large amount of property, consisting of wild lands, plantations and slaves, bank stock, and certain negroes by name, the clause concludes: " To have and to hold, share and share alike, to them and their heirs forever, subject only to the conditions and limitations as to distribution, &c., as are hereinafter mentioned." By subsequent clauses the testator provided that each of his children, as they became of age should receive a tract of land of one thousand or fifteen hundred acres, and also thirty negroes, to be purchased by the executors with any funds they might have on hand. The provision in this particular, in favor of Mary, is in the following words: " When my daughter Mary shall have arrived at full age, or shall marry, it is my will that my executors shall allow her to take any tract of my wild and unoccupied lands, not exceeding fifteen hundred acres, or if she does not like the location of any of my said lands, to purchase for her, at a price not exceeding twenty dollars per acre, a tract of one thousand or fifteen hundred acres of land; and, with any funds they, my executors, may have on hand, to purchase for her thirty negroes, to work on and cultivate the same; and they shall purchase for her, or furnish from my plantations above-mentioned, all necessary stock, implements, utensils, &c., &c., for the same; and she shall be charged with the value of said land, negroes, stock, utensils, &c., and with six per cent. per annum interest, to be charged against her portion of my estate on final distribution. Provided, that in case my daughter should marry, all the property she may thus receive, and that on final distribution, is limited to her sole and separate use, free from any control or liability for the debts of her husband. To make my intention plain, the property in this my last will and testament, devised and bequeathed to my daughter, is for her sole and separate use and behoof, and her heirs for-

ever; but should she die without issue, or if her child or children, surviving her, should die before arriving at the age of twenty-one, then the estate herein devised shall revert to my other children, and their heirs, share and share alike, according to the law of this State."

By the 13th clause the testator provided as follows, to wit: "When my youngest child, Eugene, shall have arrived at full age, it is my will that a final distribution of all the residue of my estate be made in the manner prescribed by law."

By another provision the whole property, except that given out to the children on their coming of age, was to be kept together until the youngest child, Eugene, should become of age, at which time the final distribution was to be made as above.

Mary, before she arrived at the age of twenty-one, married G. N. Jordan, the appellant, and on her marriage a plantation, slaves, &c., were purchased for her according to the eleventh clause of the will, of which Mr. and Mrs. Jordan took possession, and which is held by Jordan at this time, and which is the property now sued for.

In little more than a year after her marriage, Mrs. Jordan gave birth to twin children, and died not very long after their birth, leaving the children surviving her, both of whom, however, died in a few weeks afterwards, leaving their father surviving. The heirs-at-law of Benjamin Roach, deceased, being brothers of Mrs. Jordan, filed this bill to recover of Jordan the property which had been so purchased for his wife. Jordan demurred to the bill, and now claims to hold the property in his own right as heir to his children, and his claim, of course, is a valid one, not only to the property sued for, but to his wife's portion of the whole estate, unless the attempt at a limitation of the estate, on the contingency mentioned, be sustained.

It is contended, on our part, that the provision in the will, by which the limitation was attempted, must fail, as being not only contrary to the policy of our laws, but in direct violation of the provisions of the statute; and therefore that Mary Jordan took an absolute estate in fee simple, which descended to her children, and from them to their father, the appellant.

As this case was not argued at length before the chancellor, and

as we cannot know on what precise ground counsel for the claimants will attempt to rest their claim, or on what ground the court might incline to place the title, we are under the necessity of indulging in great latitude of discussion, so as to meet all supposable positions.

As we derive our laws of real property from the common law, the partial changes which have been made by statute can be best understood by contrasting them with the law as it was. And it will be manifest to the court, on reading the will under which complainants claim, that recourse must be had to a very great extent, to that intricate branch of the law relating to the various kinds of contingent limitations.

As we start out with the general proposition, that the complainants' title cannot be sustained under our law, we cannot show why this is so without reference to the English law, so that the changes and the reason for them may be made apparent. In view of this course of argument, the subject before us may very properly be divided thus :—First : What is the class or technical character of the estate which Mary Roach took under the will of her father, according to the English law ? Second : As the complainants claim under the same will, and in virtue of the determination of Mary's estate, by what means has the estate devolved on them ? And Third : Admitting, for the sake of argument, that their title would be a valid one under the English law, what changes have been made in that law by our statute, which go to defeat their title ?

1. What kind of estate did Mary Roach take under the will of her father ? This is an important question, and lies at the very threshold of the investigation. She had not an estate for life merely, because the appropriate language to create such an estate was not used in the will, and therefore it was not the intention of the testator to give her such an estate. But she undoubtedly took an estate of inheritance. Then she must have had a fee simple, a fee conditional, or fee tail, or a base or qualified fee, for these are the technical names known to the law of tenures for estates of inheritance. The extent or measure of interest is readily understood from the technical name of an estate, but it is sometimes difficult from the terms of the conveyance, to decide to which class an estate belongs. Without noticing the difference between these

estates of inheritance, we shall assume, with great confidence, that Mary took an estate tail, and shall endeavor to place this beyond doubt by reference to the characteristics or peculiar qualities of such an estate, and by showing that the language of the will meets all the requisites of such an estate.

An estate tail, since the statute *de donis conditionalibus,* which was a conditional fee at the common law, is an estate conveyed to a person and the heirs of his body, or some particular heirs to the exclusion of the general heirs. 1 Cruise, 85. Blackstone gives a similar definition. 2 Chitty's Blackstone, 110. Perhaps this definition is not sufficiently accurate, as the particular heirs must be lineal heirs, for it is laid down by the best authority that a fee tail can only be created by a gift to the donee and the heirs of his body. 1 Thomas' Coke on Littleton, title Fee-Tail, §§ 14, 15; 2 Preston on Estates, 355. It is the measure of the estate by the continuance of issue, and its quality to determine only on the failure of issue, which constitute the characteristics of an estate tail. 2 Preston, 392. When an estate of this kind is created, it is classed as an estate of inheritance, but it is inheritable by the issue only, and not by the heirs generally. And it goes down to the heirs of the body of the donee or devisee in perpetual succession, until a failure of descendants may happen, be that at ever so remote a period. Its character is never changed by the descent through any number of generations, but it continues to be an estate tail until the line of descent shall be broken, then it reverts to the grantor by operation of law, for though a clause be inserted in the deed that it shall then revert, that is void. 2 Cruise, 442.

Now the question is, does the language of the will create an estate tail, according to these definitions of it? Was the estate devised to Mary Roach and the heirs of her body? If so, it must be an estate tail, and cannot be anything else. And we are not to try the language of the will by the rules which apply to simple conveyances, for there is a great relaxation in those rules in the construction of wills.

It will be observed, that both in the 4th and 11th clauses the devise is to Mary and her heirs generally, or in the appropriate language for passing a fee simple, but it is not contended that such an estate passed, as the testator, with great particularity, subse-

quently explained what he meant. "To make my intention plain, the property in this my last will and testament devised and bequeathed to my daughter, is for her sole and separate use and behoof, and her heirs forever; but should she die without issue, or if her child or children surviving her should die before arriving at the age of twenty-one, then the estate herein devised shall revert to my other children and their heirs," &c. Beyond all doubt the intention of the testator was to give the property to the daughter and the heirs of her body. The rule is very clearly laid down, and it seems to be without exception, that although the word "heirs" be used in a will, yet if it be qualified by any subsequent words or provisions which show that the testator intended thereby the heirs of the body of the devisee, the devise will only in that case create an estate tail. See Cruise, 38, title Devise, ch. 12, §§ 7, 9, 12; 8 Mass. Rep. 41; 2 Yeates, 40; *Sydnor* v. *Sydnor*, 2 Munford, 263; Fearne on Remainders, 426, 427. We cite these authorities, and might cite many more to the same point, to show that an estate tail, and nothing else passed. And if they are worth anything, they do establish the point that this was an estate tail. Preston says, Let it be remembered that a gift by will to A. and his heirs, if he have issue of his body, is an estate tail in him. 1 Preston, 433, 434. And the devise over to the testator's other children, on failure of issue, as in that event they would have been the heirs-at-law of Mary, is a conclusive circumstance in showing that the testator intended to devise to Mary and the heirs of her body. Fearne on Remainders, 467, 468; 2 Jarman on Wills, 236, 237; 5 Ran. Rep. 276, 277; 3 Kelly, 557. Not only then did the testator in the devise to Mary give to her and to the heirs of her body to the exclusion of general heirs, but he intended to measure her estate by the continuance of issue, and that it should determine and revert on the failure of issue. And in that line it would have descended. If Mary's children had lived to be twenty-one, can it be said they would not have taken an estate tail which would again have descended to their children in perpetual succession? Was it not plainly the intention of the testator that it should be so? or whether or not, was not that its inevitable destiny under the statute *de donis*, or even as a conditional fee before the statute, unless defeated by alienation?

In England, no one would have thought of calling this anything but an estate tail; it fills up every requisite of the definition of such an estate.

Was the character of the estate changed by the superadded contingency, that if her children should die before they arrived at the age of twenty-one? Not at all; she did not hold a contingent interest, as it never could have been defeated in her life, or indeed during the continuance of issue; for the gift over could only take effect after the determination of the estate. And it is not at all uncommon to pile limitation on limitation, on the determination of an estate tail. The gift over was manifestly only on the contemplated failure of issue, for the testator supposed, in the event of the children's death under twenty-one, they would leave no issue. And it will be seen by reference to the authorities, to be well settled, that a devise to one, and the heirs of his body, and if they should die under twenty-one, then over, is still a devise on an indefinite failure of issue, and creates only an estate tail. This subject is fully discussed by Jarman, who refers to all the authorities, and it is sufficient to refer to his work. 2 Jarman on Wills, 291, 430; Powell on Devises, 479.

We might well contend that the gift over was void. If Mary had died without issue, the law gave the reverter, and the provision for it in the will was void, as it but gave the same estate the law would have given. Then, on strictly legal principles, the will gave but an estate to Mary and the heirs of her body, and there its effective operation ceased; all beyond that was void. The law would not presume that her children would have children before they were twenty-one; the limitation over then made no change in the estate, other than what the law would have given. The testator provided that the estate should "revert." This is a technical term, and it is not a term of bequest or devise; nothing would pass under it; the law gives the reverter, and not the will. See note to Fearne on Remainders, 381; 2 Cruise, 442. Then this provision in the will was void, and should be rejected. Stripped of all useless and inoperative verbiage, this case stands precisely as though the testator had given this estate to Mary, and the heirs of her body, and had then stopped.

In the pursuit of our plan, a few further remarks will be added

in reference to estates tail.   They were known to the common law
under the name of conditional fees, for the name has undergone a
change by virtue of the statute *de donis*, without any change in
the original character of the estate.   In their origin they were
intended to secure landed property in the family of the owner, as
long as that family might last.   They were invented and designed
to create perpetuities in landed estates, the evils of which we need
not comment on before this court.   And had this system been per-
mitted to work on without check, perhaps nearly all the land in
England, as it is now in Scotland, would have been locked up in
the hands of a few families, constituting a perpetual aristocracy,
wielding the entire power of the government.   This state of things
was of course desired by the large landholders, but the liberal and
wise policy of the common law was averse to perpetuities.   To
avoid the evil, in some degree, and to prevent its further exten-
sion, the courts of law, acting in obedience to the policy of the
common law, adopted a rule of construction, which though it did
not entirely destroy estates tail, placed such estates within the
control of the donee, and enabled him to alienate them under cer-
tain circumstances.   On the authority of the doctrine of conditions,
they held that the donee took an estate upon condition that he
should have heirs of his body, and as soon as he had such issue
the condition was performed, and he might alienate the estate.
This, it will be perceived, was an extraordinary stretch of power
on the part of the courts, justified, if at all, only by the great
public mischief it was intended to remedy.   But in case the donee
did not alienate, the estate of course passed down to the heirs of
his body in perpetual succession, according to the terms of the gift.
Therefore, this rule of construction, beneficial as it might be, was
not a complete remedy, since it was discretionary with the donee
whether he would dispose of the estate, or hold it in the line of
succession.   And interest would dictate, in most cases, the preser-
vation of the estate.   In holding that such estates, after the birth
of issue, were subject to be alienated, charged and forfeited by the
donee, the courts were evidently acting solely on public policy, for
had the application of the doctrine of conditions been just, the
estate would have become absolute on the performance of the con-
dition, as a condition when performed is forever gone.   But the

restraints were only partially removed by subjecting them to alienation, charge and forfeiture.

But this salutary rule of construction, breaking in on the intentions of the donors in these family settlements, was of course at war with the policy and designs of the aristocracy, who, being the large landholders in the kingdom, desired to perpetuate their estates in their own families, and it was completely overthrown by their influence in parliament, in the reign of Edward the first, by the passage of the celebrated statute *de donis conditionalibus*, which declared that these limited estates, in land, should descend to the heirs of the body of the donee, according to the intention expressed in the gift, and that all rules by which such intention had been defeated in the courts of law, should be abolished. It is manifest that this statute did not create estates tail as a new estate; it only restored them to what they originally were at the common law, and preserved them in their true form. The liberal policy of the common law, and the great interests of society were on one side; but the wishes and interest of the great landholders, who were either members of parliament or exercised a controlling influence in that body, were on the other side, and the latter prevailed. But this great national evil, which had apparently been fixed on the country by this statute, was the occasion of another judicial invention, which greatly crippled its force, and placed it almost in the condition it was in before the statute. Common recoveries were invented as a bar to estates tail, and thus the donee, by suffering a recovery, could as effectually dock the entail as though his power of alienation had not been taken away. Such, for a time, was the state of the English law, which was indebted for its liberal features to the inventive genius and inflexible sternness of English judges. And at the period to which we allude, it would have been a much more difficult matter to have restrained the power of alienation, and to have bound up estates by fetters and limitations in England, than it is here at this day, if the limitations in this will can be sustained.

But the sternness and policy of the English courts were destined to give way, and to yield to the general desire felt by man to perpetuate his property in his own family, and at a subsequent period the stretch of judicial authority is quite as remarkable and as great

in favoring these limitations as it had formerly been in opposing them. In violation of all rules of law, and in direct repugnance to some of its most cherished axioms, executory devises were created by judicial legislation, and by these contingent limitations were saved from the consequences which the common law imposed upon them; but of these we shall say more hereafter.

This brief allusion to the English law, its policy and its changes, are introduced not only for the purpose of showing how the law stood, but also for the purpose of showing the reason and object of our statute. In view of this state of law, repugnant as it was to the great interests of society, the policy of our statute cannot be mistaken. A great evil had grown up under the English law, and it was to relieve against this evil, and to frame our law according to the genius and spirit of government, that the statute was passed.

2. If then we have succeeded in showing that Mary took an estate tail, under the will of her father, the pretensions in this bill make it necessary that we should inquire into the nature of the complainants' title, or by what means it passed from the tenant in tail to them, and our inquiry will still be limited by the rules of the English law, regardless of any statute. They claim a fee simple. That they may have such estate may be true by the English law, but the chief ground of doubt in all such cases is by what legitimate means was it acquired? for an estate must pass by legitimate and proper means,—by some of the modes of assurance or conveyance known to the law. It cannot pass at all, unless it do so in a legal and proper way. The law must recognize the mode employed to convey an estate, as a suitable and proper one for the purpose, otherwise nothing passes. The mode of transmission is a part of the law of the estate. Let it be conceded then, that the complainants have a fee, if they have derived it through a channel capable of conveying such an interest. There are but two conceivable ways in which such an estate as they claim could pass to them under the will, after the determination of the estate tail. The one is by way of contingent remainder, and the other by way of executory devise. There is another way by which they might claim, that is, by way of *reverter*, but such a claim cannot be made by the heirs-at-law of the donor, under a deed or will,

for though the instrument contain a provision securing the rever-
sion to the grantor and his heirs, after the termination of the es-
tate tail, such a provision, we have seen, is void; the law gives
the reversion, and it cannot be sustained under a deed or will.
But complainants do not claim the reversion as heirs-at-law. If
they did, they would admit that this is an estate tail, and our sta-
tute would furnish us with a very satisfactory answer to such a
claim.    They claim under the will, and if they derive any right
from that, it must be either as a contingent remainder, or as an
executory devise; and these terms are not used as descriptive of
any particular class of estate, or quantity of interest, but merely
as indicating the means by which contingent interests may be
limited.    It is a matter of but little consequence to us, whether
their title is acquired the one way or the other.    I shall endeavor,
however, to show that the complainants derive their estate by way
of contingent remainder, which is defined to be an estate limited
to take effect and be enjoyed, after another estate is determined,
and such remainder may be either vested or contingent.    It is con-
tingent when limited so as to depend on an event which may never
happen, or be performed; or which may not happen or be per-
formed till after the determination of the preceding estate.    Fearne
on Remainders, 3.    The latter part of this definition is to be un-
derstood with this qualification—a contingent remainder may take
effect immediately, or at the instant that the preceding estate is
determined.    No time must elapse between the termination of the
preceding estate and the taking effect or vesting of the remainder;
and that is all that is meant.    Ib. 307.    On looking at the divi-
sions of contingent remainders, the court can be at no loss in plac-
ing this in the first class described by Mr. Fearne.    " It depended
entirely on a contingent determination of the preceding estate
itself."    The case before the court seems to fill completely every
requisite of a contingent remainder of the first sort.    The pre-
ceding estate was a freehold, and the remainder a freehold; whe-
ther the remainder would take effect at all, depended on an event
which might not have happened, that is, the death of Mary with-
out issue, or the death of her children under twenty-one years of
age.    Thus, too, the determination of the preceding estate was
uncertain, and the remainder depended entirely on the happening

of the contingency, and took effect the instant that it did happen, and could not take effect before. That there were two contingencies named makes no difference; they were both of the same character, and in the alternative. If Mary died without issue, (an uncertain event,) the remainder vested, or if her issue surviving her died before arriving at the age of twenty-one years, the remainder vested. This was a remainder with a double aspect. And it is immaterial how many children she may have had; they must all have died, inasmuch as any one would have inherited the estate. See Fearne on Remainders, 5, note (d). And a remainder may be limited after an estate tail. 2 Cruise, title 16, chap. 1; 6 Cruise, (Devise,) 464. Indeed, the better opinion was, that a remainder might be limited on a conditional fee at common law. The following passage from Cruise is so directly in point in this case that it is extracted:—"Wherever an estate is devised to a person and his heirs, with a limitation over in default of issue, it is construed to be an estate tail, and the limitation over is a remainder, to take effect on the determination of the estate tail; but if the limitation over be directed to take place on an event which may happen during the continuance of the estate tail, it is an executory devise, for it cannot be a remainder, because the event on which a remainder is limited must not operate so as to abridge or determine the particular estate." Here the estate is devised to Mary and her heirs generally, in the first instance, but in the same clause there is a limitation over, in the event of her dying without issue, thus making, according to the very letter of the authority, an estate tail, with remainder over. It may be added, that a remainder never can be limited after a fee simple absolute, for the plainest of all reasons: there can be no remainder, when the whole estate passes to the same person, without qualification. Mary had but an estate tail, by the will, not a fee simple. We have too, here, the essential ingredient, which distinguishes contingent remainders from conditional limitations which are not remainders. The remainder was to commence when the preceding estate, by its very terms, was to end; whereas, a conditional limitation, which is not a remainder, may take effect before the first estate expires. Fearne, 14. It is deemed unnecessary to say more on the requisites and peculiarities of remainders, and having assumed that the

complainants took a contingent remainder, we shall endeavor to show that they cannot claim under an executory devise, and even if they could, this will make no difference in the final result; and to make both of these propositions the more apparent, it will be necessary to discuss more of the doctrine of executory devises than would otherwise seem absolutely necessary.

Amongst the various definitions given of an executory devise, perhaps that given by Chancellor Kent is as accurate as any, viz: "A limitation by will of a future contingent interest in lands, contrary to the rules of limitation of contingent estates in a conveyance at law." 4 Kent, 263. The definition given by Fearne is, as the author confesses, too comprehensive. Now in analyzing the definition given by Kent, it would seem that it must be a *future* interest in land; but not only must it be future, but it must also be *contingent,* and it must be limited by will. In all these respects the complainant's claim may seem to conform to the requisites; but it falls short in a most important particular; nothing can be an executory devise unless it be contrary to the rules of limitation of contingent estates in conveyances at law; or as it is expressed in the definition adopted by Lomax, it must be such an estate as cannot, consistently with the rules of law, take effect as a remainder. We have endeavored to show that their estate took effect as a remainder, and it cannot, therefore, be an executory devise; for it is an inflexible rule that wherever, by the rules of law, a remainder can be supported, an executory devise cannot be. 6 Cruise, title 38, Devise, ch. 12, § 11, and in this all the authorities agree. And the reason of this rule is important in the present case. A remainder was a means of limiting estates known to the common law; an executory devise was not. A remainder could be barred, by the appropriate proceeding, provided by law, and the limitation was thus converted into a fee, and perpetuities prevented by removing the restraints upon alienation; an executory devise could not be barred, because no appropriate method for doing so was provided by law; and the courts, in pursuance of the wise policy of the common law, always sustained a remainder when it could be done, in preference to an executory devise. But another and perhaps a more satisfactory reason for the rule, may be found in the fact that an executory devise is not a part of the common law; it is a thing of modern

invention ; a mere rule adopted by the courts in England to favor wills and carry out the intentions of the testator, which must have failed under the rules of law.    As an arbitrary rule, adopted for this purpose alone, it could only fill out the deficiencies of the law, it could not supersede the law ; and consequently, what was by law a contingent remainder, could not be an executory devise, or wherever a remainder could be sustained, of course there was no reason for resorting to the expedient of an executory devise.    An executory devise differs from a remainder in three things.    It needs no particular estate to support it.    A fee may be limited after a fee.    A term of years may be limited after a life estate. 4 Kent, 269.    Now, when we look at the common law, we find it deficient in all these particulars, and the courts, not by a stretch of power, as has been said, but by direct judicial legislation, supplied these supposed deficiencies in the common law, by the use of a new phrase, and by holding that under that phrase, a thing void by another name was valid.    Perhaps the idea is better expressed by Cruise, who says, "The indulgence shown to testators in effectuating their intention, however untechnically expressed, induced the judges to dispense with those rules (the rules of the common law) in cases of wills, as well as in the limitation of uses."    There is but one of these differences or distinctions with which we have anything to do, and that is, that a fee may be limited after a fee.    This is said to be one of the distinguishing differences between an executory devise and a contingent remainder, and however absurd and contradictory it may seem when contrasted with other well established rules of law, yet it has found a tacit recognition by many authors, and perhaps might have some weight in the present case.    This maxim had its origin in the celebrated case of *Pells* v. *Brown*, which, although condemned by many judges in the most unqualified manner, has been followed by many others.    A contingent remainder cannot be limited on a fee simple, because the whole being gone there is no remainder left.    Now, why is there more for an executory devise to operate on than a remainder.    The whole estate passes by the conveyance in fee simple; therefore there can be no room for an executory devise which presupposes a future contingent estate, but how can there be such an estate, when the whole fee has vested in

the devisee, and his heirs ? There can be no such thing. If any thing be carved out of the estate, or if it is to determine on a future contingency, then it is not a fee simple. The law presumes that every person who dies, leaves heirs; therefore the fee simple goes to his heirs, and there are always persons to take, and if anything will defeat those heirs, the estate was not a fee simple. But again, it is conceded on all hands that if the will invest the devisee with power to dispose of the estate, an executory devise cannot be supported, because it is repugnant to the power of disposition. 3 Lomax, 288; Ib. 116; 4 Kent, 270. Now does not every devise in fee, invest the devisee with an absolute unqualified power of disposition, as much as if such power was inserted in words ? Does the insertion of such words make the estate more than a fee simple, or do they make it more transmissible than it would otherwise be ? Not at all; they are mere surplusage. Indeed any restriction on the power of disposing of an estate in fee is void. When a fee is conveyed, the absolute power of disposition constitutes part of its essence, without which it cannot be a fee simple. An express power of disposition adds nothing to it, and does not enlarge the power of the taker over it. And yet, it is said, that by an executory devise a fee simple may be limited on a fee simple, but this, it is conceded, cannot be done if a power to dispose of the estate be inserted in the will. That is to say, if a useless, unmeaning thing be done, an executory devise cannot be supported ; but if that useless unmeaning thing be not done, it may be supported. We may desire to call the attention of the court to this point hereafter, and therefore notice it in this place. We think it will appear from what has been said, that complainants' claim does not come up to the requisites here given. The facts in the case of *Pells* v. *Brown*, did not warrant the rule that was drawn from the decision that an executory devise might be limited after a fee simple.

The complainants, however, seeing the fatal results that must befall them if they should claim a contingent remainder, or an executory devise, limited on an estate tail, seek to avoid them, as it is understood, by insisting that the will conveyed a determinable fee, or as Chancellor Kent has expressed it, "a qualified, base, or determinable fee." This phrase or term, "determinable fee," is a very general one, and is one of the few terms in the law, that

conveys no definite idea to the mind, and it is not an easy matter to discriminate between a determinable, and other fees. It seems to have been a term adopted to include estates which might possibly be fees, and which could not be placed, or were not properly embraced under any other class of estates. Chancellor Kent has treated of these determinable fees, and what is very remarkable, he has treated of them in the very same chapter in which he has treated of estates tail, in which he so clearly defines the latter to be a conveyance to a man and particular heirs, or the heirs of his body. But he makes this remark about them, which it is necessary to bear in mind, as a distinguishing characteristic of such fees: "These qualified or determinable fees, are likewise termed base fees, because their duration depends upon the occurrence of *collateral* circumstances which qualify and debase the purity of the title." 4 Kent, 9-129. The circumstances, then, which debase them must be *collateral* to the estate, that is, in no way connected with the estate. How could the failure of issue, when the estate was given to the heirs of the body, be considered a circumstance collateral to the estate. The examples put by the author, show what he means, as, for instance, to a man and his heirs, so long as a church or a tree shall stand.

And in addition to the examples given by Kent, and in proof that it must be some collateral circumstance, we call the attention of the court to the examples given by Preston, eighteen in number, every one of which are circumstances collateral to the estate. And we mention one in his own language, as it seems fully to sustain the remark of Chancellor Kent, to wit: "Whilst a man or woman, (not being the donee,) shall have heirs of his body, or issue of his body." And why so particular if the issue, being the issue of the body of the donee, as in this instance, made no difference? That particularity was thought to be necessary; it is enclosed in brackets, and designed to guard the reader against the improper conclusion, that a fee might be properly determinable if given to a man and the heirs of his body. But what is still more decisive, the author, in the very next sentence following these eighteen examples given of determinable fees, uses this very emphatic language, to wit: "Let it be remembered, that a gift by will to A. and his heirs, if he have issue of his body, is an estate tail

to him." 1 Preston on Estates, 431, 432. This cautionary language was very clearly introduced to prevent the reader from confounding a determinable fee with an estate tail. But the same author, in a preceding chapter, is quite as explicit as Chancellor Kent, in stating that a determinable fee must depend upon some *collateral* event, and also that such event may happen before the period shall be completed through which the estate was extended; for example, an estate to A., during her widowhood, is an estate for life, determinable on her marriage. 1 Preston on Estates, chap. 1, p. 126, 127. But a satisfactory test may be employed, as it seems me, to determine whether this be a determinable fee or an estate tail. I suppose it will be conceded that a determinable fee must be made so by the instrument which creates it; if this was a determinable fee, it must have been made so by the will. In whom does a determinable fee vest? In the grantee of course. Then Mary took a determinable fee, and not a fee tail. It is important to observe that a determinable fee may continue forever; but it is liable to be determined by the occurrence of the event expressed in its limitation. This is clear. Suppose the event never happens, what is it then? A fee simple, beyond all possible doubt, for it cannot last as a determinable fee forever. Then suppose the children of Mary had lived to be twenty-one years of age, would they have had a fee simple, or a fee tail? I put the question. The answer to it will solve the difficulty; and we are trying it still by the English law of course. I apprehend the court will be bound to answer that they would have had an estate tail. Could they have had an estate tail, when their mother held a determinable fee? Never; an estate tail never arose by accident. And in further proof that a determinable fee must depend upon an event collateral to the estate, we insist that a determinable fee must be determinable as to the grantee or devisee only; that is, it must be some event which will terminate or perpetuate the estate in him, or in his heirs; it must not be a determinable fee in other persons. Now with what propriety could we say that there was a determinable fee in Mary and the heirs of her body, to become absolute if the heirs lived to be twenty-one, but to determine if they died under that age? Why, that is exactly the characteristic of an estate tail, and if this be a determinable fee, then every estate tail is a

determinable fee, as really it is, but that is not the appropriate term for it.

Now it is insisted that this phrase, " determinable fee," is not the proper one.   There is no such term known to the common law as a technical term.   On the contrary, Lord Coke says: " Of fee simple, it is commonly holden, that there be three kinds, viz : fee simple absolute, fee simple conditional, and fee simple qualified, or base fee."   And what is a fee simple conditional ?   We have shown what it is—it is an estate limited to a man and the heirs of his body.   Then a base or qualified fee cannot be the same thing—it cannot be an estate limited to the heirs of the body.   And the instances or examples put by Lord Coke show that Chanceller Kent was correct; it must be an event collateral to the estate, because, manifestly, if the event be connected with the estate, it is then but a condition.   The instance, too, put by Lord Hale, is collateral to the estate.   This phrase, "qualified, base, or determinable fee," for they all mean the same thing, seems to have been regarded by every author as being incapable of an accurate definition, and examples have been given by all to explain the meaning, or to give an accurate idea of the estate, and is it not remarkable, that no author has given the example of an estate to a man and the heirs of his body.   Cruise says, " When an estate limited to a person and his heirs has a qualification annexed to it, by which it is provided that it must determine whenever that qualification is at an end, it is then called a qualified or base fee'; as in the case of a grant to A. and his heirs, tenants of the manor of Dale; whenever the heirs of A. cease to be tenants of the manor of Dale, their estate determines."   1 Cruise, 79, title Estate in Fee.   In case of alienation by tenant in tail, his alienee has a base or qualified fee, determinable on the failure of issue, which as to him, is a collateral event.   1 Cruise, 97.

But suppose this were a determinable, base, or qualified fee, for they all mean the same thing; who held the determinable fee ? Mary, and the heirs of her body of course, for the complainants claim by virtue of the termination of their estate.   Would that change the nature of the complainants' right ?   Not at all; they claim the remainder, contingent on the determination of Mary's estate, and there is no distinguishing the principle of the case from

the second example of a contingent remainder put by Mr. Fearne, in section 3, page 13. The estate in the example put, was to terminate on a collateral event, but if that is not important, and this is still a determinable fee, then the two cases are not distinguishable, and the complainants claim but a contingent remainder, and can claim in no other way,—call the estate of Mary Jordan what they may. So that on complainants' own hypothesis, the case would be against them. But the hypothesis is wrong; for there is no remainder to a determinable fee. The whole estate is conveyed, subject only to be defeated by a collateral event, and nothing is left but the possibility of a reverter in the grantor and his heirs. See 4 Kent, 10, 199. In the case before the court, a remainder was disposed of, and therefore it is not a determinable fee, nor was any such thing intended to be created.

We may observe that Lomax, a very accurate writer, has not pretended to give any other idea of a determinable, base, or qualified fee, than such as could be furnished by examples, except the single remark, that if the fee be given to a man and his heirs, with a qualification annexed, it is then called a qualified, or base fee. 1 Lomax, Digest, 17. And although Preston has endeavored to draw a distinction between qualified and determinable fees, yet it is not easy to perceive the force of his distinction. He remarks, that "every qualified fee is also a determinable one." And the definition he gives of a qualified fee is, that it "is an interest given on its first limitation to a man and certain of his heirs, and not extended to all of them generally, nor confined to the issue of his body." And the example he gives is a limitation to a man and his heirs on the part of his father. Preston on Estates, 449. This definition does not embrace the case before the court, but on the contrary, excludes it. It is a quality of both determinable and qualified fees (if there be any difference,) that they may be alienated by the tenant, and the purchaser will hold until the event happens that is to terminate the estate. Mary Roach, then, assuming that she held a determinable or qualified fee, might have conveyed to a stranger, and if her children lived to be twenty-one, that stranger would have held the absolute fee, and they would have been excluded from that which was intended for them. If they lived they lost the estate, and if they died their estate termi-

nated, and their heirs lost it.   Can it be supposed in this case,
that Roach intended to create such an estate as his daughter could
alienate and exclude her children?—and this must be so, if it was
a determinable fee.   And it is a striking difference between deter-
minable or qualified fees and estates tail, that in the one case the
interest passes by an ordinary conveyance, in the other, the entail
can only be barred by recovery.   And we beg the attention of the
court to this point of difference, and ask how it would correspond
with the manifest intention of the testator in this case to hold this
to be a determinable fee, and thereby to acknowledge the power in
the first devisee to defeat her own children of their estate by ordi-
nary conveyance.   The clear intention of the testator was, that
the estate should be confined to Mary and her issue.   But suppose
the will did convey a determinable fee, does that secure complain-
ants in their title?   Not at all; for the rules of law against per-
petuities, apply with all their force to determinable fees, as well as
to contingent remainders and executory devises.   It is of no con-
sequence to us, whether it be the one or the other, and we have
only entered into this discussion in order to fix the true character
of complainants' title, so that we might, with the more certainty,
make an application of the peculiar rules of law which must go-
vern it.

Laboring, as we do, under the inconvenience of being compelled
to meet all possible grounds that might be assumed, either by the
counsel on the other side, or by the court, as a basis on which com-
plainants can place their claim, we add a few remarks to meet the
position, if it should be assumed, that the children of Mary took
as purchasers, and not as heirs.   If this were even true, the effects
of the statute limit cannot thereby be escaped.   It is as applica-
ble to those who take by purchase as to any others.   It is believed,
however, to be impossible so to construe the will as to make them
take as purchasers, for several reasons.   The language of the will,
unrestrained by superadded words, would pass a fee.   Those super-
added words have only the effect to create an estate tail, by impli-
cation, not by direct language; but from the superadded words,
the law implies that the testator did not intend general heirs, but
that he intended the heirs of the body.   It is necessary, then, to
add implication to implication, by inferring or implying further,

that he did not mean all the heirs of the body as such, but particular persons, singly and individually. This would be straining the doctrine of implication rather too far.

Fearne says, when the heirs take derivatively through or from the ancestor, as the root of succession, or person in whom the estate is considered as commencing, the words "heirs, or heirs of the body," are words of limitation; but when they operate only to give the estate imparted by them to the heirs described, originally, and as persons in whom the estate is considered as commencing, and not derivatively from or through the ancestor, they are properly words of purchase. Fearne on Remainders, 79. Surely, in this instance the estate commenced with Mary, and the heirs of her body were to take derivatively, or through her. No new estate was created in them as original parties to take. Lord Thurlow said, "where the heir takes in *character of heir*, he must take in *quality* of heir." And again : "where an estate is so given that after the limitation to the first taker, it is to go to any person who can claim as heir to the first taker, the word 'heirs' is a word of limitation." *Jones* v. *Morgan*, 1 Brown, Ch. Ca. 216. When the word "heirs" is used as descriptive of the class of legal successors, and not in designation of an individual or particular persons, it is a word of limitation, and not of purchase. 1 Preston on Estates, 275, 278. These authorities would seem to be decisive of the question. It must be beyond doubt that the original estate vested in Mary, and that the testator intended that it should be derived through her to *all* the persons who might answer the description of heirs of her body as a class of persons to take as successors to the first taker.

The word "issue" may sometimes be a word of purchase, but it is difficult to conceive a case in which it would be a word of purchase, when it is used, as in this case, only to exclude the general heirs, by substituting heirs of the body. The testator manifestly had in his mind all the children of Mary, and but for the restraining word "issue" a fee simple would have passed. Here it is used only as a restraining word. When it is used in wills, and as a substituted word for "heirs of the body," it must be construed as the word for which it is substituted would be construed. 1 Pres-

ton, 365. See also *Evans* v. *Davis*, 1 Yeates, 332; 4 Kent, 221, 222.

3. We come, in the last place, to the important inquiry, what changes have been made in the English law, by our statute, either directly or by necessary consequence? And we shall endeavor to show that, although the claim of complainants might have been well founded under the English law, under the statute of this State they cannot maintain it. In the investigation of this branch of the subject, we shall, of course, refer to adjudications in other States, on statutes similar to our own. The court, on a full investigation of this question, will be struck with the contrast which will present itself. British policy, it would seem, was against perpetuities, and so is the general policy of this country. But how different the course of judicial decisions and legislation in the two countries. In England the policy of the common law was shaped and sustained by the courts and perpetuities discountenanced. So far was this doctrine carried, that estates tail or conditional fees, although fettered and bound through all time to a particular course of descent by the terms of the gift, were declared by a forced construction, to be alienable after the birth of issue. And other contingent limitations were not more favored. But this policy of the common law did not suit the aristocracy of the country, who desired to perpetuate property in their own families; hence parliament was importuned to break it down, so as to enable the large landholders to make family settlements of their property; and as the wealth of the country had its influence, the statute *de donis* was passed, which restored entails and perpetuated them according to their original purpose. This, too, as it could not be repealed, was evaded by the judges. The judiciary was on one side—on the side of liberal public policy, and the best interests of society, in lending its aid to unrestrained alienation of property. The parliament and the nobility were on the other side, favoring the restraints on alienation, and the establishment of perpetuities in the families of the landholders. In this country the state of things is reversed; the legislative policy is to break down these perpetuities in every form, and to favor the free and unrestrained alienation of property. The judicial policy is to sustain and protect them, by evading the legislative enactments through the aid of

construction and subterfuge.   There, in a monarchy, we behold a free and liberal policy sustained by the courts, and opposed by the parliament.   Here, in a free government, we behold a free and liberal policy promulgated and sustained by the legislative authority, and opposed by the judiciary—for the court will readily perceive, on examination of many of the American adjudications, that the power of the legislature has actually been evaded, and virtually set at naught, by the expansive power of the judiciary.   So far has this been carried, that an eminent writer has declared that estates can be more readily locked up, and alienation is more effectually restrained, in Virginia than in England.

This court, for the first time, has this whole question before it; and we feel the utmost confidence that the unambiguous meaning of the statute will be adhered to, and its policy carried out; that whatever other courts may have done, this court will declare the law as it is, and relieve the questions now before it from all future cavil.   We ask for the legislative enactment its full force, and we ask nothing more.

And before we proceed to a more particular notice of the provisions of the statute, we beg to call the attention of the court to its character.   It belongs to that class of statutes which regulate public policy, as contradistinguished from statutes which define and regulate the rights and duties of individuals towards each other.   This is emphatically a statute of public policy.   It has no other object but to declare and protect that policy.   It does not strike at names, it strikes at things—names are not odious, things are.   If it can reach nothing but a name, strike it from the statute book; it is too imbecile to have a place there.   The rule for construing such statutes is well understood, and applied to the statute, it becomes efficient in the correction of evil; but if not applied, it is almost useless legislation.   It being a statute of public policy, it is to be construed and extended so as to protect that policy—to break down the mischief effectually which it was intended to remedy.   Bacon says: "A statute made *pro bono publico*, shall be construed in such manner that it may, as far as possible, attain the end proposed."   "Such construction ought to be put upon a remedial statute as will tend to suppress the mischief intended to be remedied."   This is a remedial statute, intended to

prevent the great public evil of perpetuities. Again, he says, of this description of statutes : " It is the duty of the judges to put such construction upon a statute as may redress the mischief, and guard against all subtle inventions and evasions for the continuance of the mischief *pro privato commodo ;* and give life and strength to the remedy *pro bono publico.*" 7 Bacon's Abridgment, 461, 462. We ask for this statute, in view of its purposes, an application of these rules—that it may have its legitimate and full effect—that it may be extended and applied to whatever may be within its meaning. In many of the States we find similar statutes. American legislative policy on the subject seems to be general, but we also find that by some subtle invention, or contracted construction, that policy is almost stripped of power: for, although estates tail are not sustained, substituted limitations and refinements are sustained, which are equally mischievous.

The law to which we refer is in these words : " Every estate in lands or slaves which now is, or shall hereafter be created an estate in fee tail, shall be an estate in fee simple ; and the same shall be discharged of the conditions annexed thereto by the common law, restraining alienation before the donee shall have issue, so that the donee, or person in whom the conditional fee is vested, or shall vest, shall have the same power over the said estates as if they were pure and absolute fees. Provided, that any person may make a conveyance or devise of *lands,* to a succession of donees, then living, and the heir or heirs of the body of the remainderman, and in default thereof to the right heirs of the donor in fee simple."

We have shown what the English law is, and here we see that system of limitations which was so odious to the common law, and only sustained by the power of parliament to favor the aristocracy of the country, swept away by the legislature. Even the common law, liberal as it was, was not deemed liberal enough, and its restraints are removed. The estate is at once converted into a pure and absolute fee. This statute, in view of what the law was, would seem to be plain enough to leave no room for doubt, and no room for evasion. There is nothing more odious in an estate tail than in any other estate which may operate as a perpetuity, and the statute was intended to prevent an evil, not simply by abolishing

estates tail, technically so called, but by abolishing all limitations in lands or slaves which possessed the qualities or characteristics of estates tail.   It was the conveying of estates down through a particular channel, and thus withholding them from free alienation and the purposes of society, that was intended to be prevented.   It might be said, and perhaps with propriety, that estates tail never existed in this State, inasmuch as the statute from which they derive their name never was in force here.   Conditional fees were known to our law, and this statute reaches them, not by name, but because of their qualities.   Why was the provisions of the statute extended to estates tail in slaves?   It was simply to prevent the limitation of this description of property in particular families, by conveyances which might contain provisions similar to those adopted for conveying estates tail.   It was not to cut off a mere name, for there was none to which it could apply; as estates tail or conditional fees in chattels did not exist.   The subjects of such estates were lands exclusively, not personal property.   And it will be seen from the language employed, that the legislature did not intend to be merely technical.   Estates tail are first destroyed and converted into estates in fee simple, a term which is comprehensive and expressive enough of itself to accomplish everything.   But such estates were, in addition to this, expressly declared to be discharged of the conditions annexed thereto by the common law, restraining alienation before issue born; and apparently fearing that these expressions would not be broad enough, the provision is added "that the donee or person in whom the conditional fee is vested, shall have the same power over the said estates as if they were pure and absolute fees."   This latter provision, although it may seem to be a redundancy, is not without its object, as we shall endeavor to show hereafter.   For the present we only remark, that it evinces a desire on the part of the legislature to accomplish the whole work without leaving room for doubt.

But it is the proviso to this statute that commands the most attention, and here let it be remarked that the whole statute is a restraining one, and the proviso merely qualifies the general provision in the body of the statute; and in doing so it fixed precise limits; it leaves nothing to intendment—nothing to construction.

" Provided, that any person may make a conveyance or devise of lands to a succession of donees then living, and the heir or heirs of the body of the remainderman, and in default thereof, to the right heirs of the donor in fee simple." The legislature did not pretend to designate any estate which might be so created by its proper technical name. If it had said that, by way of contingent remainder, estates might be so limited by the conveyance, or so far limited by devise as an executory devise, confusion might have arisen. To avoid this, the more intelligible expressions were employed. The power to convey, and the power to devise, were left untouched to a certain extent—not given, because they existed before, and existed to a much greater extent. The object, then, was to limit *an existing power* within certain well defined boundaries so that it could not be so extended as to be productive of the mischief intended to be remedied. And if the prescribed limit can be transcended by any shift or device, then the statute is defective. But it cannot be—it is too cautiously worded to admit of evasion. It does not strike at estates by particular names, but it limits the *power of disposition*. Estates must be transmitted by simple conveyance or by will, unless they be left to descend. Adopt, then, which way you may, either by conveyance or will, and the statute has prescribed a boundary to the power of limitation. And whether the estate be classed as a contingent remainder, or vested remainder, or as an executory devise, or a conditional limitation, or a qualified fee, or as a determinable fee, if it originated by *deed* or *will*, it can only be limited to a certain extent— after that it becomes a fee. We repeat again, that the statute *limits the power* of the owner of an estate, and as a restraining statute it must be so construed as to admit of no enlargement. And the question to be answered is, how far can the owner of an estate limit it?—not by what means can he do it; for to the extent allowed, it may be done in several ways, or rather by several technical means. This proviso is confined, too, to land—it leaves no power to limit personal property by any means whatever. Still this will disposes of both real and personal estate.

As to the extent to which the limitation may be carried, the statute is very explicit—to any number of donees then living, in succession, one after another, and to the heirs of the body of the

remainderman, and in default of such heirs of the remainderman, then over to the heirs of the donor. When there are heirs of the body of the remainderman, there the limitation must stop; and their estate, by force of the statute, is immediately converted into a fee. Any further limitation or condition must fail. And even if they take as tenants in tail, they cease to hold as such, otherwise the statute would accomplish nothing. But they do not take strictly in the capacity of tenants in tail—for the distinguishing quality of an estate tail, is that it endures from generation to generation, in a direct descending line, until that line may fail. If the remainderman should have no heirs of his body, living at the time of his death, the estate passes to the right heirs of the donor. And we should here remark, that in but few of the States is there a statute like this. It seems to have been introduced for the purpose of putting an end to all disputes in relation to the intricate branch of the law to which it had reference. We beg to press the point that this is a question of power.

Before we proceed further in the discussion, there is another section of the statute (the 26th) which demands some attention, as it will doubtless be much relied on. It is in these words: " Every contingent limitation in any deed or will, made to depend upon the dying of any person without heirs, or heirs of the body, or without issue, or issue of the body, or without children, or offspring, or descendant, or other relative, shall be held and interpreted a limitation to take effect when such person shall die not having such heir or issue, or child or offspring, or descendant, or other relative (as the case may be,) living at the time of his death, or born to him within ten months thereafter, unless the intention of such limitation be otherwise expressly and plainly declared on the face of the deed or will creating it."

It might be enough to say of this statute that it establishes, as it professes to do, and as was decided in the case of *Powell* v. *Brandon,* a rule of construction. It neither gives nor preserves power to make limitations by deed or will, but only gives a rule by which those which may be made, shall be construed. A glance at the rule of construction which had been adopted before the passage of the statute, will show its use. A conveyance to take effect on the dying of any person without heirs of the body, or issue, or

offspring, was held to mean an indefinite failure of issue, and too remote—that is, no period of time was designated at which the failure of issue was to occur, and consequently it might be at a remote period. Such limitations were held to be void. On the other hand, a limitation made to take effect on the dying of a person not having issue living at the time of his death, was a definite failure of issue, as the time was designated at which the failure should occur. This statute in effect inserts in every deed or will, containing a limitation to take effect on the dying of any person without children or issue, the definite words "living at the time of his death, or born to him within ten months thereafter," and that is all that it does, so as to avoid the question which has so much perplexed the courts. It makes that definite, which would be otherwise indefinite.

Manifestly, the object of the legislature, by the 24th section and the proviso, was to prevent perpetuities. In view of the English law, and in view of the policy which has prevailed in these States, from the very first dawn of liberty, this surely cannot be doubted, and that was the paramount and controlling purpose, the chief object, and the statute ought, therefore, to be so construed, if construction be necessary, as to make it accomplish this great object. Does the 26th section defeat the purpose of the 24th, by building up, restoring, and perpetuating that which had been torn down? And yet, contradictory, inconsistent, and absurd as such a result might seem, such, nevertheless, is the result, if the 26th section is to be construed as tolerating and providing for limitations; and with such a construction there is no harmony between the sections —they cannot stand together, the one or the other must fall. But such a result is not a natural one; it is a forced one, and can only be brought about by a perversion of the meaning of both statutes. The whole object of the one was to prevent the suspension of the power of alienation—the other was intended to furnish a mere rule for construing instruments, and cannot, by mere implication, defeat the great purpose of the legislative will. The one is a statute of great public policy, the other relates to the mere interpretation of the written instruments of individuals; and if there were even a want of harmony between them, that which is intended as a great

public benefit must be preserved, even though the other should have to be rejected entirely.

But it is sometimes said this last section must have the effect to tolerate and protect limitations, or it can have no effect at all. Such an argument is as unfounded in fact, as it is unsound in theory. Whether the 26th section can apply to any other given case, is not now a question before this court; the only question is, does it sustain the limitation in this case—leave it to have its application to others when they may arise? It is a bad reason for the application of a doubtful statute to a particular case, because no other case is seen to which it could apply. In doing this, the court would decide too much—it would decide that the statute applied to the case before it, and that there was no other case to which it could apply.

But the argument is unfounded in fact, because the 26th section rightly considered, contains a provision essential to the completion of the 24th section, and without it the 24th would be worse than imperfect—it would be suicidal. The first part of the 24th section declares that estates tail are abolished and converted into absolute fees:—the proviso declares that any person may, by deed or will, convey to a succession of donees then living, and to the heirs of the body of the remainderman, and in default thereof, to the heirs of the donor. Without further explanation, what might this proviso be construed to allow? Why, the creation of estates tail of course—for the heirs of the body of the remainderman would take such an estate, which would pass down until a failure of issue, and then go over. At least such would be, or might be construed to be, its effect, if it were an enabling statute; for by authorizing a conveyance or devise to the heirs of the body, it might be supposed that a strict and technical estate tail was allowed, the appropriate words for that purpose, being used in the statute, without restriction or explanation. The difficulty might have to be got rid of by rejecting the proviso as being repugnant to the body of the statute. But the 26th section removes all the difficulty. It must be construed in aid of the 24th section. The two together make a complete provision, which is perfectly harmonious and intelligible. It allows a devise over, not on an indefinite failure of issue, at any remote period, but on a definite failure of issue, that is, *on failure*

*of issue living at the death of the last taker*. To illustrate this, let us suppose a case by adopting first the language of the proviso. A. devises to B. an estate for life, remainder to C., and the heirs of his body, and in default thereof, to the heirs of the donor in fee simple. Default means failure of issue; but on default, when? —when is the default to occur? The proviso does not say; and the inference might be that failure of issue at any remote period, a thousand years for instance, would come within the meaning of the statute. But the 26th section explains when the failure of issue is to occur, to wit: *in default of heirs of the body living at the time of the death of the last taker of the estate.* And if there be no such default or failure of issue at that time, the remainder over is gone. In other words, if the devisee in tail leave heirs of his body, living at his death, they must take a fee simple, and the limitation over to the right heirs of the donor must fail. It is the same whether there be an intermediate estate or not; the estate is converted into a fee when it reaches or vests in the heirs of the body of the devisee. The two sections together make exactly the same provision in substance that is contained in the statutes of Connecticut, Ohio, and New York. This construction makes the statutes harmonize, and avoids even apparent inconsistency, and we need not say that it is the duty of the court so to construe statutes as to make them harmonize, if possible.

But to illustrate this statute further by the case before the court. Here was a devise to Mary and the heirs of her body— for such is the construction of the will, "but if she should die without issue," then over. Now here was a devise over on an indefinite failure of issue, and it is only made definite by the statute. But as she left issue living at the time of her death, the absolute estate vested in the issue, and the remainder over was thereby defeated, for the testator could add no further limitation or condition. Her issue took by inheritance—they took as heirs, and the statute vested the fee in them.

It is true, the case of *Kirby* v. *Calhoun*, was decided on this 26th section, as though it had given power to make limitations, whilst the statute that cut off that power was entirely overlooked both by the counsel and the court. The decision was based on a total misapprehension of a passage in Lomax's Digest, which, instead of

sustaining the decision, or at least the reasoning of the judge, is directly and flatly against it.  The case evidently did not attract much investigation, and even if it stood in our way, could not be regarded as a decisive authority.  But, fortunately, it has been overruled in two later cases.  The case of *Powell* v. *Brandon* does virtually, if it does not directly, overrule it.  The two cannot stand together, for they are based on wholly opposite views of the same statute.  But the recent case of *Hampton* v. *Rather*, in MSS., is directly adverse to the decision in *Kirby* v. *Calhoun*.  The court say in effect that *Kirby* v. *Calhoun* had been overruled by *Powell* v. *Brandon*.  In the case of *Hampton* v. *Rather*, the foregoing view of the proviso to the 24th section is sustained to the fullest extent.  The court then construed the 24th and 26th sections together, and in aid of each other, and held that, by any different construction, the latter section would defeat the first.  And the Chief Justice said: "The language of the proviso is definite and intelligible: and the boundaries therein sanctioned, are marked with unmistakable certainty."  This is precisely what we contend for; and we insist that the boundary extended to the heirs of the body of Mary, and no further, and they took the fee simple.

The inquiry may very naturally arise, why was this proviso introduced?  Estates tail had been cut off, and converted into absolute fees, as effectually as by common recovery.  The answer is, this did not reach the whole mischief.  The difficult and abstruse doctrine of contingent limitations, by remainders, executory devises, &c., was to some extent, left untouched; at least it was left in a dubious or uncertain condition; and as if to make the work complete, this proviso was introduced, and it virtually abolishes all refined distinctions between contingent remainders, executory devises, and all other contingent estates, by prescribing the utmost limit that could be reached either by deed or will.  The same result precisely, is reached, if we regard the body of the statute as cutting off all limitations, and the proviso as a mere qualifying clause, as in that case no limitation could be made to extend beyond the extent allowed.

We have thus, in a general way, endeavored to show that the English law has been entirely changed by our statute; and as we started out with the proposition that the interest of the complain-

ants, if they had any, was a contingent remainder under the common law, it becomes necessary to show, with some more particularity, why, under our statute, they cannot support their claim to such remainder; for it is certain that a remainder, within certain limits, may be supported under the statute.

The first reason we assign why this remainder failed is, that the testator undertook to limit the estate for a longer period of time than that which is allowed by the statute. He transcended the limits prescribed to the power of limitation, and having transcended them, it is immaterial how far he went beyond the point to which he was authorized to go—all beyond that was nugatory, and the law cut off the limitation at the prescribed point, and left the estate to rest there, just as though the testator had done so in his will. We need scarcely repeat what that prescribed limit was; it was to the devisee and the heirs of her body, and there the estate was converted into a fee—the testator could not control it beyond that point—there his power over it ceased—the law then stepped in and directed its further progress. It must be kept in mind that the heirs of the body of Mary were not in being when the testator died; they were born afterwards. The devise was not to them as persons in being. Now the testator might have devised to a succession of devisees then living, for their respective lives, remainder to Mary, and to the heirs of her body, but the power to create intermediate estates, does not enlarge the power to dispose of the residue because such intermediate estates were not created. As no such estates were created, Mary occupied the place of direct devisee, and of remainderman also; for had he made several intermediate estates, it took them all to make one estate. Mary, therefore, took the whole estate, subject to the devise to her children. Then the devise to Mary and the heirs of her body, was as far as the law allowed the testator to go, and that being the extent, her children took a fee simple of course. They did not take an estate tail, for if they had done so, the law would support and favor perpetuities. Now the testator undertook to tie up this estate until Mary's children, who might survive her, should become twenty-one years of age, and this was doing more than the law allowed, and it is immaterial how much or how little more. There is no law that allows it, and that is enough; the statute does not say that a

limitation may be made to the heirs of the body of the remainder-man, and for twenty-one years afterwards.    The complainants claim because the heirs of the body of Mary died under twenty-one; it was on that contingency that the estate was given to them; now, if the devise be good, would it not have been equally good if it had been made to depend on their dying under seventy-five or a hundred years.    There is nothing which authorizes the locking up of estates for one period of time more than another.    And if a departure from the law may be tolerated, where is the limit—there is no rule of limit.    And if the court can make one, it had just as well make one as another—it may just as well say five hundred years as twenty-one, and better make it long enough at once to save trouble.    If the law is to be transcended, and a rule not authorized by it is to be adopted, this is judicial legislation—it is dispensing with a rule of law, and substituting a rule of the court. Such things have been done, I know, but it is to be hoped they will not be done here.    Much of the English doctrine of limitations is but the arbitrary rules of the courts, or judicial legislation.

But a contingent remainder cannot be supported in this instance for another most conclusive reason.    A remainder cannot be limited after a fee simple as we have shown, for the plainest of all reasons —there is no remainder or residue of such estates.    Now if this were an estate tail in Mary, of which we think there can be no doubt, then the statute immediately converted it into a fee simple, and thus cut off the possibility of a remainder.    The statute was intended to operate on estates that would have been fees tail before its passage, and this was one.    But suppose the statute to tolerate limitations to a certain extent—suppose that the devise to Mary and the heirs of her body be good, there it must stop ; it was converted by statute into a fee simple in the children, and there the possibility of a remainder ceased.    As well might the testator have bound up the estate for a thousand years, as to extend the limitation one instant after it vested in the children of Mary ; in them it was a fee simple; it could be nothing else.

The court, however, may incline to the opinion that complainants' claim may be sustainable as an executory devise, and therefore we undertake to show that the statute again interposes its power,

and destroys the possibility of its being an executory devise, even if it could be so without the statute.

It might be sufficient to remark that the statute allows of no limitation created by " conveyance or devise," for a longer period than to a succession of donees or devisees then living, and to the heirs of the body of the remainderman—this does go beyond that limit, and therefore cannot be sustained. It goes beyond it without any rule, for at least twenty-one years, and with the same propriety, and with as much law to support it, the testator might have gone to a hundred years ; for when you get outside the rule of law, of course there is no rule at all—everything beyond that is merely arbitrary, and it would have been just as competent in the testator to have made the limitation over on the death of Mary's children's children under twenty-one, as it was to make this provision.

But there are other reasons why this cannot be sustained as an executory devise. All such devises create perpetuities—they are in fact estates tail, or, as Chancellor Kent says, they are a " species of entailed estate." They originated with the courts, after the Statute of Wills, and were designed to favor wills. In their origin they were confined to a life in being, but were afterwards enlarged to such an extent as to sustain perpetuities, and it became necessary for the courts to define the precise limits to which they could be extended. This was done in the case of *Stephens* v. *Stephens*, decided in 1736, in which it was held that twenty-one years added to a life in being, could be allowed without danger of perpetuities, for the reason that an infant could not convey the estate before he was twenty-one. And the addition of that time, therefore, imposed no restriction ; a reason that can have no influence here, as our laws provide for disposing of the infant's land, and it is often necessary that the power should be exercised. This rule would, therefore, defeat the policy of our law in this respect. Now this rule of holding an executory devise to be good if it did not go beyond lives in being, and twenty-one years afterwards, was a mere arbitrary rule of the courts ; it had no foundation either in the common law or statute law. It has no existence here ; we have no law but common law and statutes ; and this is neither. If it is to be law, it must be made so by the courts ; but this has not been done yet ; we trust it will not be done ; indeed it cannot be done

without disregarding our statute. It is in direct opposition to the statute. Indeed, an executory devise cannot properly exist here, as that too had its origin with the courts. Yet, it is likely this rule of allowing twenty-one years may be invoked in this case, but it applies properly to nothing but executory devises, and if the rule can be made available, it must be because this is an executory devise. The draftsman of this will, no doubt, supposed that he was framing an executory devise, and doubtless had this rule in view. Our answer to it is, that it goes beyond the statute. "A conveyance or devise of lands to a succession of donees then living, and the heir or heirs of the body of the remainderman," may be made, but no twenty-one years are added. The evident policy of our statute would be entirely defeated by sustaining this or any other limitation that may exceed the bounds allowed by the statute; and that which is opposed to the policy of a statute is against the statute.

We shall add another reason why this cannot be sustained as an executory devise. As if to guard against the doctrine, for it was not a rule, that by way of executory devise a fee simple might be limited on a fee simple, the statute not only converts estates tail into pure and absolute fees, but it confers expressly the power of disposition. We have seen that where such a power is contained in the conveyance, an executory devise cannot be supported, because it is repugnant to the power of disposition, and if permitted to operate would restrain it. It would seem that this rule of the English courts was in view of the framers of the statute, as the language employed seems to be unnecessary for any other purpose. The statute, in this instance, transferred all its provisions into the will, and as a consequence an executory devise cannot be supported, because it would be repugnant to the pure and absolute fee created by the statute. We have said that the case of *Pells* v. *Brown*, which is the first precedent for this strange, and, as it would seem, absurd rule, that a fee could be limited after a fee, had been much questioned, and we invite the attention of the court to Chancellor Kent's criticism upon it, in the case of *Anderson* v. *Jackson*, 16 Johns. Rep. 382.

It is scarcely necessary to observe that the rules of law against perpetuities, apply as well to estates created by will as by deed.

See 3 Cruise, title Devise, 133, chap. 9, § 28; 2 Ib. title 32, ch. 33, p. 277.

Some further remarks will be submitted to show that if this were a base, or a qualified, or determinable fee, the condition of complainants cannot be placed on any better footing. The remarks already made in regard to the effect of the statute, will equally apply to this description of estate. Being created by will, it could only be limited to a life or lives in being, and to the heirs of the body of the devisee. No condition or qualification—no determinable character can be invented to extend further. It was useless to pass the statute, if it may be avoided by creating a determinable fee instead of an estate tail. How absurd it seems, to say that an estate tail cannot be created, because it is a perpetuity; but a perpetuity may be created by a determinable fee. Whatever is within the reason of the statute, is within the statute, even though the letter of the statute may not reach it.

In addition to what has been said in regard to determinable fees, we may here remark that they always descend to the heirs general as estates in fee simple do. 1 Preston on Estates, 445. And no instance has been found in which a limitation over has been made on a determinable fee. Such a limitation would be a remainder, and there is no remainder in a determinable fee. If a remainder be limited, the particular estate assumes a different name. We may here add, also, that no instance has been found of the holding of chattels or personalty in this way; the doctrine seems to have no application to such property. Still, this will disposes of such property.

But suppose this were a determinable fee, by what rule can it be extended beyond the limits of the statute? We know of none. Preston says of such fees, they must be confined within the rules against perpetuities. 1 Preston, 434. What are the rules against perpetuities in this country? The statute furnishes the answer. There is no rule which admits of a conveyance or devise to take effect after a life or lives in being, and twenty-one years afterwards. And if such a rule is now to be applied, it is an enlargement of the statute. It must be remembered that these rules grew up in England without any statute. Suppose the courts of Westminster had had such a statute as this before them when the rule was

established, is it possible to believe that such a rule ever would have been thought of?

This proviso presents a feature so different from that which exists in most States, that the decisions in States where it does not exist, cannot furnish safe judicial precedents. Limitations may, with some plausibility, be sustained in those States which have not a prohibitory statute like this. In but three of the States do we find a similar provision. In Connecticut, Ohio, and New York, the same provision exists, but in language less liable to misinterpretation, to wit: "No estate in fee simple, fee tail, or any lesser estate in lands or tenements, shall be given or granted by any deed or will to any person or persons but such as are in being, or to the immediate issue or descendants of such as are in being at the time of making such deed or will, and that all estates given in tail, shall be and remain absolute estates in fee simple to the issue of the first donee in tail." Statutes of Connecticut, (1854,) 630; Swan's Statutes of Ohio, 355. Now, these statutes express exactly the meaning of ours; they prohibit the making of limitations : that is, they restrain an existing power, and so does ours, and that is its whole purpose, and by no subterfuge or technical name can it be avoided. Make what you will—contingent remainder, executory devise, determinable fee, or convey by words of purchase—if you convey by conveyance or will, you may convey only so far— no further. You may convey to donees or devisees then living, and to the heirs of the body of the last taker, and there is an end to the power, and those heirs must take in fee simple. These statutes seem to have made the question of power so plain in the States where they exist, that in some of them no attempt has been made to transcend the limit, and we therefore find no adjudications on the subject which are of much importance. We may refer, however, to *Hamilton* v. *Hempstead*, 3 Day, 332; *King* v. *Birch*, 12 Ohio Rep. 390.

A similar statute exists in New York, at least in principle it is the same, which has been the subject of adjudication in that State, and to these decisions we refer with great confidence, remarking that it is a late statute there, and it is only the cases decided since its passage, that can be useful as authorities. And we also remark, that the New York statutes do provide for certain limitations within

prescribed bounds, but the court will readily perceive that, although certain limitations may have been sustained there, this has been done under some other express statutory provision, but the provision to which we refer as similar to our own, is regarded as positive, and as admitting of no evasion or excess for even twenty-one years or twenty-one days, and this, too, whether the estate was in trust or by direct conveyance. We extract it in order to show the similarity:—" The absolute power of alienation shall not be suspended by any limitation or condition whatever, for a longer period than during the continuance of not more than two lives in being at the creation of the estate, except in the single case mentioned in the next section." 1 R. S. (N. Y.) 723, § 15. The next section allowed a contingent remainder in fee to be limited on a prior remainder in fee, to take effect in case the person to whom the first was limited should die under age, or upon any other contingency which should determine the estate before that age was attained. Under the provisions of the two sections, alienation may be restrained to a certain extent, but not beyond it.

But when the first section is left to operate alone, the courts there hold that its limits cannot be exceeded. In what does it differ from our statute? In no material point, so far as purpose is concerned. Like the Connecticut and Ohio statutes, it is in language suited to a prohibition, which is the sense of ours, or it has no sense, as it was not necessary to authorize such limitations as are mentioned in it, for they could have been made to a much greater extent without it. Nor is it a declaratory law, for it stops half way, and only declares part of the common law. The only difference is in the extent of power; the New York statute prohibits limitations which shall suspend alienation for a longer period than two lives in being; ours prohibits the suspension of alienation for a longer period than any number of lives in being. If, therefore, the courts in New York have so construed their statutes as to declare void any limitation which goes beyond the express period allowed by the statute, our statute should receive a similar construction. Our legislature, in the recent Act, has followed the examples of New York, by changing the former law. In New York, too, there is a statute abolishing entails in express terms, and notwithstanding that general provision, it was thought neces-

sary, as it was here, to insert a provision which would reach all limitations.

The effect of this statute was brought in question in the case of *Hawley* v. *James*, 5 Paige, 318; 16 Wendell, 61. The case was in substance this : A testator devised his estate in trust for six children and seven grand-children, all living at the time of his death, not to be divided until the youngest of his grand-children should attain the age of twenty-one years. Apart from the statute, it is very clear there could not have been an objection to the devise, and yet under the statute it was held void—and why ? Because the power of alienation might be suspended for thirteen lives. The court held that the statute only allowed a suspension during two lives, and we beg particularly to refer to the opinions of Judges Nelson and Bronson.

The case of *Hone* v. *Van Shaick*, 7 Paige, 221; 20 Wendell, 564, is also directly in point, as it meets fully the question of the capacity of the testator in this instance, to make the devise over in the event of the death of the children of the devisee under twenty-one. The case was in substance this :—The testator devised his estate, real and personal, to trustees, to accumulate a fund, which was to be finally divided at the expiration of twenty-one years, amongst his children and their descendants, and this too, was held to be void. The power to extend the bequest for more than two lives in being, and the addition of twenty-one years, were both discussed and settled in the brief and pointed opinion of Judge Bronson. If this case be law, it will put an end to all controversy about the power of the testator in this case to tie up his estate for twenty-one years after the death of the devisee, a period not allowed by the statute. The court in New York paid no sort of attention to the arbitrary English rule, of allowing twenty-one years after the expiration of a life in being; and we ask again, if this is not entirely outside of our statute, and with the court in New York say, it is immaterial how short or how long a time—if the time can be extended, the statute is useless.

We also refer to the cases of *Coster* v. *Lorillard*, 14 Wendell, *Marillas* v. *Halkimer*, 2 Paige, 35, which are to the same effect; and to the remarks of Chancellor Kent on this statute; 4 Kent, 271. We beg, also, to refer to the case of *Wilkes* v. *Leon*, 2

Cowen, 383, which is calculated to throw light on the earlier decisions in New York, it being a construction of the same will which had been before the court in *Jackson* v. *Anderson*, 16 Johns. 382; and it will be perceived, that even before the passage of the late statute, to which we have referred, the courts were not inclined to go further than they had already gone; on the contrary, it will be manifest that a desire was felt to retrace, to some extent at least, the steps that had been already taken. If, then, we are not mistaken in the assumption that our statute, like the New York statute, is a limitation upon the power to suspend the right of alienation—if we are not mistaken in supposing the principle of the two statutes to be the same, then the cases in New York are worth nothing at all, or we are bound to succeed. And if we are mistaken in this assumption, then we beg to know what our statute means—is it a dead letter, or is it a thing of vitality and energy? It is either wholly useless—an encumbrance on the statute book— or it meant to restrain the right of suspending the power of alienation. Like the New York statute, it admits of no half-way construction—it is not to be perverted to mean more than it says, for if it means more, it means any thing or nothing.

We shall proceed, in the next place, to devote some attention to the Virginia decisions, and it will be important that the difference in our statute and that of Virginia should be observed, as in some of their features they are very much alike. Indeed, it is generally understood, that the one furnished a model for the other. By an old statute in Virginia, it was provided, that slaves being on land might be entailed with the land; *Carter* v. *Tyler*, 1 Call, 143; and this will account for that feature in the Act of 1776, which abolishes estates tail in slaves and land; and this being the origin or model of our statute, will also account for the same provision here. As estates tail in slaves had been legalized, it was necessary, in express terms, to change the law in this particular, when it was thought necessary to abolish such estates. In 1776, estates tail were first abolished in language very similar to that which is used in our statute. In 1785, another statute was passed on the subject, which also contains this remarkable provision in the same section which converts estates tail into estates in fee, to wit: "And every limitation upon such an estate shall be held valid, if the

same would be valid when limited on an estate in fee simple, created by technical language as aforesaid. 1 Virginia Code, (1819,) 368, 369. And the same provision is carried into the Code of 1849. See Code of Virginia, 601. Now, what is the effect of this provision ? Clearly, it is to sustain executory devises, according to the doctrine of *Pells* v. *Brown*, which was, that an executory devise might be limited on a fee. The courts of Virginia have adopted that case as law, and with that principle admitted, the statute above mentioned was a direct enactment in favor of executory devises, and hence we find the courts there, in some cases, sustaining the doctrine of them—they could not do otherwise, without violating the statute. But we have no such statute here, and of course the Virginia decisions which may go to sustain such limitations, are not entitled to be regarded as authority here. Nor is there a statute in Virginia such as ours, which limits the power to suspend alienation beyond lives in being. On the contrary, the English rule against perpetuities is the only restriction which is recognized in that State. With these great and marked differences in statutory provisions, the court cannot expect much light from the Virginia decisions. Indeed, the law there being so very different, the decisions can furnish no guide at all. There, estates tail, as here, are cut off, but executory devises are sustained—here they have never been, and if they are to be tolerated at all, or if any contingent limitation is to be engrafted on our law, it must be by the decision in this case, which is for the first time to declare the law for the future.

In the case of *Bell* v. *Gillespie*, 5 Randolph, 273, the previous cases in that State are reviewed, and a reference to this is sufficient. In some of the preceding cases it will be seen, as it will also by this, that the doctrine of executory devises, or the power to create them by will, seems to have been considered or treated as an existing doctrine, rather than as a debatable point. The case was in substance this :—A will was made between the first of January, 1787, and the first day of January, 1820, by which the testator gave to his sons several tracts of land, with the proviso, that, if either of them should die without lawful issue, the part allotted to him was to be equally divided among his surviving brothers. This was held to be an estate tail, and not an executory

Jordan v. Roach et al.

devise, as had been contended. And Judge Carr remarked: "But if, instead of a remainder, dependent on an estate tail, it be an executory devise after a fee simple, it cannot be affected by the operation of our law," thus plainly alluding to the provision of the statute. As an estate tail, it would have been converted into a fee, but as an executory devise, limited on a fee, it would have been sustained.

But whilst executory devises were sustained, and remainders on estates tail were not, the courts would not favor executory devises by construction in order to avoid this consequence; *Carter* v. *Tyler*, 1 Call, 143. The case was, the testator gave lands to his two sons separately, and the heirs of their bodies, and if either should die without heirs of the body, then to the survivor, and if both died without issue, then over to the daughter. This was held to be an estate tail, with remainder to the daughter, which was by statute converted into a fee, and the remainder destroyed. The cases of *Hill* v. *Burrow*, 3 Call, 297, and *Tate* v. *Tally*, Ib. 307, are similar, and to the same effect, also the case of *Eldridge* v. *Fisher*, 1 Hen. & Munf. 359. See, also, *M'Clintic* v. *Manners*, 4 Munford, 328; *Kendall* v. *Eyrie*, 1 Randolph, 288; *Tidball* v. *Lupton*, Ib. 194. It would be impossible to distinguish between these cases in all material points, and the case before the court, unless, indeed, this be a better case, because of the superadded contingency of the death of the issue under twenty-one. And if that be so, then it is an easy matter to avoid the effect of the statute, and to build up perpetuities, by accumulating contingency after contingency, and the consequence would be, the more certain and remote the perpetuity, the better the estate.

It will be seen by reference to 2 Lomax, Digest, 221, 222, 223, that this Act of 1819 is considered by the author as reviving limitations or remainders which had been cut off by the Acts of 1776 and 1787. Hence, after adverting to the English rule, that a gift or devise to one and his heirs, but if he die without issue, then over, constitutes an estate tail, and as such by whatever form created, was converted into a fee, by the Acts of 1776 and 1785, the author remarks; an amendment in the revisal of 1819, now gives a protection to the estates limited upon what were formerly estates tail, and allows every limitation, whether by deed or will,

upon such an estate to be held valid, if the same would be valid when limited on an estate in fee simple, created by technical language. Now according to the rule in *Pells* v. *Brown,* this statute is a direct enactment in favor of limitations, and hence the Virginia decisions which sustain them, cannot be authority here, as our statute not only does not sustain them, but is opposed to them. Though we may remark that no case in Virginia, that has been found, goes far enough to sustain the case before the court.

In North Carolina, as in Virginia, there is a statute declaring that every person seised of an estate tail, shall be deemed to be seised of the same in fee simple, but there is no such statute there as our proviso. And whilst there are many decisions there which declare that estates tail are converted into estates in fee simple, perhaps there is no State, so old as North Carolina, and with as able a judiciary, in which the doctrine of remainders, executory devises, and other contingent limitations, has been as little discussed. · In no case have we been able to find anything like a tolerable investigation of this intricate branch of the law. The doctrine of executory devises seems to have silently found its way into the judicial system, without any inquiry into its merits, its history, or its consonance with the statute law. It has received a tacit recognition, until it has become fixed as a part of the jurisprudence of the State. Nor does the statute seem to have been extended to any other estates tail than such as were made so by technical language. An estate tail by implication has not been made the subject of question or doubt; although as much so, as if created by technical language, yet such estates do not seem to have been regarded as estates tail. Hence, limitations, even of personal property, have been sustained, by a sort of law peculiar to the State, for the court will at once see that they could not be sustained anywhere else. And on one occasion, some doubt seems to have rested on the mind of the court in regard to executory devises, as we should infer; as the court said, "it seems to be admitted that executory devises exist here." Their existence then does not seem to have been the result of judicial determination. In proof of what has been said, we cite some of the cases decided in North Carolina, not that they are important either way, nor indeed are they consistent. See *Roberts* v. *Jones,* 4 Iredell, 53 ; *State* v. *Skin-*

*ner,* 4 Iredell, 57 ; *State* v. *Norcom,* Ib. 255; *Garland* v. *Watts,*
Ib. 287 ; *Threadgill* v. *Ingram,* 1 Ib. 277 ; *Brantley* v. *Whitaker,*
5 Ib. 255; *Ross* v. *Fornes,* 4 Dev. 376. With this great dissimi-
larity in statutes, and in the total absence of judicial investigation,
the decisions of that State must be received with great caution and
allowance.

My colleagues will notice the statutes and judicial determina-
tions of other States, and I therefore pass on to another branch of
the subject.

We come now to discuss this case in another aspect. The will
disposes of both real and personal property, and the bill before
the court sets up a claim to the personal property purchased under
the direction of the will, as well as the real estate. It is insisted
by us, that the case is, if possible, even less doubtful—less em-
barrassed by difficulty, in regard to the personalty, than it is in
regard to realty, because there is no provision in the statute which
authorizes the devise of personal property except absolutely to the
first taker; and we again quote the language of the statute.
"Every estate in lands or slaves, which now is, or shall hereafter
be created an estate tail, shall be an estate in fee simple ; and the
same shall be discharged of the conditions annexed thereto by the
common law, restraining alienation before the donee shall have issue,
so that the donee, or person in whom the conditional fee is vested,
or shall vest, shall have the same power over the said estates, as
if they were pure and absolute fees." The proviso does not ex-
tend to personalty, by express declaration it extends to lands
only. This, if it had not already been decided, is too plain to
admit of dispute or doubt. Then the question is, what is an estate
tail in slaves ? It is just such an estate as would be an estate tail
in land, if created by the same language, and that this has been
shown to be one of that description, is, we think, beyond doubt.
This is surely the meaning of the statute, as an estate tail in per-
sonalty, technically speaking, was unknown in the English law,
either before or after the statute *de donis.* Nor do we find the
word "slaves," introduced into any of the statutes abolishing en-
tails, except in the Virginia statute, the reason of which was, as
already shown, that slaves, by an old statute, had been made the
subject of entails. The consequence is, that in other States the

English rules which applied to personal property, are held applicable 'to slaves, but that cannot be the case here. When the judicial doctrine of executory devises grew up, it was gradually extended until it was made to reach personal property, and wherever that doctrine has been adopted, its most extended application has also been adopted. Thus in North Carolina, and perhaps in other States, it is held that slaves may be the subject of executory devises. But to adopt such a doctrine here, would be directly in conflict with the terms of the statute, as well as in violation of its clear and well-defined policy. We need not cite authorities to show that the same words, which, under the English law, would create an estate tail as to freeholds, gives the absolute interest as to chattels. It follows, therefore, that no remainder can be limited in personal property, unless it be after a mere life estate, and if any contingent or conditional limitation can be sustained with regard to such property, it must be by executory devise, and by executory devise only. *Betty* v. *Moore*, 1 Dana, Rep. 237; *Morrow* v. *Williams*, 3 Dev. 263 ; 2 Kent, 352, and notes.

We think, moveover, the case of *Hampton* v. *Rather*, is decisive of this branch of the question. The gift there was of a slave to Martha K. Irby " and the heirs of her body," and the court held that such a gift of personal property passed the absolute interest, and the donee having no heirs of her body, the slave descended to other heirs, to the exclusion of the heirs of the donor. What is the difference between the cases ? This was a devise to a daughter and the heirs of her body, and in default thereof, or if the heirs should die under twenty-one, over. Does the devise over, make the case stronger ? So to hold would encourage perpetuities, and pervert the statute. We have shown that these heirs can claim the *reverter* only—the heirs at law, in the case cited, claimed exactly the same thing, and if the rule in *Shelly's case* applied to the one, it should also to the other, the limitation over being in itself void, and also against the statute. In the case cited, the court said, " the terms of the instrument in question are precisely such, as if employed under the rule in 'reference to real property would carry an estate in fee tail, and consequently the whole interest in personal property." Would the language in the case before the court, pass a fee tail, in real estate ? That we think

has been shown, and if so, this question is settled by the decision above cited. This branch of the question really seems to be so plain, as to leave no room for further discussion. Even if we should be mistaken, then, in regard to the rules of law, which are to govern the disposition of the realty, we do not think it possible we can be mistaken in regard to the law which must control the personalty; not only as regards that which was purchased for Mary under the will, but also as to the entire personal estate of· the testator which is to be divided.

The great importance of this case, together with a desire to have the whole doctrine involved in it, now for the first time fully raised, fairly and completely settled, must be my apology for the length of this argument. And trusting that it will receive the deliberate consideration of the court, and that this case may settle. the whole doctrine of contingent estates under our statute, and serve as a guide in all future cases of the kind, it is respectfully submitted.

*Daniel Mayes,* on same side,

Argued the cause orally; and also filed an elaborate written argument, too long for insertion.

*A. Montgomery,* for appellees.

The whole controversy in this suit depends on the construction of the will of Benj. Roach, deceased.

It is not necessary, in a brief, to notice more than one clause of the will, on which the whole case depends.

That language is, " The property in this my last will and testament, devised and bequeathed to my daughter, is for her sole and separate use and behoof, and her heirs forever, but if she should die without issue, or if her child or children, surviving her, should die before arriving at the age of twenty-one, then the estate herein devised shall revert to my other children, and their heirs."

The first difficulty presents itself as to the meaning of the terms "her heirs forever." These words alone, clearly convey a fee simple, but the subsequent expression "if she should die without issue," which, under our statute, means issue living at the time of her death, and not indefinite " issue," limits the meaning of the

word "heirs" to such issue.   And the word "issue" is expressly
limited by the proviso that if her child or children, surviving her,
should die before arriving at the age of twenty-one, the estate de-
vised should revert, &c., which defines the word "heirs" to be such
child or children as survive her, and arrive at the age of twenty-
one.   These views are sustained by the cases cited in 2 Jarm. on
Wills, 237.   Those cases decide that the word " heirs" is limited
·by the expression "that if the devisee dies without heirs of his body
the land should remain," &c., and convey an estate tail and not a
fee simple.

Chief Justice Marshall, says, The intent of the testator is the
cardinal rule in the construction of wills, and if that intent can be
clearly perceived, and is not contrary to some positive rule of
law, it must prevail; although, in giving effect to it, some words
should be rejected or so restrained as materially to change the
literal meaning of the particular sentence.   *Finley* v. *King's
Lessee*, 3 Peters, S. C. R. 376, 382, 383.

And the same great jurist elaborately explains and applies the
same rule in a subsequent case.   The will gave the testator's son
a small legacy, and the residue to his widow, " to and for her own
use and benefit and disposal *absolutely ;* the remainder of said
estate, after her decease, to be for the use of said son."   He says,
" The first clause clearly gives the whole interest in the property
to the widow, but the last clause as clearly gives the remainder to
the son after her death, and there is no rule of law which gives
preference to one sentence over the other, but such construction
shall be placed upon both as, from the circumstances, appear most
consonant with the intention of the testator."   And after noticing
the fact that it was the son claiming against the second husband
of the widow, he infers the testator must have intended that his
son should take in preference to the husband of his surviving wife ;
and hence that the testator, in giving his property to his widow,
had used stronger language than he intended, in giving " the dis-
posal thereof absolutely," when he must have intended that she
should only control and dispose of it during her life.   *Smith* v.
*Bell*, 6 Peters, S. C. R. 74.

The 26th section of the statute above alluded to, defines the
terms used in Mr. Roach's will without reference to intention.

The contingent limitation to complainants being made to depend on the dying without issue, or a child or children surviving her who should attain the age of twenty-one, limits the meaning of the terms "heirs," "issue," &c., to such as are living at the time of the death of the first taker. How. & Hutch. Stat. 349, s. 26.

The real difference between the rule in *Shelly's case*, and the statutory rule of construction is, that the rule in *Shelly's case* construed those expressions as words of limitation, conferring a fee simple or fee tail, unless the language of the testator plainly and expressly declared a different intention. The statute gives the first taker but a life estate "unless the intention of such limitation be otherwise expressly and plainly declared on the face of the deed or will creating it." *Powell* v. *Brandon*, 24 Miss. R. 360.

The word "heirs" has repeatedly, in England and America, received a different interpretation from its technical or literal meaning, where such construction was in conflict with the context. 2 Jarm. on Wills, 19-22.

Now the language of the quotation from Mr. Roach's will shows plainly and expressly that the testator intended to give the property, to be set apart as Mary's share, to the complainants in case she left no descendants capable of disposing of it by their own act, which is entirely inconsistent with any notion which can be attached to the use of the words "heirs or issue," in their technical or literal sense; hence they are controlled by these authorities.

The next question arising is, whether the remainder to the complainants is in conflict with any positive rule of law. The statute abolishing entails may be considered as applicable, and if the estate of Mary was a fee tail, she would take a fee simple. But I would suggest that the true construction of the statute does not go so far as to abolish or change the nature of every class of entails. The proviso of the statute saves that class of fees tail which is created by a conveyance or devise to a succession of donees in being, and the heir or heirs of the body of the remainderman, and in default thereof, to the right heirs of the donor in fee simple. This is clearly an estate tail unless the provision of the 26th section be applied to it, in which event it is not only a useless proviso, but nonsensical. If it is a species of entail, preserved by the statute, then the devise of real estate to Mary was, by the rule

Jordan *v.* Roach et al.

in *Shelly's case*, an estate tail not enlarged by the statute; and the remainder over to complainants, who are the right heirs of the devisor, must take effect.

There was abundant reason for the interposition of the legislature to get rid of entails in general, but there was some merit in that class which secured the property in a particular line, and ultimately returned it to the heirs of the donor, which called for exemption from the operation of the sweeping effect of the enacting clause of the statute.

The object of a proviso is to save from the operation of the enacting clause of the statute, something which would be controlled by it, and not to enable a thing to be done, which could not be done before. This proviso does not, therefore, give power to create a new species of estate, but secures from the operation of the statute this particular class of entails. If the rule of the statute (sect. 26,) be applied to its construction, an executory devise is created, and the terms "heirs of the body, issue," &c., become words of purchase and not of limitation. And the exemption of executory devises from the operation of a statute docking entails would be simply nonsensical.

Wills and deeds, of the description now before the court, have already received judicial construction. The first case was decided in accordance with the settled course of decision of the State of Tennessee, because the deed was made in that State, and the property was there when it was made. That deed was, in several particulars, similar to Mr. Roach's will. The property was given to the wife (by marriage settlement) for life, remainder to the heirs of the body, and on failure of such issue to arrive at the age of maturity, remainder over, &c. By the decisions of the courts of Tennessee, the rule in *Shelly's case* was sustained, and our court gave the whole estate to the first taker, but intimated an opinion that the rule of decision under our statute would be different. *Carroll* v. *Renick*, 7 S. & M. 804.

The question again came before the court on a will made in this State, and the court refers to the intimation in the case above cited, and declares a deliberate adherence to the opinion there expressed; and reviews the doctrine as recognized in other States where there are similar statutes. *Kirby* v. *Calhoun*, 8 S. & M. 471.

We insist that the estate given to complainants, in Mary's share, is an executory devise, a class of estates well known at common law, and not affected by any statute. Chancellor Kent has given so full and lucid an essay on executory devises in the 4th volume of his Commentaries, from 264 to 284, that no other authority need be referred to. He defines an executory devise to be a limitation by will of a future contingent interest in land, contrary to the rules of limitation of contingent estates in conveyances at law. 4 Kent, Com. 264.

He divides them into two classes, as to real, and a third, as to personal estate. First. Where the devisor parts with his whole estate, but upon some contingency qualifies the disposition of it, and limits an estate on that contingency. Second. When the testator gives a future interest to arise upon a contingency, but does not part with the fee in the mean time. Third. At common law if there was an executory bequest of a chattel, as a term of years to A. for life, and after his death to B., the ulterior limitation was void. There was then a distinction between the bequest of the use of a chattel interest and of the thing itself; but that distinction was afterwards exploded, and the doctrine is now settled that such limitations over of chattels real or personal in a will or by way of trust, is good. The executory trust is equally good, though the ulterior devisee be not at the time *in esse.* 4 Kent, Com. 269.

Under the first class of executory devises above enumerated the devise to Mary may properly be ranked. The will parts with the whole estate, but upon the contingency of her dying without issue, or her child or children surviving her dying before arriving at the age of twenty-one, qualifies the disposition, and limits an estate to complainants. General rules cannot more fully apply to particular cases. 1 Jarman on Wills, 780.

This executory devise to complainants is not in conflict with any known rule of law. It must take effect within twenty-one years after the death of the first taker, which has been well settled at common law to be not too remote, nor partaking of any of the nature of perpetuities forbidden by law. 4 Kent, Com. 271.

The will now under consideration was framed in anticipation of the events which have happened. Mr. Roach was making a disposition of a property worth at that time nearly one million of

dollars, and naturally desired to limit it to his descendants, as far as practicable. He foresaw that Mary's share might, in a few years, become the property of strangers to his blood and name, if he did not control it; and feared that she would be an object of speculation and fall into unworthy hands. His fears, alas! have been too fully realized. Mr. Jordan succeeded in gaining the affections of Mary, then a child only fourteen years and seven months old. He seduced her from the school where her guardian had placed her, and without the consent of any member of her family, married her. As might have been expected, the pains of child-bearing were too severe for one so young and tender. She fell a victim, and her poor feeble children soon followed, and Mr. Jordan, a stranger in blood, having no meritorious claims, here presents himself claiming a judgment for one-fifth of all the proceeds of Mr. Roach's industry, perseverence, and talents, in opposition to the plain language of his will, on some strained construction of technical rules of law. If ever a case was presented in which the wishes of a testator, as expressed in his will, should be respected, this is one; for it does not disinherit the heir, as is commonly the intention of wills, but secures and brings back to the heirs of the devisor the property, which, by operation of law, would go into the hands of strangers.

*Yerger* and *Anderson*, on same side.

This case depends upon the construction to be given to the will of Benjamin Roach, deceased. The facts have been already stated several times; a repetition of them, therefore, is unnecessary.

By the fourth section of his will, the testator devised all his property to his children, to be held subject only to the *conditions* and *limitations*, as to *distribution*, &c., "as are thereafter mentioned." The property he gave to his daughter Mary, was, by the 11th section, settled on her, if she married, to her sole and separate use, free from any control or liability for the debts of her husband. He then proceeds: "To make my intention plain, the property in this my last will and testament, devised and bequeathed to my daughter Mary, is for her sole and separate use and behoof, *and her heirs forever;* but if she should *die without issue;* or, if

her *child or children surviving* her, should *die before arriving at the age of twenty-one*, then the estate herein devised shall revert to my other children, and their heirs, share and share alike, according to the law of distribution of this State."

The questions are, whether the limitations over, "if she die without issue, or if her child or children surviving her, should die before the age of twenty-one," are, or whether either of them are valid. The limitations are in the disjunctive. The language of the testator is, if either *one* of the foregoing limitations or contingencies, should take effect, then the property to revert, &c. The latter limitation or contingency, to wit: if her child or children surviving her, die before twenty-one, the property is to revert, has taken effect. She had two children, both of whom survived her, and both died under the age of twenty-one.

It is contended by the defendant's counsel, that these limitations are void, being too remote; and being void, that the absolute interest was in Mary. The question is; are they both void. We shall briefly examine them both; and if either of them is valid, and the contingency upon which it was to take effect has happened, that will be all sufficient in the case.

1. We will examine the case, first by the rules of the common law, and second, by the rules of the common law in connection with our Statute of 1822, by both of which we will clearly prove the limitations good.

At common law, where there are *disjunctive* limitations, if one is void because limited upon an indefinite failure of issue, and the other, or alternate limitation is not too remote, the latter will be valid, and vest the property in the executory devisees, if the contingency has taken effect, although the first never could take effect, by reason of its nullity.

This principle is well settled. Fearne on Remainders, 396, 456, 517. *Wright* v. *Hammond*, 1 Strange, Rep. 427; *Dunlop* v. *Dunlop*, 4 Dessaus. Rep. 317; *Shepherd* v. *Lessingham*, 1 Ambler, Rep. 123, note 4; *Longhead* v. *Phelps*, 1 W. Blackstone, 705.

In all such cases, the first is considered as a preceding limitation—not as a preceding condition to give effect to the subsequent limitation. Fearne on Rem. 509, 510.

Jordan *v.* Roach et al.

The first limitation in this case is, "*if his daughter dies without issue.*"· The second is, " or if she dies, and her child or children surviving her die before twenty-one, then over," &c.

By the first limitation, the testator meant that, if either his daughter died without issue *living at her death;* or, that if she died leaving issue, that whenever that issue failed, whether it was one hundred or one thousand years, the limitation over should vest. If he intended the first, or if the law has given to the words "dying without issue" a legal meaning, to wit: " issue living at her death," it is a valid limitation. If he intended the last, and the words legally convey such a meaning, the limitation would be void.

We will, however, for the sake of the argument, admit that he meant by these words, an *indefinite failure* of issue, and that the law gives to them this meaning; then the limitations would read thus : "If my daughter Mary die, leaving issue, and that issue fail at any time hereafter, then the property to revert to my other children ; or, if her *child* or *children surviving* her die before arriving at the age of twenty-one, then, and in such case, the property is to revert to my other children." Supposing this to be his meaning, the property is limited upon two limitations. The first cannot be enforced, because it is void for remoteness : still, if the other is good, and the contingency in regard to it has taken effect, the property is vested in the complainants.

The question, then, on this branch of the case is, whether the second, or disjunctive limitation is good. The language, as before stated, is, "*or if her child* or children *surviving* her should die before twenty-one," &c.

An executory devise is valid, if the contingency must happen, if it happen at all, within the compass of a life or lives in being, and twenty-one years and nine months afterwards. 4 Kent, Com. 271, (4th edition); Fearne, 395, 396.

Now, in this case, the limitation, if it took effect at all, must, of necessity, take effect within the above time; for it is to take effect if the surviving child or children, whether they be children, grand-children, or great grand-children, died before twenty-one. If she died, leaving twenty children or grand-children *surviving* her, they must all die under twenty-one, to give effect to the devise over; for if the child, or children, or either, attain twenty-one, the estate

becomes absolute, and there is no longer any contingency. And, as they must be her *child or children surviving her,* whether they be children, or grand-children, or great grand-children, they must necessarily have been alive at her *death,* or they could not *survive her,* so that the devise must take effect within the. compass of his daughter's life, and at furthest, twenty-one years after *her death.*

Where the limitation is, "if surviving children *die* before twenty-one," the limitation, in numerous cases, has been held to be good. Fearne on Rem. 430, (text and note G.,) 432, 433, 468, 511, 518, 519, 520, 544.

It is therefore most conclusively demonstrated that, without the aid of our statute, at common law, the limitation in this will to the testator's children, after the death of her daughter's children before twenty-one, is valid. If it be valid, as the contingency has happened, although the first limitation is void for *remoteness,* the whole estate is vested in the complainants.

2. But although the above is demonstrably true, yet it is equally true, that both limitations in the will are valid.

At common law, particularly in regard to real estate, the words "if he or she die without issue," without restriction or limitation, undoubtedly mean an indefinite failure of *issue.* But if there is anything in the will which shows the testator meant *issue living* at the death of the first taker, then it would be good.

Innumerable cases have been decided as to what particular circumstances would restrict the generality of the words "dying without issue," but I shall not detain the court by adverting to them, inasmuch as our statute abolishing entails, and more particularly the Act of 1822, (Hutchinson's Digest, 609, 610,) has put a legal meaning on the words "dying without issue." By this statute, "dying without heirs," "without issue," "without heirs of the body," "without children, offspring, or descendants," &c., shall be interpreted to mean without heirs, issue, children, offspring, &c., *living at the time of her death.*

The same statutory provisions exist in Virginia and New York; 4 Kent, 279, 280, (4th edition.) This statute is so plain and distinct that it cannot be misunderstood. *Tilman* v. *Sinclair,* 1 Iredell, Law Rep. 185; *Clapp* v. *Folger,* 1 Dev. & Battle, Eq. 466.

This court has conclusively settled the construction of this sta-

tute in several cases. *Kerby* v. *Colhoun*, 8 S. & M. 470; 9 S. & M. 70; *Rucker* v. *Lambden*, 12 S. & M. 256; *Graham* v. *Foxworth*, Opinion Book, 436; *Powell* v. *Brandon*, 2 Cushman, 343; *Hampton* v. *Rather*, Opinion Book, 614, 615.

Upon the face of the will of Mr. Roach there is no express declaration, nor any word plainly showing that he *intended*, by using the *words* "dying without issue," to mean *issue* indefinitely. There is not the slightest implication, but on the contrary, the implication, without the aid of the statute, is the other way. To do away the legal statutory meaning of the words, the will must, in express and plain terms, state the meaning to be otherwise, as was the case in *Powell* v. *Brandon*.

As the statute has fixed the meaning of the words to mean issue *living* at his daughter's death, his will must be supposed to be made in reference to the existing law; and, bearing this in mind, his intention is clear and obvious. He is presumed to know the law had fixed this meaning to the language he used. His will will then read thus: "If my daughter die *without issue living* at her death, or if her *child* or *children surviving her* should die before, &c., then to revert," &c. His intention is manifest. If she died *without* leaving children or issue surviving her; or if she left children surviving her, and they *died* before twenty-one; in *either* event, the estate was to go his other children. The contingency has happened, and by the terms of the will the property is vested in the complainants.

In all cases, the courts always favor that construction which supports the limitation over. *Exel* v. *Wallace*, 2 Vesey, Sen. 121, and cases cited.

3. If we had no statute defining and putting a legal meaning on the words "dying without issue," still the authorities are conclusive that the first limitation in the will is good.

In England, in regard to real estate, where there is a previous fee simple limited to A.; and if he "die without issue" to B., the limitation over is void as an executory devise, but it can take effect as a remainder. In such case, the words "die without issue," cut the previous fee simple down to an estate tail, so that the limitation to B. will be valid as a contingent remainder after an estate

Jordan v. Roach et al.

tail. And as the estate tail can be barred by a fine or recovery, the property cannot be tied up.

But in regard to personal property, as it cannot be entailed, the words "dying without issue," will be restricted by the slightest circumstance, or word, to mean issue *living* at the death of the first taker. The courts seize, with avidity, any circumstance, however trivial, to give effect to the apparent intention of the testator, even as to real estate. Fearne, 471, 472, 473, 485, and authorities cited below.

So in this State, and other States where *estates tail* are abolished, the same construction prevails both as to real and personal property.

The words "die without issue," in the first limitation, are explained by the subsequent one. The testator evidently used "issue" in the first limitation, as synonymous with "child or children" in the second. They are, in fact, convertible terms. The word *issue*, in the popular sense, means *children*. It may be used either as a word of purchase, or a word of limitation, and is generally, as Kent remarks, used by the testator as synonymous with "child or children." 4 Kent's Com. 278.

The testator could not mean by the words, "if she die without issue," an indefinite failure of issue, for this is inconsistent with the last limitation. The two cannot stand together. If his intention was that it should vest in his daughter's issue, as long as that issue did not fail, then whether his daughter's surviving children died before or after twenty-one, the limitation would, if his intention were carried out, take effect.

If he intended an *indefinite* failure of issue, he necessarily meant that all his daughter's issue, as long as it lasted, should take, for it is this that makes it an indefinite failure of issue. Yet such could not be his intention; for he says expressly, that if a part of his daughter's issue—to wit : the child or children surviving her—die before twenty-one, then the property is to go to his own children, not to the issue of his daughter, although she may have left children who had issue and died before twenty-one.

This is the meaning the testator gives it. He intended that if his daughter died without child or children; or, if said child or children surviving her died before twenty-one, then over, &c.

VOL. III.—37

The authorities clearly support this, and make the first limitation good. *Clapp* v. *Folger,* 1 Dev. & Batt. Eq. 446; *Morgan* v. *Morgan,* 5 Day, R. 517, cited 4 Kent, 278; *Williams* v. *Turner,* 10 Yerger, R. 288; *Hart* v. *Thompson,* 3 B. Monroe, 481; *Corder* v. *Adrian,* 1 Hill, Ch. R. 154; *Benton* v. *Patterson,* 8 Georgia, 147; *Pond* v. *Berge,* 10 Paige, 140; *Fosdick* v. *Cornel,* 1 Johns. 448; *Lewis* v. *Claiborne,* 5 Yerg. 369; *Brown* v. *Brown,* 1 Dana, 39; *Anderson* v. *Jackson,* 16 Johns. 382; 5 Humph. 51.

We have thus, we think, legally demonstrated that the limitations contained in this will are valid; that they constitute a good executory devise, and the contingency upon which the property was limited having taken place, the court below was correct in overruling the demurrer of defendant.

Messrs. *Yerger* and *Anderson,* also filed the following argument:—

To understand the operation of the 24th section, we must first ascertain what estate Mary Roach had under the will of her father. If the estate given to her by the will was, as has been seriously argued, an estate tail, instead of an executory devise, limited after a fee simple to her, then we admit that the 24th section converts it into an absolute estate in fee simple, and that the *proviso* to the 24th section does not exempt it from the operation of the enacting clause. But if Mary took a fee simple, or a *fee simple defeasible,* upon a contingency, which, if it happened at all, must happen within a life or lives in being, and twenty-one years and ten months thereafter, then, it is submitted that neither the 24th section, nor the proviso to *it,* can in the remotest degree affect the case, as we shall hereafter prove.

The only question, then, in the case, is, whether the limitation to the complainants is an executory devise. If it is, the case is settled beyond controversy. Executory devises are of three kinds, two in relation to real estate, and the third in regard to personal estate. The first is where the *fee simple* is limited to the first taker, but may be defeated upon the happening of a contingency which is annexed to it. The second, is where the devisor gives a future estate to arise upon a contingency, *but does not depart with the fee.* Fearne on Remainders, 399, 400.

In this last kind, if there is a previous freehold estate, as an *estate tail*, or for life, *expressly limited* to the first taker, the limitation over, is always construed a *contingent remainder*, and not an executory devise. But in regard to the first, where the limitation is to *A. and his heirs*, or heirs forever, if the contingency upon which it is limited must take effect within the time prescribed against perpetuities, it cannot be construed as a remainder; for there cannot be a contingent remainder after a previous disposition *of the fee simple*—but in such case the limitation over, is a valid executory devise.

Mr. Fearne, p. 399, thus defines an executory devise of the first kind, *i. e.* where the words would give the first taker a fee simple, as to A. and her heirs, or heirs forever. "Executory devises," says he, "have generally been distinguished into three sorts, &c. The first sort in this distribution is where the devisor parts *with his whole fee simple, but upon some contingency qualifies that disposition*, and limits an estate upon that contingency; of this, the above cited case of *Pells* v. *Brown*, is an instance."

The case of *Pells* v. *Brown*, given as an instance of this class of executory devises, was this—see Fearne, 395, 418, 419, where it is stated. "A man devised to his son *T. and his heirs, forever*, paying to R. £20 at his age of twenty-one; *and if T. should die without issue, living W.*, then W. to have those lands, to him and his heirs forever. It was adjudged *that T. (the first taker,)* took a vested *fee simple*, and that the limitation over to W. *was good as an executory devise.*"

The court decided that the contingency, "if T. died without *issue living W.*" did not make the previous *fee simple* an estate tail, with a contingent remainder, because, say the court, (Fearne, 418,) "the clause 'if he die *without issue*,' was not *absolute* or *indefinite, whenever* he died without issue, but *with a* contingency of his dying without issue *living W.*, and that the limitation to W. was a good executory devise, to take effect on the contingency of T.'s dying without issue living W.; and they decided that the *recovery* suffered in that case, did not bar W., because it was not an estate tail."

We have been the more particular in stating this case, because the distinction is taken by the court, that when there is a previous

fee simple, and the contingency of "*dying* without issue," means *a definite failure of issue*, and not an indefinite failure, then the previous fee simple, limited to the first taker, is not cut down to an estate tail in the first taker, but remains a vested *fee simple*, subject to be defeated by the happening of the contingency. And this *distinction* runs through all the American and British cases, as every single case in both countries, where the limitation to the first taker, is a fee simple, proves.

Before we proceed, we will state a few propositions, or rather axioms of the common law, because there is no dispute about them, and which it is necessary to understand before examining the provisions of Mr. Roach's will.

1. A contingent remainder cannot exist, where there is a previous *fee simple limited to the first taker*. As when the limitation is to A. and her *heir* or *heirs forever*. This estate first given, cannot be defeated by a contingency and a limitation grafted thereon, by way of contingent remainder. For, say all the authorities, the difference between a *contingent remainder* and an *executory devise*, is, that the latter may be limited after a previous fee is given, but the former cannot. 2 Blackstone, Com. 317; Fearne on Rem. 373.

But such limitation in a will, says Mr. Fearne, and all the authorities, is good, if limited upon a contingency within a reasonable time, by way of executory devise, or springing or shifting executory use. Ib. 373.

2. That where the words creating the estate in the first taker, are such as would carry the *fee simple*—as to A. and his heirs, or *heirs forever*—and there is a contingency annexed which would defeat the fee simple, thus limited to A., which contingency, if it takes effect at all, must take effect within a life or lives in being, and twenty-one years thereafter, the *limitation* over is a *valid* executory devise. And no estate tail is created in the first taker, A.

3. That where the fee is thus limited to the first taker, A. and his heirs, with a contingency that if he die "*without issue*" generally, and not restricted, this means, by the English common law, an *indefinite failure of issue*, and cuts the fee simple in the first taker *down* to a fee tail, and the limitation over is only a contingent remainder.

4. But in such case, that is, a devise to *A. and his heirs forever* —if "the dying without issue" means, or is restrained to "*issue living at the death of the first taker*, or issue *living* within the time prescribed for the vesting of executory devises," it *is not* an estate tail in the first taker, but the fee is vested, subject to be divested by the happening of the contingency, and the limitation over, is valid as an executory devise.

5. But when the first taker takes only an estate tail, or for life —as a limitation to him and *the heirs of his body*, or to him and his issue, with a contingency, if he die without issue *living at his death*, or *living W.*, then it is an estate tail, and the limitation over is a contingent remainder, determining the estate tail, upon the happening of the contingency.

If authority for three hundred years can settle anything, the above propositions are settled.

The counsel on the other side, in all their arguments, have labored under two great errors. First. In cases where a previous fee simple was limited as to A. and his heirs, they have confounded a definite with an indefinite failure of issue. Second. In cases where the limitation to the first taker was to A. and the heirs *of his body*, or to A. and *his issue*, or to A. for life only, and the contingency of "dying *without issue*," in such cases meant *a definite* failure of issue, notwithstanding which, such cases were adjudged estates tail—they have, we say, confounded these cases, with those in which the limitation to the first taker was in fee, or to him and his *heirs*, or heirs forever, with a like contingency.

We admit that when the limitation to the first taker is for life, or to him and the *heirs of his body*, or to *him and his issue*—which words make an estate tail,—we admit, that in such a case, the contingency of dying without *issue* generally, or without *issue living* at the death of the first taker, does not alter the previous estate— it still remains an estate tail, and the limitation over is a contingent remainder.

So, we admit, that where the first limitation is in fee, that is to the first taker and *his heirs*—if the contingency of "his dying *without issue*," mean an *indefinite* failure *of issue*, it cuts the previous fee simple down to an estate tail, and the limitation over is a contingent remainder. But, as we have said, in no *case* has it ever

been determined to be *a fee tail*, where, the "dying without issue," after a limitation to the first taker and his *heirs* generally, meant, (as it does under our statute,) " issue living at the death of the first taker." We now proceed to prove it.

In the case of *Pells* v. *Brown*, before cited, the limitation was to *T. and his heirs forever ;* but if T. died *without* issue *living W.*, then W. to have the lands; held, this meant issue living at T.'s death, and was, therefore, not an estate tail, but a valid executory devise.

In *Anderson* v. *Jackson*, 16 Johns. Rep. 405, the first limitation was to his son *J. and his heirs forever*, and other lands to his son M. and *his heirs* forever, and " if either die without issue," then to the *survivor*. The question was, whether the " dying without issue," meant a *definite* or an *indefinite* failure of issue. And this, again, depended on the effect of the word " survivor." That word, it was contended, showed that a definite failure of issue was meant. But Chancellor Kent, in his elaborate dissenting opinion, contended that the word "survivors," did not restrain the words " dying without issue," to mean "issue living at his death." If " issue living at the first taker's death" was intended, he admitted the limitation over *was a good executory devise*, and that the first estate limited to *M. and his heirs forever*, was not an estate tail. But he insisted that an indefinite failure of issue was meant, and, *that in such case*, the word " survivor" did not restrain it to issue living at his death.

The court, however, decided " that the word ' survivors' in that case did restrict the general words ' dying without issue,' and made them to mean ' issue *living at his death*,' and consequently it was not an *estate tail*, but a good limitation over by way of executory devise."

*Hanbury* v. *Cockerell*, cited Fearne, 396. Devise to his son B. in fee, and other lands to his son C. in fee—but if either died before they married, or before they attained twenty-one, and *without issue ;* held, the sons took a fee simple, (not a fee tail,) subject to be defeated by the executory devise over.

*Fosdick* v. *Cornell*, 1 Johns. Rep. 446. Devise to his son William, and *his heirs forever*, and devise of other lands to his other sons and his daughter Elizabeth, in fee simple; and if said sons

or his daughter Mary shall happen to die *without heirs male of their own bodies,* that then the land should *return* to the *survivors;* held, that this did not create an estate tail, but a limitation over by way of executory devise.

*Porter* v. *Bradley,* 3 Term Rep. 143, cited Fearne, 473 in note. Devise to his son P. and *his heirs* forever; but in case his son P. should happen to die and *leave no issue* behind him; held, the *leaving* of issue was to be referred to the time of P.'s decease, and, therefore, not an estate tail, but good as an executory devise.

*Roe* v. *Sheers,* 7 Term Rep. 589 ; Fearne, 473, in note. Devise to T. Triswell and his heirs forever ; but in case he should depart this life and *leave no issue,* then to Elizabeth, Sarah, and Mary, his three daughters. The court was unanimously of the opinion that this was not estate tail, but was good as an executory devise.

*Doe* v. *Sloven,* 1 Mann. Granger & Scott, 447 ; 50 Com. Law Rep. The devise was to A. and *his heirs;* and if he died without issue *living,* and without disposing of the property before twenty-one, then to B. ; held, that A. did not take an estate tail, but a defeasible fee simple, and that the limitation over was good as an executory devise.

*Hill* v. *Hill,* 4 Barbour, Rep. 419. Devise to T. and his *assigns forever,* provided T. should not sell within fifteen years to any one except the testator's children ; and in case T. died without lawful issue, the estate to go to A. The court held, that *issue* meant *issue* living at T.'s death. Therefore no estate tail in T. ; but the limitation over was good as an executory devise.

In Alabama, their statute abolishing entails, is similar to our own, with precisely the same identical proviso. Clay's Digest, 157, § 37.

The following case was decided in that court: *Isbell* v. *Machlin,* 24 Alabama, 315. Devise to my half sister all my property: should she marry and have lawful issue, then said property is to go to *her heirs,* but if she should die without lawful issue, then over. The court held that the limitation over was not too remote.

*Williams* v. *Graves,* 17 Alabama, 62. Devise of slaves to two daughters and *the heirs of their bodies,* but if either died without an heir of her body, then to the *surviving* daughter, held the term

*surviving*, limits the meaning of the words " die without an heir ·of her body begotten," to *issue living* at the death of the first taker, and that the limitation over is good as an executory devise.

It will be observed that the first limitation was to them and the *heirs of their bodies*, which words give the fee simple in personal property—the same as *heirs* or *heirs forever* do in real property. Fearne on Rem. 463.

The case cited from 25 Alabama, 285, has nothing to do with the case before the court. The devise there was to A. and *his children*, and the question was, whether it gave the fee which it did. There was no subsequent limitation that if A. died without children, it should go over.

*Holmes' Lessee* v. *Holmes*, 5 Binney, 252. Devise to her grandson A., a plantation, to be possessed at twenty-one, or marriage, which shall first happen; but if he die under age or without issue, then to his next brother; held, that A. took an estate in fee simple, with a good executory devise over, in case of his death under age, and without issue.

*Barnets' Lessee* v. *Casey*, 7 Cranch, 456. Devise to John M'Connell in fee, and if it should happen that the said John M'Connell should *die before twenty-one and without issue*, then to John B. Hammond; held, that a *definite failure of issue* was meant, and that it was a valid executory devise.

In North Carolina, where they have a late statute like our 26th section, the devise was of land, to two sons *and their heirs forever;* but if any of my children die *without issue*, leaving a wife or husband; then the wife or husband to take one-half; held, the limitation good as an executory devise. *Garland* v. *Watt*, 4 Iredell, 287.

*Ray* v. *Enslin*, 2 Mass. 554. Devise to a daughter and *her heirs forever*, but if she should happen to die before she comes of age, or have *lawful heir*, then over, &c.; held, the daughter took an estate in fee simple, defeasible by a contingency reasonably to be determined—*i. e.* within the limits prescribed for executory devises.

We cite also, below, a number of cases, in all of which the limitation was in fee, or to the first taker and his heirs, with a contingency that if the first taker died without *issue*, (which in these

cases, the courts said, meant issue living at the first taker's death,) then over. In all of them, held to be no estate tail, but good executory devises. In all of them, the courts admitted that if the " dying without issue" was an indefinite failure of issue it would have been otherwise. We respectfully ask an examination of them, viz : *Clapp* v. *Folger*, 1 Dev. & Batt. 446 ; *Morgan* v. *Morgan*, 5 Day, 517, (cited 4 Kent, 318 ;) *Williams* v. *Turner*, 10 Yerg. 288 ; *Hart* v. *Thompson*, 3 B. Monroe, 481; *Corden* v. *Adrian*, 1 Hill, Ch. R. 154 ; *Benton* v. *Patterson*, 8 Georgia; *Pond* v. *Briggs*, 10 Paige, 140 ; *Fosdick* v. *Cornell*, 1 Johns. R. 448 ; *Lewis* v. *Claiborne*, 5 Yerg. 369 ; *Brown* v. *Brown*, 1 Dana, 39 ; *Anderson* v. *Jackson*, 16 Johns. 382 ; *Booker* v. *Booker*, 5 Humph. 511 ; *Jackson* v. *Staats*, 11 Johns. 327 ; *Jackson* v. *Blanshaw*, 3 Ib. 292 ; *Doe* v. *Jeffreys*, 7 Term, R. 589 ; *Porter* v. *Bradley*, 3 Ib. 143 ; *Peake* v. *Peyden*, 2 Ib. 620 ; *Doe* v. *Walton*, 2 Bos. & Pull. 324 ; 2 Binney, 532 ; 19 Barb. 494 ; *Doe* v. *Cundall*, 9 East, R. 400 ; *Scaly* v. *Laurens*, 1 Dessaussure, 137 ; 4 Ib. 345-459 ; *Zollicoffer* v. *Zollicoffer*, 4 Dev. & Batt. 438 ; *Gordon* v. *Holland*, 3 Ired. 362.

The elementary writers all concur in stating the law to be as decided in the above cases, and as we have stated it. Thus, Mr. Jarman on Wills, 361, in speaking of the failure or default of issue, says : " Following a devise to heirs *general*, a clause of this nature, we have seen, frequently explains the word 'heirs' to mean special—*i. e. heirs of the body*—and *cuts down the estate comprised in the prior devise* to an estate tail, unless there is ground for restraining the term 'issue,' to issue *living at the death*." Again, at page 417, he says : " Another question which often occurs in the construction of words importing a failure of issue, is, whether they refer to issue *indefinitely*—*i. e.*, a failure at any time—or a failure of *issue at the death*. Upon this *depends their operation to confer an estate tail*, for it is only when the words denote an extinction of the specified issue, *irrespective of time, or any collateral circumstance*, that they create an estate tail."

In 4 Kent, Com. 277, Chancellor Kent, speaking of limitations after a previous fee simple to the first taker, says : " If the limitation over, was upon the first taker *dying without issue living*, it was held so long ago as the case of *Pells* v. *Brown*, that it meant

issue *living* at the death of the first taker, and the limitation over was not too remote, but good as an executory devise."

Hilliard, Abt. 636. After stating " a dying without issue," generally means an indefinite failure of issue, says, " A devise to A. and if she die without issue, to B., gives an estate tail to the issue of A." Then, after citing several cases, he proceeds, at page 637, " But if the limitation over is upon the first taker's dying without issue *living*, or without leaving issue *behind him*, this is an executory devise, which takes effect upon his dying without children at his death."

Mr. Powell, (Powell on Devises, 166,) states the distinction with great accuracy. He says, " It is necessary in considering these cases," *i. e.*, where the limitation is to the first taker and his heirs, " to observe the distinction between the words ' and if he die without issue, (used with reference to the first devisee,) *standing alone*,' and the words ' if he die without issue *living A*. or the like,' or ' before A. arrive at twenty-one;' for the former words operate only as an explanation of the testator's intent who shall succeed, namely, issue of his body, and whenever the devisee dies without issue, the land will remain over; but the latter words *qualify* the preceding estates with a collateral determination, and *give* effect to a conditional limitation to another if such an event happen, and operate a complete defeasance of the first fee upon that event, but by no means tend, *independent* of such event, to *abridge* or *narrow* the extent of the first estate *limited*, or to reduce it *from a fee simple to an estate tail;* because the latter clause ' if he die without issue,' is not *absolute and indefinite, whenever he die without issue*, but is with a *contingency*, if he die without *issue living*," &c.

The same distinction is taken by Mr. Cruise, (6 Cruise, Digest, title Devise, ch. 17, §§ 23, 24, 25, 26.

It is supposed that Jarman, at page 430, qualifies what he had previously stated. Not in the slightest degree. He is speaking, at page 430, of the effect of the words " dying without issue," when they are restricted to some defined period *collateral to the devise;* as a devise to A. and *his heirs*, with a devise over, in case he should die " without issue *in the lifetime of B*."

He says, three constructions have been put on these words—the *first* and third construction stated by him, bring them within the

time allowed for executory devises to vest. The second would not; but would leave them indefinite—that is, as not importing issue living at A.'s death. Which of the constructions is right, he says is uncertain; but if the words had meant "issue living at the death of the first taker," there could be no doubt of their effect, for on the succeeding page 432, he says emphatically, "Where the testator expressly devises the estate in the event of the preceding devisee dying without issue *living at the time of the death*, the language of the will seems to exclude all controversy;" precisely as our statute, which makes "dying without issue," mean "issue living at the death of the first taker," excludes all controversy.

We have thus piled case upon case, decision upon decision, because of the extraordinary argument which has been made, that there cannot be a valid executory devise, where the first taker takes a fee simple, and, of the still more extraordinary argument, that where the limitation is to the first taker and his heirs, the contingency of his dying without issue *at his death*, does not prevent it from being an estate tail,—a position unwarranted by a single judicial decision.

We, therefore, emphatically repeat, that there is not a case in England or America, from the year books down, where there was a limitation, by will, to A. and his heirs, and if he die without issue *living at his death*, which created an estate tail.

The counsel on the other side cited many cases where the contingency of dying without issue, meant issue living at the death of the first taker, which cases, the court held, were estates tail; to wit: Fearne, 327, 328; Butler's Note, p. 6, of the same author; 2 Jarman on Wills, 329, 330, and other cases. But in all these cases the limitation to the first taker was for life, or in tail; that is, to him and the *heirs of his body*, or to him and his *issue*, which words, in a will, make an estate tail.

This palpable distinction, which in this case seems to be overlooked, is thus noticed by Mr. Fearne, p. 419, 420. After referring to the case of *Pells* v. *Brown*, where the first limitation was to T. and *his heirs, &c.*, which limitation over was held to be an executory devise, and not a remainder; he says, "We are to remember that, in the last noticed case, the first limitation *carried the fee*. For we shall find a material distinction between the *first limitation*

*being in fee,* and its being *only in tail.*    In the first case, we have seen the limitation over upon a dying without issue *living W.,* was good as an executory devise, because the *whole fee being first limited* to a person in *esse, there was no room for considering the subsequent limitation as a remainder.*    But if *the first* limitation had been in tail only, then the subsequent devise might have been considered as a contingent remainder, depending on that estate tail; and as limited to take effect only in case that estate tail determined in the life of W.—that is, in case the first devisee in tail died without issue in W.'s lifetime."

In like manner, if the limitation is to A. and *his heirs,* and if he die without *heirs,* to B., the limitation to B. is void, both as a remainder and as an executory devise; it cannot be a remainder, as it is limited after a fee; nor an executory devise, because dying without issue is an indefinite failure of heirs.    But if, in such case, the limitation over *was to a collateral* heir, as a brother, this would show, that the contingency of dying *without heirs,* meant *lineal* heirs, *i. e.,* issue, and being "indefinite," would make an estate tail, as in the cases cited in 2 Preston, 504, 505, 506, 507; and Fearne on Remainders, 466.    But if the contingency in such case had *been to heirs living at his death,* this would also have showed *lineal heirs* or *issue was intended,* and not *being* an *indefinite failure,* it would not have been an estate tail, as all the authorities we have cited prove.

The decisions in this State, as in all the States of the Union, and in England, are to the same effect.

The case of *Kirby* v. *Calhoun,* 8 S. & M., arose upon the limitations in a deed.    The court thought the 26th section of the Act of 1822, applied to deeds and wills; and whether this part of the decision was right or wrong, it is not necessary to inquire.    But the decision, as to the effect of the limitations, if contained in a will, followed the decisions of every court since the case of *Pells* v. *Brown.*

The limitation in that case was of slaves, to his daughter and the *heirs of her body,* (which words, by the common law, created a fee simple in personal property; Fearne, 463;) "provided that, if his daughter died without heirs of her body," *i. e.* issue, "then

over;" held a good limitation, and that the whole interest did not vest in the first taker.

The opinion of the court, including Chief Justice Sharkey, was unanimous.

This case was recognized in 9 S. & M. 361.

Next came *Rucker* v. *Lambden*, 12 S. & M. 231. This case was twice elaborately argued. The devise consisted of both real and personal property; the limitation was to Sarah A. Truly, and her bodily heirs. These words, the English law made an estate tail; but create a fee simple by our Act abolishing entails. The contingency was, "and at her death, should she have no issue, to her brothers; held, that this was not an estate tail, but a good executory devise." Chief Justice Sharkey concurred as to the personalty, but as to the realty, the point argued was that, as it was in a different part of the will, the contingency of "her dying without issue, did not apply to it." The court thought it did, but on this point Judge Sharkey was not entirely satisfied.

The next case was *Powell* v. *Brandon*, 2 Cushman, 344. The devise was in trust, to permit M. to have and possess the land and negroes for life; and in trust, after his decease, to put and continue in possession, the lineal descendants of said M., to the remotest posterity, and on failure of lineal descendants, then in trust, for the heirs generally. The court decided that the limitation, under the rule in *Shelly's case*, gave the first taker a fee simple, and that "the failure of descendants to the remotest posterity, on which the estate was to go over, was void; because the testator plainly said he meant issue or descendants, whenever they failed. This case could not have been decided otherwise. If it had been to A. for life, remainder to his descendants, and if he died without *descendants*, then over, this would have been a good executory devise; for the 26th section would have made descendants mean, descendants *living* at the death of the *first* taker;" but this was precluded, because the testator said descendants to the *latest posterity*.

The next case was *Gray* v. *Foxworth*, in which the court decided that *Kirby* v. *Calhoun*, and the previous cases, conclusively settle that case. S. P. 14 S. & M. 183.

The next case, *Hampton* v. *Rather*, decided, that a limitation of

slaves to A. and the heirs of his body, vested the fee in A. There was no executory limitation over, and consequently could be no decision on the point involved in this case.

We are now prepared to state, according to the above principles, what estate Mary Roach took under her father's will.

The devise is to Mary, for her sole and separate use and behoof, and *her heirs forever.* Hence, according to all the above cases, a fee simple is given; then he proceeds, but *" if she should die without issue,"* or, *if her child or children surviving her die before* arriving at the age of twenty-one, then the estate to revert to his other children. The first limitation is to Mary and her heirs, and the first contingency is, "if she die without issue." These words import, in England, an indefinite failure of issue, and would make an estate tail in England, unless explained in other parts of the will. But the 26th section of our statute says, *these words shall mean issue living at her death;* and this will having been made since the passage of the statute, we must read it, that "if *Mary die without issue living at her death,* or, if her child or children *surviving* her die before twenty-one, then over," &c.

The first contingency, "if Mary die without issue living at her death," according to all the above English and American authorities, creates a valid executory devise, not an estate tail. In such case, if she had died leaving no issue, the executory devise would have taken effect and vested the property in the complainants. But she died *leaving* issue *surviving* her, *i. e.* two children; therefore the first contingency, although valid and good, failed to take effect. Our next inquiry, therefore, must be, whether the alternate contingency, " or if her *child or children surviving her* died before twenty-one," created a valid executory devise to complainants, and if it did, whether the contingency has happened.

And here, we confess, we are at a loss how to argue or prove a self-evident proposition. We scarcely know how to prove that ".white" is "white," or " black" is "black." Argument cannot make the testator's intention plainer than the precise language of the will. He says, his daughter is to have the fee simple, by the devise to her and her *heirs forever.* He then says: "If she die without issue *living at her death,*" (the words 'living at her death,' being supplied by the statute,) then to his other children; "or, if,"

said he, "her surviving child or children—that is, her children, grand-children, or descendants *surviving* her, *i. e.*, co-existing, but living after her death—die before twenty-one, then, and in that case, to his other children."

The intention—the paramount intention of the testator, is so demonstrably plain, that the most unlettered man can instantly tell what he means. He intended his daughter's issue to take, if she had any *living* at her death, provided they arrived at the age of twenty-one; if she had none living at her death, or if she had, and they died before twenty-one, he wanted his other children to have the estate. Human ingenuity cannot torture the language of the will into any other meaning.

To make his meaning *plain*, beyond all cavil, the testator says, not his daughter's child or children, but her *surviving* child or children. "Surviving," is defined, "outliving—living beyond the life of another—remaining alive—yet living," &c. The testator then, necessarily says, if his daughter's issue, alive at her death, die before twenty-one, then over. Here, then, the contingency must happen within twenty-one years, at furthest, after his daughter's death, which, according to all authority, is within the time for executory devises to vest.

But it is said, the testator meant " by child or *children surviving her*," "issue" *surviving her*. Suppose he did—and we are perfectly willing to read the will in that way—then it would read, if her issue *surviving* her died before twenty-one, that is, if her child, grandchild, or descendants, who survived her, *i. e. who existed at* her death, and survived her, died before twenty-one, then over. In such case, her surviving issue, if there were fifty, must all die before twenty-one, or the limitation over cannot take effect; for if either attained twenty-one, " her issue" did not die before twenty-one, because " issue" embraces all, and all must die before twenty-one to give effect to the limitation over. If, therefore, any child or descendant who was living at her death attained twenty-one, the fee simple, which was before defeasible, has become absolute. But if they all died under twenty-one, as they did in this case, then the limitation over took effect. And as her "issue," which were living at her death, and survived her, must, if they die before twenty-one, necessarily die within twenty-one years after her death, the

contingency is within "a life or lives in being," *i. e.* Mary's life, and twenty-one years afterwards, and by all the authorities, ancient or modern, is a good executory devise.

But it is said, that if this is so, it would cut out the grand-children of Mary, born after her death, if the parent of the grand-child died before twenty-one—for it is said Mary might have children, they might have children born after Mary's death, and then Mary's children might die before twenty-one, and thus their children born after Mary's death would be cut out. His meaning was, they say, that Mary's issue should take, and therefore he could not have intended that if "her children or issue" died before twenty-one, and *left issue*, that this issue should be cut out. A testator's meaning is to be judged of by the whole will; and if this be his meaning, the court must give it effect. But if such be his meaning, and if full force and effect be given to it, to the fullest extent, then the will would have to be read thus, "or if Mary's child or children surviving her, die before twenty-one, *and without issue*, then over. If he meant her issue to take, if her child or children surviving her, died before twenty-one, then, according to the argument, the words "and without issue," must be added to the clause, to make it read as above stated. We must then read the will one of two ways. Thus, First—"or if Mary's surviving child or children surviving her died *before* twenty-one," then over—this would cut out after-born children, if the parent died before twenty-one. Second, "or if Mary's child or children surviving her died before twenty-one," *and without issue*—this would let them in, if the parent died before twenty-one. Either of these contingencies, it is settled beyond dispute, make a valid executory devise, and not an estate tail.

If he intended the first, it is valid, and the court cannot alter it, because he did not foresee or provide for such an event, as in the case of *Doe* v. *Hazelwood*, 10 Com. Bench, 544; 70 Com. Law Rep., the testator, being sick, devised to his wife for life—remainder to his nephew—but if his wife should be delivered of a posthumous child, then to that child. The testator got well—a child was born—and he then died. The court held, that although they supposed he could not have intended to give the property to his nephew, if he had a child, whether posthumous or not, yet that intention was not

on the face of the will, and they could not make a will for him, and they decided the nephew took the property.

If Mr. Roach, therefore, intended that the property should go to his own children, if his daughter's surviving *children* or grand-children died before twenty-one—whether they left issue or not—it is a good executory devise; of this, we suppose, no lawyer can doubt. A few cases out of many will be cited to prove this. A devise was to A. and his heirs, but if A. died before twenty-one, to B.; held a good executory devise. Fearne on Rem. 468. A. devised to his wife for life, remainder to his son and his heirs, but if his son died before twenty-one, then to J. S.; held a good executory devise. Fearne, 431, last note. A. devised land to B. and his heirs, provided, that if he should die within age, then the land to remain to C. and his heirs; held a good executory devise. Fearne, 430, 431. The cases of *Massenberg* v. *Ash*, 1 Vernon, 234; *Stucholm* v. *Hodgson*, 3 P. W. 300 ; *Stephens* v. *Stephens*, C. T. Talbot, 228, decide the same thing. In all these cases the devisees might have had children and died before twenty-one, and yet the children would not take the property.

But if Mr. Roach intended, that if Mary's issue died before twenty-one, the estate should go to the complainants, but farther intended, that if they left issue, it should not, then to carry his intention into effect, we must read his will, as before stated, thus, " or if Mary's child or children *surviving* her, died before twenty-one," *and without issue*, then to complainants, &c. This, also, is beyond all controversy, a good executory devise, and not an estate tail, as before stated by us. This we will now prove.

A devise to A. and his heirs, and if he shall die under twenty-one, and *without issue*, then to B.; held, a good executory devise. *Barnets' Lessee* v. *Casey*, 7 Cranch, Rep. 456.

So a devise to Mary Barrs, and her heirs and assigns forever, but if she should die before twenty-one, and *without leaving issue*, then to the testator's grand-son; held, a good executory devise. *Buckworth* v. *Thorkhill*, 6 Cruise, Digest, tit. Devise, ch. 17, § 28.

Devise to a daughter, " but if she shall fortune to die without issue, *or* not having attained twenty-one, then over ;" held, the word " *or*" must be construed " and," and then, say the court, " This, then, is nothing more or less than an executory devise over,

contingent upon the event of the daughter dying in the lifetime of the mother, without attaining the age of twenty-one, *and without having issue." Doe* v. *Jessup,* 12 East, 458.

Same point decided in 1 Wilson, Rep. 140. The court, in the case in 7 Cranch, say, the authorities are conclusive. In such case, in order to give effect to the executory devise, the party must die under twenty-one, and *without issue.* If Mary's surviving issue died before twenty-one, but left issue, the contingency has not taken effect, and the estate, or fee simple in the first taker is absolute; so, if Mary's surviving children, or either of them, arrive at the age of twenty-one, the estate is absolute, although they may have no issue.

But it is said, that where a limitation is to A. and his heirs, and " if he die without issue," or if " the issue die before twenty-one," then over, that these latter words are a part of the same contingency, and do not restrain the former words " dying without issue," to mean " issue living at the death;" and, for this is cited the case of *Grimshaw* v. *Pickup,* 9 Simons, Rep. 595. Undoubtedly this is so, because the " dying without issue," in that case, meant, as the court decided, " an indefinite failure of issue," and the question was, whether the superadded words, " or if the issue die before twenty-one," restricted the " dying without issue," to mean "issue *living* at his death;" and the court decided it did not. But if the contingency in that case had been " dying without issue living at his death," as our statute makes the words mean, then the whole argument fails. If the words in that case had been, " if A. die without issue *living at his death,"* or " if that issue *surviving* him die before twenty-one," the question would be a wholly different one. In the case of *Grimshaw* v. *Pickup,* as it was an indefinite failure of issue, the issue of that issue might not die under twenty-one for an indefinite period of time, hence, it was too remote. There was nothing in that case that restrained the dying "without issue," to "issue living at the death." Consequently, the issue might last for one hundred years, before a death before twenty-one, took place.

We have now proved, beyond all controversy, and without a dissenting opinion to the contrary, the following propositions:— First. That where an estate is limited by will to A. and *his heirs,*

or his *heirs* forever, these words vest the fee simple in him, and, that a contingency annexed, that "if he die without issue living at his death," then over, &c., does not create an *estate tail*, but the limitation over, is a good executory devise. Second. We have, therefore, proved that the limitation to Mary Roach and *her heirs*, vested the fee simple in her, and that the contingency, "if she die without issue," by our statute, meant "issue living at her death," and consequently was valid. Third. We have, also, proved that the alternate limitation, that if Mary's "*surviving* child or children," died under twenty-one, then over, &c., was a valid contingency; and that the limitation over to complainants, was good, as an executory devise. The estate of Mary Roach, was not, therefore, an *estate tail* under the statute of *de donis*, nor a conditional fee at common law; but was a vested fee simple, subject to be divested upon the happening of either contingency. How, then, we ask, in the name of law and justice, can the 24th section and the proviso, which, by the terms used, plainly designate that only estates tail and conditional fees were turned into fees simple, except so far as the *proviso* preserved one described case, apply. We ask, how can this 24th section apply either in words or spirit, to a wholly different class of cases, and a different kind of estate?

In nearly every State in the Union estates tail are converted into fees simple, yet no judge or court has ever decided that executory devises and contingent limitations upon vested fees simple, were turned into *absolute* fees.

A vested fee simple, defeasible upon a subsequent contingency, is wholly different from a conditional fee or conditional limitation.

In the case of *Buckworth* v. *Thirkell*, 6 Cruise, Digest, tit. Devise, ch. 17, § 28, where it was urged by counsel, that an executory devise was a conditional limitation, the court used this emphatic language: "It is no such thing, there was no condition in it; it was a *contingent* limitation."

An estate tail, under the statute *de donis*, is a limitation to a man and the heirs of *his body*; *i. e.* his issue.

A conditional fee is a limitation to a man, upon condition that he have issue. The fee simple is not vested in him until he have issue.

An executory devise, after a fee simple, is a limitation to A. and his heirs, which vests at once the fee simple, but a contingency is annexed, upon the happening of which, the fee that was vested is divested, and vests in the person designated in the ulterior limitation. A *fee tail* and a *conditional fee* alone are embraced in the 24th section and proviso. An executory devise, limited after a fee, is precisely where the common law placed it. The 26th section neither adds to it nor takes from it. It only *defines* what certain words, when used in a will or deed, shall mean.

How, we ask, can the 24th section, or the proviso to it, be made to apply to any thing but what is legitimately embraced in its words and spirit? How can it be made to repeal the common law rule in regard to executory devises, or limit or abridge the term within which they are to vest. It is strange, it is passing strange, that the human mind could imagine a thing so contrary to the plain language of the statute, and to all rules of interpretation. The enacting words of the section turn *estates tail* and conditional fees into fees simple; and the *proviso*, so far from destroying, or restricting executory devises, or any other kind of estate, only excepts from the operation of the section, the particular estate mentioned in it. It destroys nothing, but declares valid the estate limited by it.

What is a proviso in a statute? It is merely a declaration that certain things, before mentioned in the statute, should be exempt from it; or, that the words of the statute should not apply to the case specified in the proviso. Dwarris on Statutes, 660.

What did the legislature mean by the proviso? They meant what they say, that is, to except from the operation of the enacting clause the particular estate mentioned in the proviso, and to declare that that estate mentioned in the proviso, should, notwithstanding the words of the section, be good.

Now, be the estate excepted by the proviso what it may, it declares that that estate is valid; and we ask, has it ever been heard of, in the history of jurisprudence, that a law of the legislature declaring a particular estate valid, thereby declared any other estate invalid?

Neither a rule established by the common law, nor by a statute,

is repealed by another statute, except it be *expressly* abrogated, or the two rules are inconsistent. Tested by this rule, how does the case stand? The logic of the argument is this:—The legislature says, an estate limited to several donees in succession, and the heirs of the body of the remainderman, and in default of such, to the right heirs of the donor, shall be valid—*ergo:* an executory devise is invalid or abolished.

Again:—The legislature declares that such an estate is valid—*ergo:* the time limited for the vesting of executory devises is abolished or restricted to a life in being.

Again:—Estates tail and conditional fees are, by legislative act, turned into fees simple—*ergo:* vested fees simple, determinable upon subsequent contingencies, are also turned into absolute fees simple.

In the name of reason, common law, and common sense, can such arguments be tolerated?

If the limitations in this will do not create a *fee tail*, or a *conditional* fee, it is utterly impossible, without a prostration of all authority, and the perversion of plain, unambiguous language, to say, that the 24th section, or the proviso to it, has anything to do with executory devises or contingent limitations after a fee.

In the case referred to from Alabama, it was not supposed that the proviso in their statute, which is like ours, had anything to do with it. The court decided that that case was a good executory devise.

It is unnecessary to inquire what kind of estate was intended to be excepted by the proviso. It is sufficient for us to show that declaring one kind of an estate valid, does not necessarily declare another and a different kind, invalid.

To a lawyer, who understands what a conditional fee at the common law, and what an estate tail under the statute *de donis* are, the proviso to the 24th section is easily understood.

The statute *de donis* never was in force in Mississippi, at least not since the Act of 1807. Hutch. Code, 65.

Strike out the 24th section from our statute books, and conditional fees at common law would exist in Mississippi, but not an estate tail. An estate to A. and the heirs of his body, would not be an estate tail, but a conditional fee.

The 24th section declares, that estates tail and conditional fees shall thereafter be fees simple. At common law, where there was a conditional fee, as to A. and the heirs of his body; if A. had heirs, the condition was performed, and he then had an estate in fee, at least so far as to alienate it. If he did not have *issue* and died, the estate reverted to the grantor, although there might have been no limitation "that in default of issue it should revert." The 24th section, standing alone, abolished these estates, and of course, although the donee might have no issue, the fee being in him by the statute, all remainders and reverters were abolished. The legislature intended, by the proviso, to except from the sweeping clause a conditional fee at common law, where there is an *express limitation, that in default of issue, there should be a remainder to the right heirs of the donor*. In other words, they intended, if the donee in remainder died without leaving issue, the estate in fee simple should not be in him, but in conformity with the *express* stipulation of the deed or will, should revert to the heirs of the donor. But where there was no *such express limitation* to the right heirs of the donor, then the absolute fee should be in the donee, whether he had issue or not. Thus, an estate to A. and *the heirs* of his body, without more, is a conditional fee at common law, and is, by virtue of the 24th section, an estate in fee. And a limitation to a succession of donees, that is to A. for life, remainder to B. for life, remainder to C. for life, (all these being in existence,) remainder to D. *and the heirs of his body*, would also be a conditional fee in D. at common law, and this, by the 24th section, whether D. had issue or not, would be a fee simple; but if, to the last limitation had been added, in express words, in *default* of issue of *D., remainder to the right heir of the donor*, the proviso would have given effect to the express remainder, and D.'s estate would not, in such case, be a fee simple. But, if he, in such case, had issue, then the condition would have been performed, and the estate in fee would be vested in him; but if he had no issue, the estate would revert to the heirs of the grantor.

And this proviso neither creates, nor tolerates, a perpetuity; because the estate in the proviso would only remain inalienable during the lives of the donees and the life of the remainderman; for, if the remainderman died without issue, the estate immedi-

ately reverted; but if he died leaving issue, the condition was performed, and the absolute estate in fee was in his heirs, at least to alienate.    This is the more plain, because the *proviso* applies only to "lands."

This is so plain and palpable, that it only has to be stated to be at once seen that it is the only meaning which can be attached to the proviso; for, to apply the proviso to the destruction or restriction of executory devises, or the contingencies on which they were allowed by law to be limited, is, as we have said, to establish the absurd proposition, that an Act which declares one particular estate limited in a particular way shall be valid, means that all other estates limited differently, are invalid.

We know it was argued that, under the provisions of this will, none but the issue of Mary could take.    This is simply a very great mistake.    If it is a good executory devise, and the contingency takes effect, Mary's estate, of course, is divested, as is the case in all executory devises, limited after the fee simple.    But, if the contingency fails, as if, in this case, Mary's children had attained twenty-one, then the estate would be absolute in fee; and if her children surviving her attained twenty-one and died without lineal heirs, the estate would go to collateral heirs.    This at once destroys the whole argument.

In South Carolina, as in Mississippi, estates tail never existed. And, in the case of *Beden* v. *Beden,* 2 Bailey, R. 236, the court decided that as no estate tail existed in South Carolina, none could be created by implication after a previous devise of the fee; also that a fee conditional would not, in such case, be implied, and consequently that, in that class of cases, where the fee was first limited, and "dying without issue," was made a contingency to defeat it, (by which it was construed an estate tail, in England,) such a limitation would be a good executory devise by the law of South Carolina.

This case is a vitally important one.    We ask for it, at the hands of the court, a full investigation.    If it is fully investigated, and the authorities on both sides are carefully considered, we have not the slightest doubt as to the result.    The intention of the testator is so clear and manifest, that the most unlearned in the law

would tell you at a glance, that the testator meant what he plainly said, that is, "if his daughter Mary died without issue at her death, or if *leaving children,* they died before twenty-one," then he wanted the complainants, his other children, to have the property, or, at least if the children of Mary died before twenty-one, and without leaving issue. We submit the case, in the confident belief, that unless every principle of law in relation to executory devises is overturned and blotted out of the jurisprudence of Mississippi, the case must be decided for the complainants.

*G. M. Davis,* on same side.

SMITH, C. J., delivered the opinion of the court.

This was a bill filed in the Superior Court of Chancery, by the appellees, for the recovery of certain real estate and personal property consisting of slaves, stock, farming utensils, &c., held and claimed by the appellant.

The controversy involves the construction of the last will and testament of Benjamin Roach, Sen., deceased, under which both parties claim title.

The testator having, by previous devises and bequests in the will, disposed of certain portions of his estate, by the fourth clause devised and bequeathed to his five children, "all the rest of, and all kinds" of his property, to have and to hold the same "share and share alike, to them and their heirs forever, subject only to the conditions and limitations as to distribution," &c., as were thereinafter mentioned.

By subsequent clauses the testator provided that each of his children, as they became of age, should receive a tract of land of a thousand or fifteen hundred acres, with thirty slaves, to be purchased by the executors with the funds of the estate. In reference to his daughter Mary, the provision is in these words: "when my daughter Mary shall arrive at full age or shall marry, it is my will that my executors shall allow her to take any tract of my wild and unoccupied lands, not exceeding fifteen hundred acres, or if she does not like the location of any of my said lands, to purchase for her, at a price not exceeding twenty dollars per acre, one thousand or fifteen hundred acres of land; and with any funds they

may have on hand, to purchase for her thirty negroes to work on and cultivate the same; and they shall purchase for her or furnish from my plantations above mentioned, all necessary stock, implements, utensils, &c., &c., for the same; and she shall be charged with the value of said land, negroes, stock, utensils, &c., with six per cent. per annum interest on the same, to be charged against her portion of my estate on final distribution. Provided, that in case my daughter should marry, all the property she may thus receive, and that on final distribution, is limited to her sole and separate use, free from any control or liability for the debts of her husband. To make my intention plain, the property in this my last will and testament, devised and bequeathed to my daughter, is for her sole and separate use and behalf, and her heirs forever, but should she die without issue, or if her child or children surviving her, should die before arriving at the age of twenty-one, then the estate herein devised shall revert to my other children and their heirs, share and share alike, according to the law of this State."

By the terms of the will, the property devised to the testator's children, except the portions to be advanced upon their arriving at the age of twenty-one, was to be kept together until the youngest child should attain the age of majority, at which time, according to the directions of the will, a final distribution was to be made of the estate.

The daughter, Mary, before she arrived at the age of twenty-one, intermarried with German N. Jordan, the appellant, and on her marriage, a plantation, slaves, and stock, in execution of the clause of the will above recited, was purchased for her, of which Jordan and Mrs. Jordan took possession. Mrs. Jordan died in May, 1855, having previously given birth to twins, who survived their mother but a few weeks. The plantation, slaves, &c., are now held by Jordan, and constitute the subject of the suit.

The appellees are the surviving children of the testator, and the brothers of Mrs. Jordan, and claim the property directly in contest, as well as her undivided portion of the testator's estate. They do not allege title in the character of heirs-at-law, or distributees of Mrs. Jordan or her children, but they claim in virtue of the limitation over "to the other children" of the testator, which it is averred took effect upon the dying of the children of

Mrs. Jordan before they attained the age of twenty-one years. Jordan demurred to the bill, and claims as the heir-at-law of his children.

The case, thus stated, raises the question of the validity of the limitation to the " other children" of the testator; and to determine this, we must first ascertain the character and kind of estate which vested in Mrs. Jordan.

It is insisted by appellant's counsel, that if Mrs. Jordan took an estate tail, the limitation to the " other children" of the testator was defeated and destroyed, by the statute abolishing entails, which enlarged her estate into a fee simple absolute.

Executory or contingent limitations, made upon an estate tail, do not change the character of such estate. As, for example, where in lands of inheritance an estate tail is limited to one, and then a limitation is made to another, on the contingency that the tenant in tail shall die without issue living at the time of his death, such limitation does not abridge the first estate, or accellerate its determination; and therefore cannot affect or convert it into an estate of a different kind. *Driver* v. *Edgar*, Cowp. Rep. 379; Fearne on Rem. 428; Jarman on Wills, 329, 333, 358, 359.

If, therefore, Mrs. Jordan took an estate tail, and the statute, by enlarging it into an estate in fee simple absolute, worked the destruction of the ulterior limitation, that result would follow, whether she took an estate tail proper, or a qualified estate tail, or an estate tail determinable on a subsequent collateral event. As all these species of estates tail were subject to be barred by a common recovery, which destroyed all conditions and subsequent limitations; Fearne, 424; 4 Kent. 279; and our statute, in its operation, is quite as comprehensive as the common recovery.

We shall proceed now to inquire, whether Mrs. Jordan took an estate tail; or whether a fee, determinable upon her death without issue of her body then living, or, on the death of such issue, if they should survive her, within the age of twenty-one years, was created by the will. These propositions are maintained by the respective counsel of the parties.

As estates tail, at most, exist to a very limited extent in this State, since the enactment of the statute in 1821, concerning wills,

in prosecuting this inquiry we must, of necessity, refer to the English law.

What was a conditional fee at the common law, has, since the Statute of Westminster 2, 13 Edw. 1, been denominated an estate tail. This statute, commonly called the statute *de donis conditionalibus*, took away the power of alienation on the birth of issue, which existed in reference to conditional fees. These, at common law, were construed to be fees simple, on condition that the grantee had the heirs prescribed. If the grantee died without issue, the land reverted to the grantor; but if he had the prescribed issue, the condition was held to be performed, and the estate became absolute, so far as to enable the grantee, by alienation, to bar not only his own issue, but the possibility of a reverter. Under this statute the courts of justice considered that the estate was divided into a particular estate in the donee, and a reversion in the donor. Where the donee had a fee simple before, under this construction of the statute, he had what was called an estate tail; and where the donor had before but a bare possibility, he had a reversion expectant upon the estate tail.

"An estate tail," says Cruise, "may be described to be an estate of inheritance, deriving its existence from the statute *de donis conditionalibus*, which is descendible to some particular heirs only of the person to whom it is granted, and not to his heirs general." 1 Cruise, 78. An estate tail is created where lands are conveyed to a person and the heirs of his body, or to some particular heirs, to the exclusion of the heirs general. But the specified heirs, must be lineal heirs, as an estate tail can only be created by a gift to the donee and the heirs of his body begotten. 1 Thomas' Coke, Litt. title Fee Tail, §§ 14, 15; 2 Preston on Estates, 355. And it goes down to the heirs of the body of the donee in perpetual succession. Its character is never changed by the descent through any number of generations. Its peculiar characteristics are, the measure of the estate by the continuance of issue, and its quality to determine only on the failure of issue. 2 Preston on Est. 392. When the line of descent is broken, by the failure of the issue of the donee, it reverts to the grantor by operation of law.

In both clauses of the will, which have any material bearing upon the subject under consideration, appropriate language is used

for passing an estate in fee simple absolute.    In the first, the testator devised all the rest of his property, of what kind soever, to his five children, of whom Mrs. Jordan was one, "to them and their heirs forever," subject to the conditions thereinafter mentioned.    In the second, the testator declares that the property devised to his daughter is "for her sole and separate use and behoof, and her heirs forever."    This language, if unexplained or controlled by any other provision in the will, would unquestionably pass a fee simple.    But that such was not the intention of the testator is shown in the clearest and most unequivocal language.    He says, " To make my intention plain, the property in this my last will and testament, devised and bequeathed to my daughter, is for her own separate use and behoof, and her heirs forever; but should she die without issue, or if her child or children surviving her, should die before arriving at the age of twenty-one, then the estate herein devised shall revert to my other children and their heirs," &c.

Here there is no possible ground to doubt that the testator used the word "*heirs*" in the restricted sense of "heirs of the body."

Where a testator, in the first instance, devises lands to a person and his heirs, and then proceeds to devise over the property in terms which show that he used the word "heirs" in the prior devise in the restricted sense of heirs of the body; such devise confers only an estate tail, the effect being the same as if the latter expression had been originally employed.    "Indeed, so well," says Mr. Jarman, "has this been settled from an early period, that to found an argument in favor of a contrary construction, resort is always had to special circumstances."    2 Jarman on Wills, 237, and cases cited.

It is not, therefore, to be controverted, that Mrs. Jordan did not take an estate in fee simple ; but that she took an estate tail, unless the subsequent limitation has had the effect to convert it into a qualified fee determinable on the contingencies specified.

The statute has declared "that every contingent limitation in any deed or will, made to depend upon the dying of any person without heirs, or heirs of the body, or without issue, or issue of the body, or without children, or offspring, or descendant, or other relative, shall be held and interpreted a limitation to take effect

when such person shall die, not having such heir or issue, child or offspring, or descendant or other relative (as the case may be) living at the time of his death, or born to him within ten months thereafter, unless the intention of such limitation be otherwise expressly and (as) plainly declared on the face of the deed or will creating it." Hutch. Dig. 610, § 26.

The effect of this statute, as settled by this court, is to make the limitation over to "the other children," a limitation dependent upon a definite failure of issue, unless the contrary intention be expressly and plainly declared on the face of the will. *Powell* v. *Brandon*, 24 Miss. R. 343; *Hampton* v. *Rather*, 30 Miss. R. 193.

In the argument, at bar, it was conceded or assumed by the respective counsel, that the devise before us is one to which the legislative construction attaches. And, for the present, admitting this to be the case, we must apply the same construction which should be given if the will contained the additional words " living at the time of her death."

What then is the effect of these superadded words upon the estate which Mrs. Jordan took under the will? Will the effect be to convert the fee tail limited to her, into a qualified or determinable fee, as contended by counsel, and thus render the limitation over good as an executory devise?

In the case of *Driver* v. *Edgar*, the testator having devised lands to one of his daughters, to hold the same, after the death of the testator's wife, to his said daughter and the heirs of her body, lawfully begotten; and to another daughter, other lands to hold from and after his wife's decease, to her and the heirs of her body; and declared his further will to be, that in case either of his said daughters should happen to die single, married or widow, without leaving child or children living at their decease, lawfully begotten, then the estate, given by his will, should be void as to the inheritance of heirs, and the lands so given her should go to his heirs male, &c. The first daughter, after her mother's decease, suffered a common recovery of the lands so devised to her; and afterwards devised them in fee, and died unmarried and without issue. Upon a question whether the recovery had barred the remainder over, it was holden, by the Court of King's Bench, that she was tenant in tail up to the hour of her death; and, there-

fore, that the common recovery which had been suffered, barred all limitations upon the estate tail.    Cowp. 379.

Mr. Fearne, commenting upon this and the analogous case of *Fontain* v. *Gooch*, said, "however the expressions in cases of this sort may wear the complexion of conditions or conditional limitations, they seem, in fact, not to differ from remainders; as they are taken up from an event which is itself a regular determination of the estate tail, that is, the death of the tenant in tail, without leaving issue then living, so that the express declaration, that the estate tail should cease, determine, or become void in such event, being nothing more than what is involved in the very nature of the estate itself, is, in strictness, perhaps a mere nullity.    And the ulterior limitation not operating in any degree to abridge or interfere with the estate tail, or accelerate its determination, may well be considered as a remainder, not vested indeed, because confined only to the event of the estate tail, determining by the decease of the tenant in tail leaving no issue then living, but contingent upon the expiration of the estate tail by that event.    Fearne, 428.    See also the note at page 6, of the same author, by Mr. Butler.

The authority of these eminent elementary writers, and numerous adjudicated cases, show, conclusively, that where an estate tail has been expressly limited in the first instance ; as, for example, where lands are devised to one and the heirs of his body, the words "living at the death," &c., which introduce the limitation over, cannot be resorted to as a test by which to determine whether the testator did not intend to limit an estate tail.    And further, that these words have no effect whatever upon the prior limitation, and consequently do not change the estate tail into an estate of a different kind.    This doctrine is consistent with the nature of such limitations, and with the principles of reason.    It seems to result necessarily from the very nature of the subject.    For where lands are devised to one and the heirs of his body, the heirs, in such case, cannot take as purchasers by present devise, for the manifest reason, they are not in existence.    They cannot take by way of remainder, for that would cut the estate of inheritance expressly limited to the first devisee, down to an estate for life.    It is obvious that they could take, alone, by descent.    Otherwise, the ex-

pressed objects of the testator's bounty would be shut out, and his declared will be defeated.

It is equally manifest, that the expression "living at the death," &c., preceding the limitation over, cannot characterize or affect the prior limitation. In such case, the ulterior limitation is made to depend upon a contingency which is, in itself, a natural determination of the estate tail; that is, the death of the first devisee without issue of his body then living. And as the condition on which the ulterior limitation is to have effect is taken up from that event, that is, from an event which is the regular determination of the estate tail, it is impossible, from the very nature of things, that the ulterior limitation could in anywise abridge, interfere with, or accelerate the determination of the prior estate. Fearne, 420, 428; 6 Cruise, Dig. title Devise, 258; *Gilman* v *Elvey*, 4 East, 313; *Driver* v. *Edgar*, Cowp. 379; *Richards* v. *Burgaveny*, 2 Jarman on Wills, 329, 330, 358, 359; *Clifton* v. *University of Oxford*, 1 Eden, Rep. 473.

In the case last cited, certain premises were devised to Doctor Clifton and the issue of his body, lawfully begotten, living at his death, and for want of such issue, to the University of Oxford. " This," said the Lord Keeper, " is the plainest case I ever saw in my life. The issue cannot take by present devise, as joint tenants with the defendant. They are not to take by remainder, but by descent; all the posterity are intended to take; it cannot therefore be a contingent remainder, but an estate tail."

But there is a settled distinction between the case which we have been considering and those cases in which the first limitation is to the devisee and his heirs generally, which would carry the fee simple; and the words "dying without issue," &c., subsequently used, are held to cut down the fee simple to a fee tail.

In the celebrated case of *Pells* v. *Brown*, Croke's Jas. 590, the testator devised lands to his son Thomas, and his heirs *in perpetuum*, paying to his brother Richard £20 at his age of twenty-one years; and if Thomas died without issue living William his brother, that then William should have those lands, to him and his heirs and assigns forever, paying, as Thomas should have paid, the said sum of £20. Thomas having entered, suffered a recovery, and it was holden that he took a fee. The circumstances that

the lands were devised to him and his heirs *in perpetuum*, and that he was required to pay £20 upon his arriving at the age of majority, were considered to indicate an intention to limit the fee to him. The clause, "if Thomas died without issue," was not indefinite, whenever he should die without issue, but was rendered definite by the clause which restricted the dying without issue to the lifetime of William. And as a fee could not, by way of remainder, be limited after another, it was agreed that the limitation to William was good as an executory devise.

It would be foreign to the question immediately before us, to inquire, whether, in the decision of that case, the recognized and well-settled characteristics of a remainder were not disregarded, and conditional limitations confounded with contingent remainders. Our present purpose is to ascertain what effect, according to the settled doctrines of the jurisprudence of England, at the date of the adoption of our statute concerning conveyances, the words "without issue living at the death," &c., have upon the prior limitations which carried the fee.

The courts at Westminster have, for centuries, constantly recognized the doctrine laid down in *Pells* v. *Brown* as law. And it is not now to be controverted, that words, which import a definite failure of issue following a devise of the fee, will not confer an estate tail.

Hence, applying the legislative construction to the devise before us, it follows, necessarily, that the testator did not intend an indefinite, but a definite, failure of the issue. Upon this view, therefore, Mrs. Jordan took an estate in fee, subject to be determined by the event of her death without issue then living, and not an estate tail.

But serious objections present themselves when we attempt to apply the statutory rule of construction. If we hold that the statute applies, the limitation to the testator's "other children" is made to depend upon the dying without issue living at the time of the death of the prior devisee. But, as Mrs. Jordan might die leaving issue, if such issue should die before attaining the age of twenty-one years, the declared will of the testator would be defeated, as it was his expressed intention, in the latter event, that the limitation over should take effect.

If we should, as argued by counsel, regard the words "if she should die without issue," and "if her child or children surviving her, should die before arriving at the age of twenty-one," as providing two distinct and independent contingencies, upon the happening of either of which the subsequent limitation was to vest, no objection would be encountered, in holding that the statute applies to the first, and not to the second contingency.

According to this view, the expression in the will, "if she should die without issue," should be read with the additional words, "living at the time of her death." And looking at the two events on which the limitation over might take effect, as two distinct and independent contingencies, it is manifest that this might be done consistently with the testator's intention. But it would produce a palpable absurdity, if we should insert those latter words in the condition upon which the limitation is made to depend upon the dying of her issue within the age of twenty-one years. If, therefore, we regard the two events expressed in the will as distinct, and the latter as an independent contingency, and look at it alone, it is "plain and express upon the face of the will," that the testator did not intend a failure of issue "at the death" of the first devisee.

But where lands are devised to one and his heirs generally, with a limitation over if he should die without issue; "or, if such issue should die before attaining the age of twenty-one years," the latter event, that is, the dying of the issue within age, is held to be but "a limited portion of the contingency expressed by" the preceding words, "if he should die without issue." And, agreeably to what appears to be the approved doctrine of the courts in England, the words describing the latter contingency have no effect whatever, in varying the fixed legal construction attached to the preceding words, "die without issue." The reasons assigned for the rule are, that words providing for a limitation upon the contingency of the issue of the first taker dying before attaining the age of twenty-one years, do not indicate a definite failure of issue; and being but a limited portion of the general contingency which is expressed by the words "die without issue," is necessarily included in it, and therefore superfluous. *Wright* v. *Jesson*, 2 Jarman, 291; *Grimshaw* v. *Pickup*, 9 Sim. 590; 2 Jarman, 429.

The statute has fixed the construction of the words " die without issue," when unexplained by the context. Their import is directly the opposite of that applied by the courts at Westminster. They mean " a failure of issue at the death."

Now, if we apply the reasons assigned for the rule above stated, to the question before us, the result would be, that we must exclude or disregard the second contingency, for, being a limited portion of the general contingency expressed in the first instance, it is included in it, and therefore superfluous, and consequently ineffectual to vary the fixed legislative construction which must prevail if the statute applies. And following this result, we would be compelled to hold that the event, upon the happening of which, the limitation over was to take effect, was the dying of the prior devisee without issue living at the time of her death. This result would be decisive of the controversy and fatal to the appellees, as the prior devisee died leaving issue surviving.

But this construction is not to be tolerated, as it was the expressed will of the testator, that, although his daughter might die leaving issue, the estate devised should nevertheless go over to his other children, if such issue should die under the age of twenty-one years.

There is no provision of the will from which it appears plainly and expressly, that the testator designed to make the limitation over dependant upon the failure of issue at any specified period of time. In fact, under the rule recognized by the courts in England, the will presents a case in which the devise over, in the first instance, is dependant upon an indefinite failure of issue. Hence, whatever doubt may exist, when we consider what was the obvious, paramount, general intention of the testator—that is, that his daughter and her lineal descendants should enjoy the devised estate, so long as such descendants continued to exist; and that the limitation over was not to take effect upon any contingency short of an extinction of the issue, we are compelled, by the explicit and imperative language of the statute to adopt the rule of construction which it supplies. Then, applying this rule, the will must be read as providing for the limitation over, in the first place, upon a failure of the issue, restricted to the time of the death of the first taker. And thus construing the will, there is no reason for hold-

ing that the contingency of the dying of the issue under twenty-one, is only a limited portion of the general contingency expressed by the previous words. In so doing we steer clear of the obstacle presented by the rule laid down by the authorities above cited.

Conceding, then, that the legislative construction applies, we must regard the two events described in the will, as distinct and independent contingencies, upon the happening of either of which the limitation over was to take effect. Considered with reference to the doctrines of the English law, the will presents the case of an executory devise, limited first, upon a dying without issue "living at the death," and secondly, upon a dying of the issue under the age of twenty-one years.

The first contingency having failed, we will confine our attention to the second. And we propose, for the present, to consider the questions arising upon it without regard to the supposed effect which our statute has had upon the validity of the limitation, but with exclusive reference to the principles of the English jurisprudence.

The exemption of executory devises from being barred or destroyed, is the foundation of an invariable rule in respect to the contingency upon which estates created by that means are permitted to take effect. The rule is, that the contingency must happen within a limited space of time. The utmost limits, as settled in the celebrated case of *Stephens* v. *Stephens*, allowed for executory devises, are a life or lives in being, and twenty-one years and the fraction of a year, sufficient to cover the ordinary period of gestation. Fearne on Rem. 521. As estates of this character are not subject to be barred or destroyed, every executory devise, so far as it goes, creates a perpetuity; that is, an estate inalienable until the contingency has happened one way or the other. The courts, for manifest reasons of policy, prescribed these limits; for "otherwise," says Mr. Fearne, "it would be in a testator's power to limit an estate inalienable for generations to come; and thus render property, to a great measure, useless to the calls and purposes of a commercial community."

The immediate question then, arising in the case is, whether the devise to the testator's daughter and her heirs generally, but if she should die without issue living at her death, " or if her child

or children surviving her, should die before arriving at the age of twenty-one years, then over" to the testator's other children, does not violate this rule?

The intention of the testator to be deduced, by applying the principles of law, from the terms of the devise, must determine this question.

Then, was it the testator's intention, or what is the same thing, according to the legal construction of the will, was the contingency upon which the limitation over was to take effect, an event which must happen, by the very terms creating the limitation, within the period allowed for executory devises; that is, within twenty-one years after the death of the prior devisee?

The words "child or children," as they are employed in the will, are synonymous with "issue." This was, in effect, conceded in the argument at bar. The term "issue" is of very extensive import, and when used as a word of purchase, and when unexplained or uncontrolled by any clear indication of intention, will comprise all persons who can claim as descendants, whether as children, grand-children, &c., from or through the person to whose issue the limitation is made; and to restrict the legal meaning of the term, a clear intention must appear upon the will. *Hanburry* v. *Davenport,* 3 Vesey, 257; *Bernard* v. *Montague,* 1 Mer. 424; *Leigh* v. *Norbury,* 13 Vesey, 340; *Freeman* v. *Paisley,* 3 Ib. 421.

Unless, therefore, there is some clear indication in the will before us, that the testator intended to restrain the legal import of the term, and to confine it to some limited portion of the issue of his daughter, as the immediate issue, to the exclusion of her grandchildren, or great-grand-children, he must be understood to include as the objects of his bounty, any or all of her remotest descendants who might live to attain the age of twenty-one years.

It is contended, that this intention is plainly shown upon the face of the will. It is insisted that it was his manifest intention to exclude the grand-children or the issue of the issue of his daughter, unless such issue was in existence at the date of her death.

The expression, in the will, mainly relied on to maintain this construction, are the words "surviving her," introduced in immediate connection with the preceding words "child or children." And it is argued that this expression restricts the general import

of the term "issue," and makes it mean the specific individuals comprising the issue who might happen to be in existence at the date of the demise of the first taker. Thus excluding the issue of the issue, or the grand-children of Mrs. Jordan who might be born subsequent to her death.

But it seems very clear that this was not the office or purpose designed to be performed by this expression. Mrs. Jordan could not have died leaving issue, without leaving a child or children, the survivor or survivors. The word "survive," in its popular significa-tion, may mean " over-living a specified individual," or " living beyond a specific event," or it may mean " still living," or "living at some designated period of time." In the particular connection in which these words occur—they mean simply, what would other-wise have been implied from the limitation itself, " if she died leaving issue."

If we consider the general provisions of the will, and the para-mount general intention of the testator disclosed by them, this will be more apparent.

The devised property was very large. The sons of the testator, his " other children," were at least equally and amply provided for with the daughter. And nothing can be clearer than that his paramount general intention, in respect to the devise and bequest to her, was that she should, at the least, possess the property dur-ing the term of her life, and that upon her death it should go to the heirs of her body, if she should leave such heirs, and that so long as they continued, the property should be enjoyed by them. The intention is equally clear and manifest that the limitation over was not to take effect upon any contingency short of an entire failure of the lineal descendents of Mrs. Jordan. Hence, this paramount object of the testator might be defeated, if the con-struction contended for were adopted. The estate might pass to the ulterior limitees, notwithstanding issue of the first devisee having attained the age of twenty-one years, were still surviving. For if the surviving issue were to die under twenty-one, leaving issue, such issue, that is the grand-children of Mrs. Jordan, would be shut out, although still living to claim the testator's bounty. Fur-ther, according to this construction, a grand-child born before the death of Mrs. Jordan, being, according to the argument "surviving

issue," would be comprised in the objects intended to be provided for; but another, born the day after her death, would be excluded. This forcibly illustrates the impropriety and absurdity of the construction; as it is scarcely possible to suppose that the testator designed to draw such a distinction between the daughter's lineal descendents, standing in precisely the same relation to himself.

· The remoteness of the contingency is not so great as to warrant the conclusion that the testator deliberately excluded it from his consideration.    The happening of the contingency was certainly an event within the ordinary range of human possibilities.    Mrs. Jordan, herself, died under sixteen, leaving issue of her body.    And at this latitude, where females arrive at puberty at so early a period in life, the contingency of such issue dying under twenty-one, and leaving issue, is scarcely to be regarded as an improbability.

It is very evident, that the principle upon which it is held, that where lands are devised to one and his heirs generally, with a limitation over, if he shall die under the age of twenty-one, and without issue, a definite failure of the issue is intended, and hence, is construed as "a devise in fee simple, subject to an executory limitation over, in the event of the prior devisee's death under the given age, and leaving no issue surviving him," (2 Jarman on Wills, 428,) is not applicable to the devise before us.

There is a manifest distinction between the case at bar and that class of cases to which this rule is applied.    In all the cases in which the event of dying of the first taker is confined to a definite age, the person upon whose death without issue the limitation over is made dependant, is referred to as a specific person or individual who can only take in the character and capacity of a purchaser, and not as a class or denomination of individuals who would take by inheritance.    See the cases referred to in Jarman on Wills, 2d vol. 429; and Fearne, illustrating the rule.

Where a limitation over is made to depend upon the dying of J. S., for example, under twenty-one, the contingency must, of necessity, happen within the compass of twenty-one years.    So, where it depends upon the dying of J. S. under twenty-one, and without issue.    For the failure of the issue and the death of J. S. must both, by the very terms of the limitation, happen within that

period of time.   In both these instances, the limitation over would, unquestionably, be good as an executory devise.

But in the will before us, the issue of Mrs. Jordan would not take by immediate devise, as purchasers, but by descent, as her heirs; and are not referred to as specified individuals, but as a class or denomination of persons to take in succession, any individual of whom, attaining the age of twenty-one, would be entitled.

Jarman lays it down in express terms, that where lands are devised "to one and his heirs, with a devise over, in case he should die without issue, or such issue should die under the age of twenty-one years, he would be tenant in tail," which clearly would not be the case if the words referring to the dying of the issue under twenty-one imported a definite failure, or an extinction of the issue within twenty-one years from the death of the first taker.   2 Jarman on Wills, 429.

This principle was recognized in the leading case of *Jesson* v. *Wright*, 2 Jarman, 291, and afterwards in the case of *Grimshaw* v. *Pickup*, 9 Sim. 596.   In these cases it was held, that the contingency of the issue dying under twenty-one did not necessarily imply a failure of issue at a specified time, and therefore could not control the legal import of the words, " die without issue," previously used.

Assuming then, that according to the true legal construction of the will, the issue of the issue, or the grand-children of Mrs. Jordan, were included within the objects of the testator's generosity, the limitation over could not vest, so long as a grand-child or great-grand-child of the first devisee survived.   Hence, if she should die leaving issue, and such issue should die under the age of twenty-one years, leaving issue, although the latter might die under that age, the contingency upon which alone the limitation could take effect would not happen within twenty-one years from the death of the first taker.   The contingency would, therefore, be too remote, and consequently the limitation over, void as an executory devise.

According to this view, the property devised, real and personal, vested absolutely in Mrs. Jordan; consequently, the appellant, as the heir-at-law and distributee to his children, to whom the property descended upon the death of their mother, is entitled to the succession.

This disposes of the controversy, unless, as it is supposed, the statute sustains the devise over to the other children of the testator. We propose to make a very brief examination of this subject.

The provisions of the Act of the 13th of June, 1822, concerning conveyances, bear upon the questions presented by the will and discussed in the argument at bar.

The 27th section of that statute provides that, "where an estate hath been, or shall be, by any conveyance, limited in remainder to the son or daughter of any person, to be begotten, such son or daughter born after the decease of his or her father, shall take the estate in the same manner as if he or she had been born in the lifetime of the father, although no estate shall have been conveyed to support the contingent remainder after his death; and hereafter, an estate of freehold or of inheritance may be made to commence *in futuro*, by deed, in like manner as by will." Hutch. Dig. 610.

When this statute was passed, neither the statute of Westminster, 2d, 13 Edward I., called the statute "*de donis conditionalibus*," nor the Statute of Wills, 32 Hen. VIII., was in force within this commonwealth. As early as the year 1807, all the statutes of England and Great Britain not re-enacted, were, by express enactment of the legislature, excluded from operation within the territory. Hutch. Dig. 65.

The whole doctrine, therefore, in regard to estates tail and executory devises, which was engrafted upon the statutes above named, never had existence in this State by any express or positive legislative enactment.

It must, however, be admitted, that the legislature, in passing the Act above quoted, proceeded upon the supposition, that it was competent and legal for testators to limit estates, by way of executory devises, which would not be valid according to the rules of the common law; and that our courts, in some instances, have gone upon the same supposition. There was, unquestionably, an implied legislative recognition under some modification, or to some extent, at the least, of the existence and legality of executory devises; for otherwise, the last clause of the 27th section of the statute would be unmeaning and useless. But, giving to the last clause of the section—which is the only provision contained in it

material to be noticed—the meaning which its words import, and the operation which the legislature must have intended, it will not be contended that it was designed to relax the rule against perpetuities, and to sanction limitations by way of executory devise, which, under that rule, would be void. The plain and expressed object was, simply to empower persons, by deed of conveyance, to limit certain estates which, theretofore, as the legislature supposed the law to stand, could only be done by the party in his last will and testament. And it is manifest that one of the main effects of the provision is, to destroy the characteristic differences then recognized by the law between remainders and conditional limitations, or executory devises.

The 26th section, as construed by this court, was not intended to authorize new limitations, upon contingencies not warranted by the common law. Its object was to apply a definite and fixed construction to certain words of frequent use in deeds and wills, in cases in which the grantor or testator had not, upon the face of the instrument, plainly and expressly declared the meaning to be otherwise. And having performed that office, it can have no effect whatever upon either the previous or succeeding limitations, or upon the capacity of the owner to dispose of his estate.

The 24th section was designed to have a much broader operation. By declaring that "every estate in lands or slaves, which now is or shall hereafter be created an estate in fee tail, shall be an estate in fee simple, absolute," the legislature must have intended to abolish estates tail, supposing them to exist under our law as it then stood, or it must have intended to limit the power which a man may have over his own estate, and to confine its exercise within the period of his own life. For, in these cases, the grantee, donee, or devisee, being vested with the unrestricted power of alienation, the dominion of the grantor or devisor over the estate would, of necessity, terminate with his own life.

There is nothing more certain than that the statute *de donis conditionalibus* never had existence or operation within this State; consequently, the whole system of rules in regard to estates tail, which was constructed upon it by the English courts, never was a part of our jurisprudence.

Therefore, notwithstanding the express declaration of the sta-

tute, that " every estate in lands, &c., which now is or shall here-
after be created an estate in fee tail, shall be an estate in fee sim-
ple," the position, that the legislature did not intend to strike at
estates tail, which never existed here, but designed to operate upon
estates known at the common law as fees conditional, taken by
counsel, is at the least, plausible.

Without admitting the correctness of this position, let it be con-
ceded, for the purpose of argument, that, in the enactment of the
24th section it was neither the purpose of the legislature to abo-
lish estates tail, nor to impose a rule which would effectually cut
off perpetuities of all kinds, but to abolish conditional fees, or to
enlarge them into fees simple absolute. The result would be that,
since the adoption of the statute, conditional fees cannot be created,
and that neither before nor since its enactment could an estate tail
be limited.

Under this view the question arises as to the effect of the pro-
viso, by which it is declared, "that any person may make a con-
veyance or devise of lands to a succession of donees then living,
and the heir or heirs of the body of the remainderman, and in
default thereof to the right heirs of the donor."

Where lands were conveyed to one and the heirs of his body, it
was a conditional fee at common law. If he had the specified
heirs the condition was held to be performed, and the estate became
absolute, at least so far as the power of alienation was concerned.
If he died without issue, or the issue failed at any subsequent
period, without having aliened the estate, it reverted to the donor.
And this was a condition implied in the nature of the estate,
whether there was or was not an express provision made for a
reverter, in the event of a failure of the heirs of the body of the
donee.

Upon the hypothesis that the 24th section has reference to con-
ditional fees, the effect in the case supposed would be to convert
the fee conditional into a fee simple absolute, thereby making the
estate descendible to the heirs general of the donee, and destroy-
ing the reversion which otherwise would have remained in the
donor.

Now, it is manifest that the proviso must perform one of two
offices. First. It must in all cases authorize a conditional fee to

be limited to "the remainderman and the heirs of his body," freed from the operation of the statute. But this construction would effectually destroy the efficacy of the statute: it would render the proviso repugnant, and therefore void. Or, Second. It authorizes a limitation of such an estate to "the remainderman and the heirs of his body," and by inserting a clause providing for a reverter, in the event of a failure of his issue, secures the reversion to the donor. But this construction is manifestly absurd, if the main object of the statute be to make the conditional fee a fee simple absolute, thereby securing to the donee the unrestricted power of alienation. For in all cases the donor, by inserting the clause for a reverter, could suspend the power of alienation during the lifetime of the donee; and in the event of the donee or remainderman dying without issue, secure the reversion to his own right heirs.

It seems, hence, very clear, that this cannot be the true construction of the statute.

We must, we think, look at the statute as one, the express object of which was to abolish estates tail, which the legislature supposed were sanctioned by the law, and to construe it accordingly.

And thus regarding it, the object and effect of the proviso, beyond question, are not to allow an estate tail to be limited directly to one, or where there are a succession of donees to the remainderman. For if this could be done, in accordance with the legitimate construction, one of two results would follow. First. In all cases where an estate, under the proviso, is conveyed or devised to a man and the heirs of his body, either directly or to the remainderman, when preceded by a particular estate, the lineal heirs of the tenant in tail, to the remotest posterity, would take in succession, unaffected by the general provisions of the statute. Or, Second. The estate tail would be converted by the statute into a fee simple absolute. In the one case the manifest policy and declared object of the statute would be entirely defeated; in the other, the proviso would be utterly nugatory.

The manifest object of the legislature was, by converting fees tail into fees simple, to withdraw the restraints upon the alienation of property imposed by the system of entailments, and to render the property of the community subservient to the purposes of the

community; to restrain the power which most persons are prone to exercise, of directing the descent and providing for the enjoyment of their estates after they have ceased to exist; and to prevent inequality in the condition of families, which would most likely be produced by that means.

If we stop at the proviso, we shall find that the power to control the disposition of his property, and to restrict the right of alienation in regard to it, is bounded by the time when the owner shall cease to live, or at which he has parted with his estate. But the legislature thought, and thought wisely, that the right of alienation might, consistently with sound policy, be suspended for a limited period of time after a person, either by conveyance or devise, has divested himself of the ownership of his estate. It has accordingly fixed that limit to a life or lives in being, giving to the donor or devisor the right to limit the ultimate fee to the heirs of the body of the remainderman; and in default of such heirs, to his own right heirs. Within this limit, the partial interests or particular estates given to the successive donees, may, without doubt, be created by deed, or limited by executory devise. Whatever interest the donor or devisor may choose to give to the remainderman, where the estate is conveyed to a succession of donees, with a limitation over to the heirs of his body, it is certain that it cannot be an estate of inheritance, as the heirs of the body of the remainderman must take, if they take at all, as purchasers, and not as heirs.

And finally, it may, with certainty, be affirmed, that there is nothing in the proviso, or upon the face of the statute, or within its equity, nor any consideration arising from the policy indicated by the law from which the authority can be inferred to limit an estate upon a contingency which is not to happen within the compass of time prescribed by the proviso to the 24th section of the Statute.

The modes of transmission and acquisition of estates are regulated by the positive provisions of the law. In all cases of grant or devise, the question of the power or capacity of the grantor or devisor is essentially involved. When we assert the want of power, we decide upon the invalidity of the grant or devise. Now, if we test the validity of the limitation in question by the provisions of

the statute, it is seen clearly, that it is not only unauthorized, but repugnant to the obvious policy of the law.

We have been referred to the decisions of the courts in several of the States of this confederacy, and particularly to those of the courts of Virginia, from whose code of statute law, in force at the adoption of our code, in 1822, our statutes have been mainly drawn.

But these decisions, for manifest reasons, constitute neither argument nor authority to guide us in the construction of our own statute. First. Because the statute *de donis conditionalibus*, was, at a very early date, re-enacted by the colonial legislature of Virginia; and the doctrines of the English courts in regard to estates tail and executory devises, fully recognised. Second. Because, when estates tail were abolished, the legislature of the State expressly recognized the validity of executory devises. Third. And more especially, because our statute contains the proviso which we have been considering, which renders the legislation of this State, on the subject, materially and essentially different from that of Virginia.

This court, in the cases of *Renich* v. *Carroll*, 7 S. & M. 798; *Kirby* v. *Calhoun*, 8 Ib., and *Lambden* v. *Rucker*, 12 Ib., has recognized the validity in regard to both real estate and personal property, of limitations by way of executory devise. But the decisions in these cases, in connection with the question before us, require no comment; as in neither was it holden that broader limits were allowed for executory devises than the boundaries prescribed by the proviso to the 24th section.

Let the decree of the Superior Court of Chancery be reversed, and the bill dismissed.

A petition for a re-argument was filed, but overruled.

NOTE.—The reporter is indebted to W. P. Harris, Esq., for the very lucid syllabus in this case.